U.S. SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/7/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
GREGORY MANGO,                      :
                                    :      17 Civ. 6784 (VM)
                    Plaintiff,      :
                                    :
    - against -                     :      **DECISION AND ORDER**
                                    :
BUZZFEED, INC.,                     :
                                    :
                    Defendant.      :
-----------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Gregory Mango ("Mango") brings this action against defendant BuzzFeed, Inc. ("BuzzFeed"), alleging that BuzzFeed reproduced and published without authorization a copyrighted photograph taken and owned by Mango (the "Photograph"). (See "Amended Complaint," Dkt. No. 16.) Mango alleges that he created the Photograph, which depicts a man named Raymond Parker ("Parker") sitting on a couch, and licensed the Photograph to the *New York Post*, a daily newspaper. Mango alleges that BuzzFeed subsequently published a copy of the Photograph on its website, BuzzFeed News, without licensing the Photograph or otherwise obtaining Mango's permission to do so. (See id. ¶¶ 17-26.) On these facts, Mango brings claims for copyright infringement (Count I) and for the removal of copyright management information (Count II). (See id. ¶¶ 27-42.)

1

After the Court denied Mango's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the case proceeded to a bench trial on both counts. (See Dkt. Nos. 30, 32.) Ahead of the trial, the parties stipulated to BuzzFeed's liability as to Count I. (See Dkt. No. 46.) After trial, the parties submitted letters pertaining to the elements of Count II. (See "BuzzFeed Oct. 8 Letter," Dkt. No. 52; "Mango Oct. 11 Letter," Dkt. No. 54.) The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT[1]

Mango is a professional photographer who makes a living licensing his work, such as the Photograph, to media companies. Mango licenses his photographs in a few ways. Chiefly, Mango works on freelance assignments for the *New York Post*, licensing his photographs to the newspaper in exchange for a daily rate of $300. Sometimes, however, Mango personally negotiates a license for a certain photograph or set of photographs. Mango has personally negotiated licenses

---

[1] While the Court has reviewed and considered all of the live testimony and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to its legal conclusions. Except where specifically referenced, no further citation to these sources will be made.

to his photographs with other large media companies for fees ranging from $250 to $750 per photograph. For obvious business reasons, Mango begins these negotiations with a high opening fee offer and generally prefers to license sets of photographs at a lower fee per photo, but larger overall fee. Such opportunities for negotiation arise partly from his work for the *New York Post*, because media companies sometimes seek to license photographs that they first see published in the newspaper. As a final method of licensing his work, Mango syndicates some of his work via photography agencies, which then negotiate licenses on his behalf.

Mango created the Photograph while working on one of his usual freelance assignments for the *New York Post*. On January 18, 2017, Mango was covering the story of Parker, the lead figure in a discrimination lawsuit against New York City brought by federal prosecutors. The *New York Post* used the Photograph on its website in a January 18, 2017 article about Parker and the lawsuit (the "*New York Post* Article"). The name "Gregory P. Mango" appeared in a separate line of text below the Photograph but above the article text. Credits such as this one are commonly known in the industry as "gutter credits" and are often placed adjacent to photographs to

3

indicate its photographer.[2] When the Photograph is downloaded from the *New York Post* Article, its metadata does not contain any gutter credit or other attribution to Mango, but provides a hyperlink to the *New York Post* Article.

The Photograph appeared on BuzzFeed News months later, when a veteran BuzzFeed reporter covered a development in Parker's case. On April 10, 2017, federal prosecutors announced that New York City settled the lawsuit involving Parker. The next day, Gregory Hayes ("Hayes") wrote an online article for BuzzFeed covering the lawsuit (the "BuzzFeed Article"). Hayes has written over a thousand articles for BuzzFeed, each of which is usually accompanied by at least one photograph. Hayes obtains photographs from a variety of sources: stock photography agencies, staff photographers, and freelance photographers. In some instances, an editor might find a photograph for Hayes's article. BuzzFeed trains reporters like Hayes to determine the origin of photographs and instructs them never to use photographs without permission. Unsurprisingly then, Hayes's articles always included gutter credits underneath photographs. Hayes testified that he understands he is required to obtain

---

[2] The parties stipulated during trial that an online archival website, the Wayback Machine, indicates that the gutter credit for Mango existed as of January 20, 2017. (Trial Tr. at 120.)

4

permission and credit photographers for their work, and that he has repeatedly done so in the past. Despite his training and knowledge of BuzzFeed's rules about obtaining permission for photographs and crediting photographers, Hayes included in the BuzzFeed Article an unlicensed copy of the Photograph without attribution to Mango.

The parties stipulated that BuzzFeed's use of the Photograph was unlicensed, but presented conflicting evidence on how this unlicensed use occurred. Hayes maintained that Liane Fisher ("Fisher"), Parker's attorney, gave him permission on a telephone call to use the Photograph, but Fisher denied -- albeit tentatively -- that she gave him permission.

The events before and after the telephone call are clear. At about 10:54 a.m. on April 11, 2017, Hayes reached out to Fisher via email, seeking comment about the settlement for his article. About twenty minutes later, Fisher replied to the email to say she would call within the hour. Hayes followed up quickly to that response by asking Fisher to send a photograph of Parker. The two spoke on the telephone at some point later that day, but Fisher never sent Hayes a photograph of Parker. Instead, Hayes downloaded the Photograph from the *New York Post* Article at around 11:48

a.m. that morning. Hayes testified that he did not see the gutter credit when he downloaded the Photograph. The Photograph was then published with the BuzzFeed Article with a gutter credit listing "Fisher & Taubenfeld," Fisher's law firm. Hayes created this gutter credit. The BuzzFeed Article also hyperlinked to the *New York Post* Article.

The conflicting evidence thus centers around what Hayes and Fisher said during the telephone call. The Court recognizes that evaluating the competing accounts of the telephone call and surrounding events rests largely on a determination of the witnesses' credibility. The Court also recognizes that "[c]redibility determinations are among the most subtle a fact-finder is called upon to make" because "they involve complex assessments of demeanor, bias, motive, consistency, probability, memory, and a host of other factors." Starr Intern. Co., Inc. v. American Intern. Group, Inc., 648 F. Supp. 2d 546, 550 (S.D.N.Y. 2009). Further, self-interest "creates such a powerful incentive to shade the truth that it is unusual for an interested witness to be totally candid." Id.

Hayes testified that during the telephone call, Fisher advised him to use the Photograph, but the evolution and context of that testimony is telling. In addition to Hayes's

unexplained conduct and shifting testimony, the Court also takes into account his obfuscatory and defensive demeanor in the courtroom during his testimony.

To start, Hayes first asserted the Photograph was "given" to him despite conceding early on that he downloaded the Photograph from the *New York Post* Article. (Trial Tr. at 33-34.) He then clarified that he was "given access" to the Photograph. (Id.) Hayes later stated that Fisher "advised" him to use the Photograph from the *New York Post* Article and stated that she had the authority to distribute the Photograph to media outlets. (Id. at 100.)

Fisher does not recollect her telephone call with Hayes in any detail. When asked whether she directed Hayes to the Photograph, she testified "I don't remember, but I don't believe so." (Id. at 59.) Fisher also testified that she "just can't imagine that I talked to him or gave him permission to use a picture that I myself had no authority to give permission for." (Id. at 67.) Fisher's candid admission of her uncertainty bolsters her credibility, and the Court notes that Fisher does not face the same "powerful incentive" of self-interest as Hayes. Starr Intern., 648 F. Supp. 2d at 550.

7

Fisher's uncertain testimony must be balanced against Hayes's credibility problems and unexplained conduct. First, Hayes did not explain why he never contacted the *New York Post* to determine the origin of the Photograph, contrary to BuzzFeed's policy. His lack of diligence diminishes the import of his repeated emphasis that he simply never saw Mango's name in the gutter credit. And even that testimony is hard to credit. Hayes described the gutter credit as faint and difficult to read, but, when pressed by the Court, he was able to make out the gutter credit clearly from a few feet away on a computer monitor. (Id. at 114.) Thus, even if it was faint, Hayes would have seen the gutter credit had he looked for it. As noted earlier, Hayes is a veteran reporter who is familiar with the importance of obtaining permission to use photographs and the use of gutter credits. His experience as a veteran reporter also makes the lack of author information in the metadata irrelevant, because Hayes could have contacted the *New York Post* to determine the Photograph's origin.

Finally, Hayes's certitude at trial that Fisher gave him oral permission to use the Photograph is belied by his belief almost a year earlier that Fisher had specifically emailed him the Photograph. In September 2017, when Hayes learned of

8

Mango's claim against BuzzFeed for its use of the Photograph, he emailed Fisher about the Photograph. He wrote that "[i]t is my recollection that your firm provided this photo to us for the story, but I can't seem to find the email in my inbox." (Pl. Ex. 81.) Fisher was unable to find such an email and suggested that perhaps Parker himself provided the Photograph to BuzzFeed. (Pl. Ex. 85.) Hayes never explained why, months before trial, he thought Fisher emailed him the Photograph, but at trial he was certain she advised him to use the one featured in the *New York Post* Article.

In sum, despite Fisher's uncertainty, the Court credits her testimony that she likely would not have directed Hayes to the *New York Post* Article in order to use the Photograph it featured. Based on Hayes's experience and training, he knew what a gutter credit was and where to look for it, and even if he never saw it, he could have followed BuzzFeed's policies and contacted the *New York Post* to determine the origin of the Photograph.

## II. CONCLUSIONS OF LAW

The Court considers Mango's claim of copyright infringement and removal or alteration of copyright management information in turn.

9

A. COUNT I

BuzzFeed has already stipulated to its liability under Count I, thus the only determination left for this Court is the appropriate amount of damages. Mango seeks $30,000 in statutory damages. As the Court summarized in its Order regarding the parties' motions in limine:

> Section 504 of the Copyright Act provides that a copyright owner may elect to pursue either actual damages or statutory damages as a remedy for copyright infringement. See 17 U.S.C. § 504; see also Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339, 356 (S.D.N.Y. 2017). Statutory damages may range from $750 to $30,000 for each copyrighted work, although a court may increase the award up to $150,000 for willful infringement and may decrease it to $200 for an innocent infringement. See 17 U.S.C. §§ 504(c)(1), (2). In determining the amount of statutory damages, a court considers: "(1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." Bryant v. Media Right Prods., Inc., 603 F.3d 135, 144 (2d Cir. 2010).

Mango v. BuzzFeed, Inc., 316 F. Supp. 3d 811, 813-14 (S.D.N.Y. 2018).

The Court further explained that, "courts in this Circuit commonly award, in cases of non-innocent infringement, statutory damages of between three and five times the cost of the licensing fees the defendant would have paid." Id. at 14 (citing Broad. Music, Inc. v. Prana Hosp., Inc., 158 F. Supp. 3d 184, 199 (S.D.N.Y. 2016)). In order to

show non-innocent infringement, a plaintiff must prove that a defendant "had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility." Bryant, 603 F.3d at 143; see also Agence France Presse v. Morel, 934 F. Supp. 2d 547, 570 (S.D.N.Y. 2013) (considering "whether the infringer was on notice that the copyrighted work was protected; whether the infringer had received warnings of the infringements; [and] whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent" when evaluating defendant's willfulness (internal quotation marks omitted)). Thus, in calculating statutory damages, the Court must determine both the licensing fee BuzzFeed would have paid Mango, as well as the appropriate multiplier of that fee.

Turning first to the appropriate multiplier for the statutory damages award, the Court is persuaded the multiplier should be at the higher end of the range typically awarded by courts in this district. As described above, Hayes is a veteran reporter familiar with the concept of a gutter credit and he had the ability to contact the *New York Post* about the Photograph. The context of his use of the Photograph and substitution of "Fisher & Taubenfeld" in place of "Gregory

11

P. Mango" justify a finding of willfulness with a resulting statutory damages award five times the licensing fee that BuzzFeed would have paid.

Next, the Court finds that BuzzFeed would have paid a licensing fee of at least $750 for the Photograph. Mango has previously negotiated licenses for his photographs in the range of $250 to $750 per photograph. His negotiation process accounts for the budget of the licensee, medium of the work, duration of the license, rarity of the work, and newsworthiness of the subject, among other considerations. Although BuzzFeed cross-examined Mango and focused on the cheaper licenses third-party photography agencies negotiated on Mango's behalf, BuzzFeed did not call any of its own experts to contest Mango's approach to valuing personally negotiated licenses.

Because BuzzFeed would have had to negotiate the license with Mango personally to obtain the Photograph, the Court finds that the fees that Mango personally negotiated in prior licenses are the best approximations for the licensing fee Mango would have received for the Photograph. See Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339, 359 (S.D.N.Y. 2017) (identifying the "closest proxy" for the licensing fee defendant would have paid, in the absence of

12

existing licensing for comparison). Mango had previously negotiated licenses in the narrow range of $250 to $750 per photograph, with multiple licenses for at least $500 per photograph. Mango testified he would have begun the negotiations for licensing the Photograph above that range, at an offer of $1,000 based on the above considerations. Of course, this would have just been the opening bid in a negotiation that would have likely resulted in a lower licensing fee, although Mango could not answer how much he would have accepted for the Photograph. In this instance, given both the relatively narrow range of licensing fees at issue and Hayes's willful conduct that deprived Mango of the opportunity to negotiate, the Court resolves any uncertainty about the hypothetical licensing fee after a negotiation in Mango's favor. The Court finds that $750, the top of the range for negotiated fees, is an appropriate hypothetical licensing fee.

In sum, the Court is persuaded that BuzzFeed's infringement was willful and awards statutory damages to Mango of five times a licensing fee of $750, for a total of $3,750 for Count I.

B. COUNT II

The 1998 Digital Millennium Copyright Act ("DMCA")
protects against the removal or alteration of copyright
management information ("CMI"), which is defined in part as
identifying information about the author of a work "conveyed
in connection with" the work. 17 U.S.C. § 1202(c). Pursuant
to the DMCA:

> No person shall, without the authority of the
> copyright owner or the law --
>
> (1) intentionally remove or alter any copyright
> management information,
>
> (2) distribute or import for distribution copyright
> management information knowing that the copyright
> management information has been removed or altered
> without authority of the copyright owner or the law, or
>
> (3) distribute, import for distribution, or
> publicly perform works, copies of works, or
> phonorecords, knowing that copyright management
> information has been removed or altered without
> authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under
> section 1203, having reasonable grounds to know, that it
> will induce, enable, facilitate, or conceal an
> infringement of any right under this title.

17 U.S.C. § 1202(b).

Thus, by it terms, section 1202(b) prohibits three kinds
of acts, each corresponding to its numbered subparts. The
first is the removal or alteration of CMI (the
"Removal/Alteration Prohibition"). The second is the
distribution of CMI with missing or altered information. The

14

third is the distribution of works with missing or altered CMI (the "Distribution Prohibition").

Relatively few courts in the Second Circuit have addressed the Distribution Prohibition at issue in Count II.[3] Notably, the Court of Appeals for the Second Circuit has not yet interpreted section 1202(b) in any fashion. Further, the Removal/Alteration Prohibition is much more commonly addressed by district courts in the Second Circuit than the Distribution Prohibition. The Court thus turns to those courts' treatment of the Removal/Alteration Prohibition for guidance. Those courts commonly list the elements of proof for the Removal/Alteration Prohibition as requiring: "(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." E.g., Janik v. SMG Media, Inc., No. 16 Civ. 7308, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018) (quoting Gattoni v. Tibi, LLC, 16 Civ. 7527, 2017 WL 2313882, at *4 (S.D.N.Y. May 25, 2017)).

Because the Distribution Prohibition and Removal/Alteration Prohibition are both subparts of section 1202(b) and structured similarly, the elements of the

---

[3]     Mango's Amended Complaint arguably made out claims under both the Removal/Alteration Prohibition and the Distribution Prohibition, but at trial Mango argued for liability on the Distribution Prohibition.

15

Removal/Alteration Prohibition is a helpful starting point for determining the elements for the Distribution Prohibition. Using that test as a framework, a similar formulation for less-commonly addressed Distribution Prohibition would be: (1) the existence of CMI on the infringed work; (2) distribution of the infringed work containing missing and/or altered CMI; and (3) that the distribution was done knowing that the CMI was removed and/or altered without permission.

As the parties' post-trial letters regarding the Second Circuit's summary order in Krechmer v. Tantaros, No. 17 Civ. 4061, 2018 WL 4044048 (2d Cir. Aug. 24, 2018), make clear, however, both of these formulations fail to capture part of the statute's scienter requirements. (See BuzzFeed Oct. 8 Letter at 1; Mango Oct. 11 Letter at 1.) Specifically, as both parties agree, section 1202(b) has a "double scienter" requirement that applies to all three types of prohibition. They disagree, however, on what that requirement entails, and Krechmer provides limited guidance because it involves violations under section 1202(a), which contains different operative language than section 1202(b). BuzzFeed argues that Mango must prove that BuzzFeed "knew that the [CMI] being provided was false and that [BuzzFeed] intended to conceal

CMI." (BuzzFeed Oct. 8 Letter at 1.) Mango argues that he must show that (1) "Hayes distributed the Photograph having reasonable grounds to know that CMI was removed or altered" and (2) "Hayes [knew], or [had] reasonable grounds to know that he was not authorized to republish the Photograph." (Mango Oct. 11 Letter at 2.)

Neither of the parties' formulations are correct. BuzzFeed writes out the constructive knowledge feature of section 1202(b) entirely, whereas Mango improperly incorporates it into both scienter inquiries. The last paragraph of section 1202(b) makes clear what plaintiffs may prove only by constructive knowledge: knowledge that the alteration, removal, or distribution induces, enables, facilitates, or conceals infringement. See 17 U.S.C. § 1202(b). However, the three numbered subparts prohibiting alteration, removal, and distribution require plaintiffs to prove actual knowledge of the alteration or removal of CMI itself. See id.

Thus, for the Distribution Prohibition, Mango must show both that: (1) BuzzFeed distributed infringing works knowing that CMI was removed and/or altered without permission; and (2) BuzzFeed distributed works with removed and/or altered CMI having reasonable grounds to know such distribution "will

17

induce, enable, facilitate, or conceal an infringement." See
17 U.S.C. § 1202(b). This, in effect, adds a fourth element
to the Distribution Prohibition stated above. Therefore, the
elements of the Distribution Prohibition are: (1) the
existence of CMI on the infringed work; (2) distribution of
the infringed work containing missing and/or altered CMI; (3)
that the distribution was done knowing that the CMI was
removed and/or altered without permission; and (4) that the
distribution was done knowing that it would induce, enable,
facilitate, or conceal an infringement.

Applying these elements to the section 1202(b) claim
here, the Court concludes that BuzzFeed is liable on this
claim because: (1) the gutter credit here constitutes CMI;
(2) BuzzFeed distributed the Photograph with altered and
missing CMI without permission; (3) BuzzFeed distributed the
Photograph knowing its CMI had been removed and altered; and
(4) BuzzFeed had reasonable grounds to know that such removal
and distribution concealed a DMCA infringement.

First, the Court agrees with the reasoning of other
district courts that gutter credits constitute CMI under the
statute. As the one court in this district persuasively
argued, "the DMCA defines CMI as information 'conveyed in
connection with copies' of a work -- it does [not] require

18

the CMI to appear on the work itself." Agence France Presse v. Morel, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) (quoting 17 U.S.C. § 1202(c)) (emphasis in original); see also Janik, 2018 WL 345111, at *12 (noting that legislative history accompanying the DMCA explained that in section 1202, "[t]he term 'conveyed' is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed" (quoting S. REP. 105-190 at 35 (1998))). Thus, the gutter credit need not be on the Photograph or present in the Photograph's metadata to constitute protected CMI.

The determination of the second element is straightforward. BuzzFeed distributed the Photograph on its news website, with the altered gutter credit listing "Fisher & Taubenfeld." BuzzFeed did this without Mango's permission, as it stipulated.

Third, BuzzFeed knew the gutter credit was altered and removed because Hayes did the alteration himself. Hayes's testimony that the gutter credit was hard to see is not credible given Hayes's familiarity with gutter credits and the training he received from BuzzFeed. Moreover, Hayes's earlier insistence that he had received the Photograph from

19

.

Fisher -- rather than permission to use it -- undermines his credibility on this point.

Fourth, and for similar reasons, BuzzFeed had reason to know distribution with the altered CMI concealed infringement. Hayes testified that he understood from his training and experience that he was required to get permission to use photographs. Therefore, he should have reasonably known that altering the gutter credit to include a false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement.[4]

Having determined BuzzFeed's liability on Count II, the Court next addresses damages. Civil plaintiffs injured because of a DMCA violation may seek either actual damages or statutory damages of $2,500 to $25,000 per infringement. 17 U.S.C. § 1203(c). Mango seeks statutory damages of $5,000. Much like in the determination of statutory damages for copyright infringement, courts typically assess the "circumstances of the violation" and willfulness of the

---

[4] During its closing statement, BuzzFeed argued that Hayes's hyperlinking within the BuzzFeed Article to the *New York Post* Article belied any intention to conceal BuzzFeed's infringement. But again, this ignores Hayes's training and experience, which gave him reasonable grounds to know that his actions concealed an infringement. In fact, given Hayes's training and experience, BuzzFeed's argument would essentially preclude liability for any infringer who hyperlinks to the original work.

violation. Myeress v. Elite Travel Grp. USA, No. 18 Civ. 340, 2018 WL 5961424, at \*4 (S.D.N.Y. Nov. 14, 2018). The Court is persuaded that this modest amount accounts for BuzzFeed's willful conduct as described earlier with regards to Count I. This amount also avoids duplicating compensation for similar conduct as addressed in Count I and notes that district courts in the Second Circuit award amounts consistent with or above this figure. See, e.g., id. at \*4 (awarding $5,000 for single violation after default); Reilly v. Plot Commerce, No. 15 Civ. 5118, 2016 WL 6837895, at \*12 (S.D.N.Y. Oct. 31, 2016), report and recommendation adopted, (S.D.N.Y. Nov. 22, 2016) (recommending "$5,000 for each of the two violative acts" under the DMCA.); Sheldon v. Plot Commerce, No. 15 Civ. 5885, 2016 WL 5107072, at \*17 (E.D.N.Y. Aug. 26, 2016), report and recommendation adopted, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016) (awarding maximum statutory damages of $25,000 per DMCA violation).

## III. **ATTORNEYS FEES**

Mango requests that the Court award him costs and attorneys fees pursuant to Section 505 of the Copyright Act. See 17 U.S.C. § 505. "When determining whether to award attorneys fees, district courts may consider such factors as (1) the frivolousness of the non-prevailing party's claims or

defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively unreasonable; and (4) compensation and deterrence." Bryant, 603 F.3d at 144. "The third factor -- objective unreasonableness -- should be given substantial weight." Id. The first and third factor weigh heavily in Mango's favor. The Court first notes that BuzzFeed did not even contest its liability on Count I. Then, BuzzFeed generally offered a limited defense on the issues raised at trial beyond Hayes's questionable testimony. Although BuzzFeed was certainly permitted to contest whether its violation qualified as willful, that defense must amount to more than questioning Fisher's credibility and ignoring Hayes's conduct. These considerations persuade the Court that BuzzFeed's defenses, while perhaps not entirely frivolous, were severely defective. Turning to the fourth factor, though the award of statutory damages adequately compensates Mango, the Court finds that the more significant award of costs and attorneys fees stemming from litigation through trial is necessary for deterrence purposes.

Thus, the Court is persuaded that, as the prevailing party, Mango is entitled to reasonable attorneys fees and costs upon an application to the Court.

## IV. ORDER

For the reasons stated above, it is hereby

**ORDERED** that judgment be entered against defendant BuzzFeed, Inc. ("BuzzFeed") in favor of plaintiff Gregory Mango ("Mango") for copyright infringement under Count I. BuzzFeed shall be liable in the amount of $3,750.00 in statutory damages; and it is further

**ORDERED** that judgment be entered against BuzzFeed in favor of Mango for the alteration of copyright management information under Count II. BuzzFeed shall be liable in amount of $5,000.00 in statutory damages; and it is finally

**ORDERED** that Mango shall submit an application for reasonable attorneys fees and costs to the Court by February 1, 2019. BuzzFeed shall respond to the application by February 15, 2019. Mango's reply, if any, shall be submitted by February 22, 2019.

**SO ORDERED.**

Dated: New York, New York
17 January 2019

VICTOR MARRERO
U.S.D.J.

23