```
I8DJMAN1                      Trial
```

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  GREGORY MANGO,
 4              Plaintiff,
 5          v.                          17 Civ. 06784 VM
 6  BUZZFEED, INC.,
 7              Defendant.
 8  ------------------------------x
 9                                      August 13, 2018
                                        9:00 o'clock a.m.
10
11
12  Before:
13                      HON. VICTOR MARRERO,
14                                      District Judge
15
16                      APPEARANCES
17
18  LIEBOWITZ LAW FIRM, PLLC
         Attorneys for plaintiff
19  BY:  JAMES H. FREEMAN, Esq.
         JOSEPH ANTHONY DUNNE, Esq.
20               Of counsel
21  COWAN, DeBAETS, ABRAHAMS & SHEPPARD, LLP
         Attorneys for defendant
22  BY:  ELEANOR MARTINE LACKMAN, Esq.
         BRITTANY LAINE KAPLAN, Esq.
23               Of counsel
24  Also Present:
         GREGORY BREHM, VP & Assoc. General Counsel Buzzfeed, Inc.
25

```

I8DJMAN1                         Trial

1              (In open court)

2              (Case called)

3              THE COURT:  Good morning.  Thank you.  Be seated.

4         This is a proceeding in a matter of messenger versus

5    buff.  It is Docket No. 17 Civ. 6784.  We're here to proceed

6    with a Bench trial on the case.

7              The parties submitted a stipulation in which the

8    defendant accepted liability for copyright infringement by

9    virtue of the photograph that is at issue, and so what is here

10   today is a trial on the question of damages, if any, how much

11   and whether the defendant's conduct was sufficiently willful

12   and knowing to warrant punitive damages.

13             Is the plaintiff ready to proceed?

14             MR. FREEMAN:  Yes, your Honor.

15             THE COURT:  Ms. Lackman?

16             MS. LACKMAN:  Yes, your Honor.

17             THE COURT:  Are there any matters of procedure or

18   housekeeping or otherwise you may wish to discuss before we

19   proceed?

20             MR. FREEMAN:  We don't believe so, your Honor.  Thank

21   you.

22             MS. LACKMAN:  No, your Honor.

23             THE COURT:  In that case, let's go straight to it, Mr.

24   Freeman.

25             MR. FREEMAN:  May I have brief opening statement?

1              THE COURT:  How long?

2              MR. FREEMAN:  About 30 seconds.

3              THE COURT:  That is long enough.

4              MR. FREEMAN:  Back in December of 2017, the parties

5     submitted a joint letter to the court in which the plaintiff

6     indicated that we were seeking $30,000 in civil penalty for

7     violation of the Copyright Act, 17 U.S.C. 501, and we were also

8     seeking $5,000.00 for the defendant's violation of Section 1202

9     (b), and the evidence today will show why those substantial

10    damages award is warranted.  Thank your Honor.

11             THE COURT:  Thank you.  Ms.  Lackman.

12             MS. LACKMAN:  Yes, your Honor.

13             There is not much to respond to except the evidence

14    will show on both the way the damages calculated in this

15    district does not warrant a lift up to $30,000 for a photo at

16    most is worth $150.00 for license abuse.

17             Secondly, the Section 1202 claim is meritless on its

18    face.  There is, as the evidence will show, there is no

19    indication of not just willfulness and removal and claim

20    removal, but willfulness in the activities that are required

21    under the statute to be met, with a very high burden that 1202

22    requires.

23             THE COURT:  Mr. Freeman.

24             MR. FREEMAN:  We would like to call our first witness,

25    Mr. Michael Hayes.

1    MICHAEL HAYES,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5              THE COURT:  State your name and spell it for the

6    record.

7              THE WITNESS:  Michael Hayes, M I C H A E L, H A Y E S.

8              THE COURT:  Mr. Freeman.

9    DIRECT EXAMINATION

10   BY MR. FREEMAN:

11   Q.  Hello, Mr. Hayes.  Thank you for appearing today.

12             Would you please -- you stated your name for the

13   record.  What is your occupation?

14   A.  I'm a reporter.

15   Q.  Your title?

16   A.  Senior Reporter, Buzzfeed.

17   Q.  How long have you had that position?

18   A.  About five years.

19   Q.  What kind of news stories do you report?

20   A.  General news, breaking news, any news.

21   Q.  What is breaking news?  How would you define it?

22   A.  That is kind of a strange.question.  It is any activity

23   that merits news coverage.

24   Q.  Are you under time pressure to post news articles that you

25   would characterize as breaking news?

I8DJMAN1                         Hayes - direct

1    A.  I wouldn't call it pressure.  There is an expectation to

2    produce articles in a timely manner.

3    Q.  Does it matter whether you break the news before a

4    competitor reports on the same story?

5    A.  Sometimes.

6    Q.  How long have you worked at Buzzfeed?

7    A.  Since March 2011.

8    Q.  So about seven and a half years?

9    A.  Yes.

10   Q.  Prior to becoming a senior reporter, what was your

11   position?

12   A.  Social media editor.

13   Q.  Did the position of social media editor involve the use of

14   photographs?

15   A.  Yes.

16   Q.  While a social media editor for Buzzfeed, did you credit

17   photographers for their work?

18   A.  Yes.

19   Q.  In your current position as senior news editor, do you

20   customarily credit photographers by name?

21   A.  By name or by photo outlet.

22   Q.  Do you have an educational background in journalism?

23   A.  Yes.

24   Q.  Where did you attend school?

25   A.  Fordham University.

I8DJMAN1                          Hayes – direct

1    Q.  Did you study photojournalism at Fordham?

2    A.  No.

3    Q.  Did you take a course in media law?

4    A.  Yes.

5    Q.  At Fordham, did you learn whether photographers are

6    supposed to be credited for their work?

7    A.  Yes.

8    Q.  Did you learn whether photojournalists or photographers are

9    considered the owners of the photographs they take?

10   A.  I don't recall every aspect of my education.

11   Q.  Where did you work as a journalist before joining Buzzfeed

12   in March of 2011?

13   A.  I worked freelance.

14   Q.  Did you use photographs in those positions?

15   A.  Yes.

16   Q.  Did you credit the photographer when using a photograph at

17   those positions?

18   A.  Yes.

19   Q.  Have you ever worked as a photographer or photojournalist?

20   A.  I have produced news articles where I've incorporated my

21   own photography.

22          MR. FREEMAN:  At this time, I would like to mark for

23   identification Plaintiff's Exhibit 37 and I would like to ask

24   the court's permission to approach the witness with the

25   exhibit.

I8DJMAN1                          Hayes – direct

 1          THE COURT:  Yes.  (Pause)

 2          Let me ask the parties whether they prepared a binder

 3    of exhibits that are not objected to?

 4          MR. FREEMAN:  We have prepared one binder, your Honor.

 5          THE COURT:  Are the exhibits in the binder all not

 6    objected?

 7          MR. FREEMAN:  I believe there is going to be some

 8    exhibits in the binder that will be objected to.

 9          THE COURT:  Well, would you be able to identify those

10    now?

11          MR. FREEMAN:  We could do that, yes, your Honor.

12          Of course, you know, Ms. Lackman, we have had on

13    Thursday, we had an hour-long conversation, we walked through

14    each exhibit, so Ms.  Lackman did want to reserve certain

15    objections, but we can walk through that now.

16          So there is not going to be an objection to Plaintiff

17    Exhibit 11.  Plaintiff's Exhibit 13 to 19 --

18          MS. LACKMAN:  Wait.  Hold on a second.

19          So there is also in the interim the parties discussed

20    the fact that the plaintiff is not going to be using every

21    exhibit in the binder, so there are some exhibits to which we

22    do reserve objections, but as of Thursday it was still not

23    clear what the ultimate scope of exhibits were going to be from

24    the plaintiff.

25          So I will take, to the extent we are going through the

I8DJMAN1                         Hayes - direct

1    pretrial order and that sort of thing, if we maintain an

2    objection, I'll take the fact Mr. Freeman is going over it to

3    mean it is not going to be included.

4               MR. FREEMAN:  Correct.  In other words, your Honor,

5    the joint pretrial order contains 95 exhibits, but we

6    substantially reduced those.  In the table of contents in the

7    trial binder that has been provided to your Honor as as well to

8    defendant's counsel, there is substantially less, and we could

9    also state that many of these exhibits -- for example,

10   Plaintiff's Exhibit 13 to 19 -- are news articles in which Ms.

11   Lackman intends to object on the basis of hearsay.  We have

12   prepared a very brief Bench memorandum to address that issue.

13              There is also, let's see, exhibits, Plaintiff exhibit

14   29 to 35 are all default judgment orders which the defendant

15   objects to putting into evidence.

16              Plaintiff's Exhibit 37, which is before the witness at

17   this time, I am not sure if you're still maintaining an

18   objection to that.

19              Plaintiff's Exhibit 38, 39, 41 and 44 are all news

20   articles that were written by the witness.  I don't intend to

21   walk through all four.  I would like to do at least one or two.

22   I am not sure if Ms. Lackman still maintains an objection to

23   those.

24              Plaintiff Exhibit 48 is a docket sheet from Massey

25   versus Buzzfeed.  I anticipate that Ms. Lackman will make an

I8DJMAN1                        Hayes - direct

1    objection to the admissibility of that document on relevance.

2    No objection to Plaintiff's Exhibit 69.  No objection to

3    Plaintiff's Exhibit 72 through 81.

4         Ms.  Lackman will need to inform us if she has

5    objections to 83, 84, 85.  Then that leaves us with Plaintiff's

6    Exhibit 88, 89, 90 and 91, which are all the licensing fee

7    transactions as well assume areas thereof.  Both sides have

8    summarized the licensing fee evidence.

9         We don't plan to object to the admissibility of the

10   defendant's submissions.  We just believe the submission is not

11   entitled to any weight.  I don't know if Ms. Lackman is going

12   to maintain objections to the licensing fee transactions.

13        Plaintiff's Exhibit 93 is correspondence between

14   plaintiff's counsel and defendant's counsel regarding discovery

15   deficiencies.  Plaintiff's Exhibit 95 is another default

16   judgment.  96 is a stipulation of facts.

17        So at this stage if Ms. Lackman -- I think we worked

18   together to resolve these objections.  I am not anticipating

19   that there is going to be many, but perhaps Ms. Lackman would

20   like to explain if there is any that she objects to at this

21   stage.

22        MS. LACKMAN:  Sure.  So the news articles all go to an

23   issue on which the court has already ruled.  They appear to go

24   through the purported size and value of my client.  The court

25   has already granted a motion in limine as to that topic in

1   general.  It is also hearsay, classic hearsay they're offering

2   for the truth of the matter asserted.  We dispute that any of

3   that should come in.  Of course, the court already made a

4   ruling on this issue and, therefore, on relevance.  Therefore,

5   they should not come in for that reason as well.

6          Default judgment rulings, we don't believe are

7   evidence.  These are orders of the court.  They are not

8   relevant to this case, and so we believe they should not come

9   in as evidence on that ground.

10          Other articles written by Mr. Hayes, I am not quite

11   sure how they are hearsay.  I am not quite sure how they're

12   intended to be used, and I think it makes sense to reserve an

13   objection until that time.  I don't anticipate one, but it is

14   possible that this could arise, it could be used in a hearsay

15   manner.

16          Docket sheets again are not evidence, a different

17   case, apropos of nothing, essentially it is 402 and 403

18   evidence or should be ruled on and rejected under those rules

19   and should not come in, and we shouldn't spend time going

20   through docket sheets for decisions that have nothing to do

21   with this case.  They can be raised if Mr. Freeman so chooses.

22   He can raise them in his post-trial briefing or otherwise.

23          Summaries of the licensing, Mr. Freeman is correct

24   both parties have summarizing licensing.  We have objections as

25   to whether the summaries are actual summaries or not.  I think

I8DJMAN1                      Hayes - direct

1    Mr. Freeman feels the same way about ours.  I have no objection

2    to the parties, to Mr. Freeman using that, assuming he has no

3    objection to our using it, and we can look at the admissibility

4    and weight for that.

5           As to correspondence between Mr. Freeman and me, I

6    don't think anybody wants that.  I don't think it is relevant.

7    I object.  I don't know that it has to do with anything.  It is

8    discussion between the parties regarding scheduling this case.

9           The matter was never brought to the court.  There was

10   no motion to compel, so we think that should be stricken, too,

11   and in that respect, that would reduce the volume significantly

12   of exhibits that remain in this case.  This is not a

13   document-intensive case.

14           THE COURT:  Thank you.

15           So in order to move as smoothly and efficiently as

16   possible, what the parties should do is if you come upon or

17   you're about to introduce a document, an exhibit that is not

18   objected to, I will assume on the record that it is admitted.

19           If there is an objection, then at that point we'll be

20   able to deal with it.

21           MR. FREEMAN:  May I proceed?

22           THE COURT:  Mr. Freeman.

23   BY MR. FREEMAN:

24   Q.  Mr. Hayes, I would like to direct you to the exhibit marked

25   37.  At the top of this document do you recognize the URL as

1   Buzzfeed dot com/my case?

2   A.  Yes.

3   Q.  And Mr. Hayes and URL refers to you, correct?

4   A.  Yes.

5   Q.  Is it accurate to say this document contains screen-shots

6   taken from the URL?

7   A.  Yes.

8   Q.  The document contains headlines of articles that you've

9   written for publication by Buzzfeed?

10  A.  Yes.

11          MR. FREEMAN:  Plaintiff respectfully moves the court

12  for admission of Plaintiff's Exhibit 37.

13          MS. LACKMAN:  No objection to the extent it is

14  represented as being true and accurate.

15          (Plaintiff's Exhibit 37 received in evidence)

16  BY MR. FREEMAN:

17  Q.  Mr. Hayes, in the left-hand column you see, are these

18  thumbnails of photographs that were published along with each

19  article?

20  A.  Yes.

21  Q.  Is it accurate to state each of the news articles you've

22  written for Buzzfeed includes photographs?

23  A.  Yes.

24  Q.  Approximately how many Buzzfeed articles do you write per

25  day?

I8DJMAN1                         Hayes – direct

1    A.  It varies.

2    Q.  And per week?

3    A.  It also varies.

4    Q.  Can you give me a ballpark.

5    A.  Some days I write multiple articles, sometimes I write one

6    article a month.

7    Q.  I see.  Any idea how many per year?

8    A.  No.

9    Q.  Do all the news articles you write contain photographs?

10   A.  I would say yes.

11   Q.  When you publish a news story to Buzzfeed's web site, do

12   you personally upload that photograph which accompanies each

13   story?

14   A.  Not always.

15   Q.  So what would be circumstances where you don't upload the

16   photograph personally?

17   A.  An editor or our photo editor might upload the photo.

18   Q.  Where do you obtain photographs for use in your news

19   stories?

20   A.  Wire services, we have photographers on staff.  We also

21   hire freelance photographers.

22   Q.  Do you ever obtain them from what is called stock photo

23   agencies such as Getty Images or Polaris?

24   A.  Yes.

25   Q.  Do you ever personally contact photographers directly?

1    A.  I don't understand the question.

2    Q.  In other words, if you want to use a photograph for a

3    particular story, do you ever investigate the name of the

4    photographer and pick up the phone and call the photographer

5    directly to see if you could obtain permission to use the

6    photograph?

7              MS. LACKMAN:  Objection.  This calls for speculation?

8              THE COURT:  Overruled.

9    A.  I am sorry.  I don't understand the question.

10   BY MR. FREEMAN:

11   Q.  If you want to use a photograph for a news story, and you

12   want to include that photograph in your news story, do you ever

13   investigate the name of the photographer and attempt to contact

14   the photographer to obtain his or her permission to use the

15   photo?

16   A.  I have contacted photographers and asked to use their

17   photos, yes.

18   Q.  Does Buzzfeed employ photographers on staff?

19   A.  Yeah.  I already said that.

20   Q.  My apologies.

21              Before posting a photograph to Buzzfeed's web site in

22   connection with the news article you write, do you need to

23   obtain clearance from the legal department at Buzzfeed?

24   A.  Not always.

25   Q.  What circumstances would you be required to obtain

1   clearance?

2              MS. LACKMAN:  Objection.  We say this is privileged.

3              THE COURT:  What is privileged?

4              MS. LACKMAN:  A discussion as to when and whether he

5   consults counsel regarding whether a photograph can be used.

6              THE COURT:  Overruled.

7   A.  Would you repeat the question.

8   BY MR. FREEMAN:

9   Q.  Before posting a photograph to Buzzfeed's web site, do you

10  need to obtain clearance from the legal department?

11  A.  Not always.

12  Q.  Under what circumstances would you be required to obtain

13  clearance to post a photograph?

14  A.  From the legal department?

15  Q.  Yes.

16  A.  Our legal department reviews some, not all articles before

17  publication.  In the instance where they review the article,

18  that would include reviewing the photos or artwork.  In that

19  case, I would say that constitutes our lawyer's reviewing the

20  photos and artwork in a story.

21  Q.  I see.  So if the subject matter of the news article calls

22  for the legal department to review it, then in that

23  circumstance they would also review the use of the photograph?

24  A.  I am not sure I understand what you're saying legal.

25              If you want me to repeat myself, some articles are

I8DJMAN1                    Hayes - direct

1    reviewed by our legal department for publication.  Through

2    those reviews they also review the artwork.

3    Q.  Are you the one who selects what content or subject matter

4    you're going to write about on any given day?

5    A.  Sometimes I select my own stories.  Sometimes it is

6    assigned to me.

7    Q.  Does Buzzfeed provide you with a weekly budget for

8    licensing photographs?

9    A.  I'm not sure I understand the question.

10   Q.  For example, would you say that if you want to use a

11   photograph, a licensing fee needs to be paid to the

12   photographer?

13   A.  Not always.

14   Q.  Does a licensing fee need to be paid to the copyright

15   owner?

16   A.  We subscribe to Getty AP Images, Reuters Photo Services,

17   and typically use those photos and there's very little

18   discussion for including them in articles.

19   Q.  But does Buzzfeed say to you, for example, you have $500.00

20   a month as a budget to license photographs?

21   A.  No.

22   Q.  So what's the process of how you pay photographers for the

23   photographs you use in your news articles?

24              MS. LACKMAN:  Objection.  There is no foundation.

25              THE COURT:  Sustained.  Lay a foundation.

I8DJMAN1                    Hayes - direct

 1  BY MR. FREEMAN:

 2  Q.  I would like you to look back at Plaintiff's Exhibit 37,

 3  and on the bottom-right-hand corner you're going to see what is

 4  called a Bates stamp number, M A N G, followed by a number.

 5  Can you turn to M A N G 147 about eight pages or so into the

 6  document.  It is M A N G 0147.

 7          If you look down at the very bottom there, do you see

 8  where it says through the picture on the -- Jeff Sessions,

 9  Department of Justice lawyers fear Trump will scrap all their

10  work.

11          Do you see that, Mr. Hayes?

12  A.  Yes.

13  Q.  I would like to ask you about that article.

14          MR. FREEMAN:  I would like to mark it Plaintiff's

15  Exhibit 38.  Your Honor, may I have permission to approach the

16  witness with the document?

17          THE COURT:  Yes, of course.

18          (Pause)

19  BY MR. FREEMAN:

20  Q.  Mr. Hayes, do you recognize this document?

21  A.  I am seeing it for the first time.

22  Q.  Is it a screen-shot of a news article that you wrote as

23  senior news reporter for Buzzfeed?

24  A.  Yes.

25          MR. FREEMAN:  Plaintiff respectfully moves the court

I8DJMAN1                    Hayes – direct

1   for admission of Plaintiff's Exhibit 38.

2              MS. LACKMAN:  No objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 38 received in evidence)

5   BY MR. FREEMAN:

6   Q.  Under the article headline, Mr. Hayes, do you see there is

7   a photograph of president Trump and Attorney General Jeff

8   Sessions?

9   A.  Yes.

10  Q.  Underneath that photograph to the left there appears to be

11  two lines.  The first line which is in bold face says President

12  Trump and Jeff Sessions.

13             The question is, is that line, as used to describe the

14  subject matter, depicted in the photograph?

15  A.  Yes.

16  Q.  The second line underneath reads, "Evan Lucci/AP"?

17  A.  Yes.

18  Q.  So Evan Lucci is the name of the photographer of this

19  photograph, correct?

20  A.  Possibly.  I believe so.

21  Q.  And "AP" refers to Associated Press?

22  A.  Yes.

23  Q.  Is the line which refers to Evan Lucci known in the

24  industry as a gutter credit?

25  A.  Yes.

I8DJMAN1                          Hayes - direct

1   Q.   Where did you get the credit information about this

2   particular photograph?

3   A.   I don't recall exactly how I got it because this article is

4   over a year old.  However, it is most likely that this photo

5   credit was included with this photo in the AP Photo Exchange

6   that we subscribe to.

7   Q.   I see.  When you wrote this news article, are you the one

8   who inputted the gutter credit information?

9   A.   I don't recall.  It is old.

10  Q.   When you work in a news article, are there other editors at

11  Buzzfeed who contribute to your articles?

12  A.   As I already said, photos can be added to articles by

13  either an editor or our photo editor.

14  Q.   Did you obtain a written licensing agreement with the

15  photographer to publish this photograph?

16          MS. LACKMAN:  Objection.

17          THE COURT:  Overruled.

18  A.   As I have already said, we subscribe to various photo

19  services like the AP, and through that subscription we have

20  access to these photos and are allowed to incorporate them into

21  our articles without individualized outreach to photographers,

22  if that is what you're suggesting.

23  Q.   On the next page there is another photograph, and again

24  there is a couple of lines, three lines beneath the photograph,

25  the first being in bold face.  Does that accurately describe

1   the subject matter of the photograph?

2   A.   Which photo are you referring to?

3   Q.   One of Loretta lynch, Benita Gupta and Chicago Mayor

4   Emanuel?

5   A.   Yes.

6   Q.   Once again, the italicized line which refers to Theresa

7   Crawford, is that the name of the photographer of the

8   photograph?

9   A.   I believe so.

10  Q.   Does Buzzfeed's legal department provide you with any job

11  training concerning how to credit photographers?

12  A.   We have training on how to use photos in our articles, yes.

13  Q.   Does Buzzfeed issue a written handbook or a training manual

14  which describes the proper use of photographs?

15  A.   I'm not sure that I would call it a written handbook or

16  manual.  There are several internal documents that describe the

17  training.

18  Q.   Who currently supervises your work in Buzzfeed?

19  A.   I report to various editors depending on what story I'm

20  working on.

21  Q.   Who is Gregory Brehm?

22  A.   He is a lawyer at Buzzfeed.

23  Q.   And has Mr. Brehm informed you at any time that you're

24  required to credit the photographer for photographs you publish

25  on the Buzzfeed web site?

I8DJMAN1                         Hayes - direct

1              MS. LACKMAN:  Objection.  This is privileged

2     information, what counsel advised.

3              THE COURT:  Overruled.

4     A.  I can't recall which member of our internal legal staff

5     most recently communicated that information.

6     BY MR. FREEMAN:

7     Q.  Are you familiar with a person in the legal department

8     named Wajmah Yaqubi?

9     A.  Yes.

10    Q.  Are you familiar with Ms. Yaqubi's title?

11    A.  No.

12    Q.  Is she the director of rights and clearance at Buzzfeed?

13    A.  Possibly, yes.

14    Q.  Has Ms. Yaqubi ever informed you you're required to credit

15    photographers for photographs published on Buzzfeed's web site?

16    A.  As I just said, I can't recall who in our legal department

17    informed me directly.

18    Q.  Is there anyone else at Buzzfeed who provided training to

19    you in terms of properly crediting or licensing photographs?

20    A.  We have multiple lawyers, as I've said, photo staff on

21    staff at Buzzfeed, and my recollection is several people have

22    been involved in training.

23              MR. FREEMAN:  At this time I would like to mark

24    Plaintiff's Exhibit 13, your Honor.  May I have the court's

25    permission to approach the witness?

I8DJMAN1                      Hayes - direct

1             THE COURT:  Yes.

2             (Pause)

3   BY MR. FREEMAN:

4   Q.  Do you recognize this document, Mr. Hayes?

5   A.  Yes.

6   Q.  Is it a screen-shot of a news article published by the New

7   York Post on January 18th, 2017 about a man named Raymond

8   Parker?

9   A.  Yes.

10  Q.  Did you reference this New York Post article as a source

11  for a Buzzfeed article that you wrote about Mr. Parker?

12  A.  I believe so.

13            MR. FREEMAN:  Plaintiff respectfully moves the court

14  for admission of Plaintiff's Exhibit 13.

15            MS. LACKMAN:  No objection.

16            (Plaintiff's Exhibit 13 received in evidence)

17  BY MR. FREEMAN:

18  Q.  Under the headline, Mr. Hayes, there is a photograph of

19  Raymond Parker, correct?

20  A.  Yes.

21  Q.  Under the photograph of Mr. Parker, is that a gutter

22  credit?

23  A.  It's very faint, but I believe there is a gutter credit.

24  Q.  If you turn to the last page of the document that I've

25  provided, this is just a magnified version of the first page.

I8DJMAN1                          Hayes – direct

1          I would like to ask you again, would it be accurate

2     that the two lines below the photograph of Mr. Parker is

3     referred to as a gutter credit?

4     A.   There is no photo of Mr. Parker on the last page of this

5     document.

6               MR. FREEMAN:  May I approach the witness, your Honor?

7               THE COURT:  Yes.

8               MS. LACKMAN:  I would like to lodge an objection.  It

9     is just the sentence, there is no foundation that anyone has

10    ever seen an enlarged portion or this version of what is being

11    shown here.

12              THE COURT:  Overruled.

13              MR. FREEMAN:  Your Honor, it is identical, it is just

14    zoomed in, just a magnified version of Page 1 just so we can

15    read it quickly.

16    BY MR. FREEMAN:

17    Q.   So the question is under the photograph of Mr. Parker, is

18    that a gutter credit?

19    A.   In the blown-up version you just handed me?

20    Q.   Yeah.  You had said it was very faint, so I just wanted to

21    give you a magnified version of it, and so either way, whether

22    on Page 1 or on the page I just provided you, would it be

23    accurate to describe the line underneath the photograph of

24    Mr. Parker as a gutter credit?

25    A.   Yes.

I8DJMAN1                        Hayes - direct

1    Q.  So the first line in bold face describes the subject matter

2    of the photograph, which is Raymond Parker, correct?

3    A.  Yes.

4    Q.  The second line shows a photograph named Gregory P. Mango,

5    correct?

6    A.  Yes.

7    Q.  I would like to mark as Plaintiff's Exhibit 73.  Your

8    Honor, may I have the court's permission to approach the

9    witness?

10             THE COURT:  Yes.

11             (Pause)

12   BY MR. FREEMAN:

13   Q.  Do you recognize this document, Mr. Hayes?

14   A.  Yes.

15   Q.  This is the e-mail from you to Liane Fisher?

16   A.  Yes.

17             MR. FREEMAN:  The plaintiff respectfully moves the

18   court for admission of Plaintiff's Exhibit 73.

19             MS. LACKMAN:  No objection.

20             (Plaintiff's Exhibit 73 received in evidence)

21   BY MR. FREEMAN:

22   Q.  Who is Liane Fisher?

23   A.  She is an attorney.

24   Q.  Why did you contact Ms. Fisher?

25   A.  She represents Mr. Parker.

I8DJMAN1                        Hayes - direct

1    Q.  How did you know that Ms. Fisher represented Mr. Parker?

2    A.  She is identified in various legal documents pertaining to

3    his case as his attorney.

4    Q.  You contacted her to solicit comment on an article about

5    Mr. Parker's settlement with the City of New York?

6    A.  Yes.

7    Q.  Thank you.

8           MR. FREEMAN:  I would like to mark Plaintiff's Exhibit

9    74, your Honor.  May I have the court's permission to approach

10   the witness?

11          THE COURT:  Yes.

12          (Pause)

13   BY MR. FREEMAN:

14   Q.  Mr. Hayes, do you recognize this document?

15   A.  Yes.

16   Q.  This is the e-mail from Liane Fisher in response to your

17   e-mail of 10:54 am, correct?

18   A.  Yes.

19          MR. FREEMAN:  Plaintiff respectfully moves the court

20   for admission of Plaintiff's Exhibit 74.

21          MS. LACKMAN:  No objection, contingent on Ms. Fisher

22   testifying today.

23          MR. FREEMAN:  Let the record reflect Ms. Fisher is

24   present in the courtroom.

25          THE COURT:  Proceed.

I8DJMAN1                          Hayes - direct

 1           (Plaintiff's Exhibit 74 received in evidence)

 2   BY MR. FREEMAN:

 3   Q.  This e-mail informs you that Ms. Fisher will call you back

 4   within the hour?

 5   A.  Yes.

 6           MR. FREEMAN:  I would like to mark for identification

 7   Plaintiff's Exhibit 75.  Your Honor, may I have the court's

 8   permission to approach the witness?

 9           THE COURT:  Yes.

10           (Pause)

11   BY MR. FREEMAN:

12   Q.  Mr. Hayes, do you recognize this document?

13   A.  Yes.

14   Q.  This is the e-mail from you to Ms. Fisher?

15   A.  Yes.

16           MR. FREEMAN:  Plaintiff respectfully moves the court

17   for admission of Plaintiff's Exhibit 75.

18           MS. LACKMAN:  Objection.

19           (Plaintiff's Exhibit 75 received in evidence)

20   BY MR. FREEMAN:

21   Q.  So this email is in response to Ms. Fisher's e-mail of

22   11:16 am, correct?

23   A.  Yes.

24   Q.  Here you say, "the sooner the better."  Do you see that?

25   A.  Yes.

I8DJMAN1                          Hayes - direct

1    Q.  Mr. Hayes, were you in a rush to publish the article?

2    A.  No.

3    Q.  Was this a breaking news article?

4    A.  Yes.

5    Q.  If you weren't in a rush, then why did you say, "the sooner

6    the better"?

7    A.  I wanted to get the story published in a timely manner.

8    Q.  Is your job performance assessed by breaking news stories

9    faster than your competitors?

10   A.  No.

11   Q.  In this link to justice.gov, is that where you found out

12   about the news of Mr. Parker's settlement?

13   A.  I can't recall exactly how I found out about the news.

14          MR. FREEMAN:  Plaintiff would like to mark Plaintiff's

15   Exhibit 76.  Your Honor, may I have the court's permission to

16   approach the witness?

17          THE COURT:  Yes.

18          (Pause)

19   BY MR. FREEMAN:

20   Q.  Mr. Hayes, do you recognize this document?

21   A.  Yes.

22   Q.  This is an email from you to Ms. Fisher?

23   A.  Yes.

24   Q.  Which is one minute after the prior email we just

25   discussed?

I8DJMAN1                          Hayes - direct

1   A.  Yes.

2             MR. FREEMAN:  Plaintiff respectfully moves the court

3   for admission of Plaintiff's Exhibit 76.

4             MS. LACKMAN:  No objection.

5             (Plaintiff's Exhibit 76 received in evidence)

6   BY MR. FREEMAN:

7   Q.  Here you write, "Also if you guys have a picture of Raymond

8   you can share, please send."

9             Do you see that?

10  A.  Yes.

11  Q.  So you wanted to obtain a photograph of Raymond Parker for

12  your article, correct?

13  A.  Yes.

14  Q.  And you wanted to obtain that photograph for free?

15  A.  I wanted to obtain a photograph for the article.

16  Q.  That doesn't quite answer the question.  Let me ask again.

17            When you asked Ms. Fisher if she could share a picture

18  of Mr. Parker, was it your intent to license the photograph

19  from Ms. Fisher?

20  A.  Ms. Fisher never mentioned licensing a photo to me.  Had

21  she mentioned it, I would have considered it at the time.

22  Q.  But not in response to any email that Ms. Fisher sent to

23  you regarding the photograph, correct?

24  A.  This email appears to be me mentioning interest in a

25  photograph.

I8DJMAN1                         Hayes - direct

1   Q.  Before you asked Ms. Fisher to share a photograph of Mr.

2   Parker, did you check Getty Images or some other stock photo

3   agency to see whether a photo of Mr. Parker was available for

4   license?

5   A.  I don't recall.

6   Q.  As of 11:18 am on April 11th, the time of this email, had

7   you already seen the New York Post article, dated January 18th,

8   2017?

9   A.  I don't recall when I saw the article.

10  Q.  In response to this email, did Ms. Fisher send you a

11  photograph of Mr. Parker?

12  A.  No.

13  Q.  Have you ever seen an email where Ms. Fisher sent you a

14  photograph of Mr. Parker?

15  A.  No.

16          MR. FREEMAN:  At this time plaintiff would like to

17  mark Plaintiff's Exhibit 77.  Your Honor, may I have the

18  court's permission to approach the witness?

19          THE COURT:  Yes.

20          (Pause)

21          (Plaintiff's Exhibit 77 received in evidence)

22  BY MR. FREEMAN:

23  Q.  Mr. Hayes, do you recognize this document?

24  A.  Yes.

25  Q.  Is it accurate to describe this as a screen-shot of

1   meta-data associated with the photograph of Raymond Parker?

2   A.  I'm not sure if -- I am not an expert on meta-data.  I can

3   explain to you how I obtained this information.

4   Q.  Yes, please.

5   A.  Well, I don't remember the exact steps, but there are ways

6   to research the source of photo content that is contained on

7   the computer, and that is what this is.

8   Q.  I see.  Would it be accurate to state that if you download

9   a photograph onto your computer desktop and then you right

10   click "get info," that the next step is it would produce this

11   screen-shot?

12   A.  That's possible that that's how you obtain this.

13        This was a long time ago I did this so I don't recall

14   exactly how.

15   Q.  But it is accurate to state that this document was created

16   by information obtained from the photograph itself?

17   A.  I'm not sure I understand the question.

18        This document was created by information that I was

19   able to find on my computer when I was looking into the source

20   of this photo.

21   Q.  Did you need the photograph to produce this document?

22   A.  Yes.  This is information on the photo.

23   Q.  So you created this document, correct?

24   A.  It appears to be an exhibit created by you, but, yeah, I

25   created the screen-shot contained here.

I8DJMAN1                          Hayes - direct

1    Q.  Thank you.

2            MR. FREEMAN:  Plaintiff respectfully moves the court

3    to admit Plaintiff's Exhibit 77 into evidence.

4            MS. LACKMAN:  No objection.

5            (Plaintiff's Exhibit 77 received in evidence)

6    BY MR. FREEMAN:

7    Q.  Under the section here labeled "more info," do you see

8    that?

9    A.  Yes.

10   Q.  There is a line that says, "where from."  Do you see that?

11   A.  Yes.

12   Q.  Then it lists a URL associated with the New York Post,

13   correct?

14   A.  Yes.

15   Q.  Does this mean you downloaded this photograph from the New

16   York Post web site?

17   A.  Yes.

18   Q.  On next labeled "General," do you see that in the top?

19   A.  Yes.

20   Q.  It says, "Created Tuesday, April 11th, 2017, at 11:48 am."

21   Is that correct?

22   A.  Yes.

23   Q.  Does this mean you downloaded the photograph of Mr. Parker

24   from the New York Post at 11:48 am Eastern Standard Time on

25   April 11th?

1   A.  I'm not sure exactly what this created field is in

2   reference to.

3            MR. FREEMAN:  I would like to mark Plaintiff's Exhibit

4   20.  Your Honor, may I have the court's permission to approach

5   the witness with the document?

6            THE COURT:  Yes.

7            (Pause)

8   BY MR. FREEMAN:

9   Q.  Do you recognize this document, Mr. Hayes?

10  A.  Yes.

11  Q.  Is it a news article published by Buzzfeed on April 11th,

12  2017, at 12:14 pm?

13  A.  Yes.

14  Q.  Is that approximately 26 minutes after you downloaded the

15  photograph from the New York Post?

16  A.  It is approximately 26 minutes after the time that's listed

17  under the created field in the photo information.

18  Q.  Thank you.

19           You wrote this article in your capacity as senior

20  editor of Buzzfeed, correct?

21  A.  Buzzfeed news reporter.

22           MR. FREEMAN:  Plaintiff respectfully moves the court

23  for admission of Plaintiff's Exhibit 20.

24           MS. LACKMAN:  No objection.

25           (Plaintiff's Exhibit 20 received in evidence)

I8DJMAN1                          Hayes – direct

1   BY MR. FREEMAN:

2   Q.  So under the headline there is a photograph of Raymond

3   Parker, correct?

4   A.  Yes.

5   Q.  And underneath the photograph of Mr. Parker to the left, is

6   that a gutter credit?

7   A.  Yes, there is photo credit listed under the photo.

8   Q.  Does the first line in bold face describe the subject

9   matter of the photograph, which is Raymond Parker?

10          MS. LACKMAN:  Objection, just to the extent it

11  mischaracterizes the exhibit.  It may be an edited version.

12  BY MR. FREEMAN:

13  Q.  So the first line underneath the photograph of Mr. Parker

14  describes the subject matter of the photograph?

15  A.  Yes.

16  Q.  The second line identifies Fisher Taubenfeld.  Do you see

17  that?

18  A.  Yes.

19  Q.  Who is Fisher Taubenfeld?

20  A.  It is a law firm.

21  Q.  So Fisher Taubenfeld is not the name of the photographer?

22  A.  It is the name of the law firm that gave me access to this

23  photo.

24  Q.  Gregory Mango is the name of the photographer of this

25  photograph, correct?

1           MS. LACKMAN:  Objection; foundation.

2           THE COURT:  Overruled.

3   A.  At the time this photo was given to me, I was informed that

4   it belonged to Fisher Taubenfeld.

5   BY MR. FREEMAN:

6   Q.  This photograph was given to you?

7   A.  I was given access to use this photo, as I just said.

8   Q.  Didn't you download this photograph from the New York Post

9   yourself?

10  A.  Yes.

11  Q.  Why didn't you use the name of the photographer, Mr. Mango,

12  in the gutter head?

13  A.  At the time I published this article, I was not informed

14  that Mr. Mango was the photographer.

15  Q.  Before publishing this article about Mr. Parker, have you

16  ever credited a photograph to a law firm or an attorney?

17  A.  Yes.

18  Q.  Why would you credit a law firm or an attorney?

19  A.  Because that law firm or that attorney was the person who

20  gave me access to the photo.

21  Q.  I see.  Have you been trained in Buzzfeed that a law firm

22  or an attorney owns the rights to a photograph of the clients

23  they represent?

24          MS. LACKMAN:  There is privilege here.  You can ask

25  was it in his knowledge, but conversations with attorneys

I8DJMAN1                          Hayes – direct

1  are --

2          THE COURT:  Rephrase the question, Mr. Freeman.

3          MR. FREEMAN:  Yes.

4  BY MR. FREEMAN:

5  Q.  At Buzzfeed, you testified that you've been provided

6  training by the legal department as to how to credit

7  photographers for their work.

8          The question is, as part of your training, did you

9  learn that a law firm or an attorney owns the rights to a

10  photograph of the clients they represent?

11  A.  As part of our training, we learn to credit the source of

12  photos, and it has been my experience that law firms and

13  attorneys can be the source of photos.

14  Q.  Doesn't the photographer own the rights to the photograph?

15          MS. LACKMAN:  Objection.  He is not a lawyer.

16          THE COURT:  Overruled.

17  A.  Can you repeat the question.

18  BY MR. FREEMAN:

19  Q.  Sure.  Doesn't the photographer own the rights to the

20  photograph?

21  A.  It is my understanding again that a law firm or an attorney

22  can own or have access to a photo and be able to share photos

23  with journalists.

24  Q.  Have you ever received a press kit from a lawyer containing

25  a photograph of the lawyer's client?

I8DJMAN1                         Hayes – direct

1    A.  I can't recall receiving a press kit.

2    Q.  So it is not common practice for you to receive press kits

3    from attorneys?

4    A.  I'm not sure I understand the question.

5    Q.  During the course of this litigation, did anyone from

6    Buzzfeed ask you to go through your files and produce any

7    copies of press kits that you received from attorneys?

8    A.  No.

9    Q.  Did you receive a press kit from Ms. Liane Fisher

10   concerning Raymond Parker?

11   A.  I don't recall receiving a press kit.

12   Q.  Did you receive a press release from Ms. Liane Fisher

13   concerning the settlement of Mr. Parker's case?

14   A.  I don't recall.

15          MR. FREEMAN:  Your Honor I would like to identify

16   Plaintiff's Exhibit 78.  Your Honor, may I have the court's

17   permission to approach the witness?

18          THE COURT:  Yes.

19          (Pause)

20   BY MR. FREEMAN:

21   Q.  Do you recognize this document, Mr. Hayes?

22   A.  Yes.

23   Q.  This is an email from you to Ms. Fisher?

24   A.  Yes.

25          MR. FREEMAN:  Plaintiff respectfully moves the court

I8DJMAN1                         Hayes – direct

1    for admission of Plaintiff's Exhibit 78.

2              MS. LACKMAN:  No objection.

3              (Plaintiff's Exhibit 78 received in evidence)

4    BY MR. FREEMAN:

5    Q.  Mr. Hayes, so you sent Ms. Fisher a link to the Buzzfeed

6    article at 12:24 pm?

7    A.  Yes.

8              MR. FREEMAN:  I would like to mark as Plaintiff's

9    Exhibit 79.  Your Honor, may I have the court's permission to

10   approach the witness?

11             THE COURT:  Yes

12             (Pause)

13   BY MR. FREEMAN:

14   Q.  Do you recognize this document?

15   A.  Yes.

16   Q.  This is email from Ms. Fisher to you?

17   A.  Yes.

18             MR. FREEMAN:  Plaintiff respectfully moves the court

19   for admission of Plaintiff's Exhibit 79.

20             MS. LACKMAN:  Subject to the same comment we had about

21   Exhibit 74, namely, her testimony, we have no objection.

22             (Plaintiff's Exhibit 79 received in evidence)

23             MR. FREEMAN:  Plaintiff marks for identification

24   Plaintiff's Exhibit 18.  Your Honor, may I have the court's

25   permission to approach the witness?

I8DJMAN1                              Hayes – direct

1              THE COURT:  Yes.

2              (Pause)

3    BY MR. FREEMAN:

4    Q.  Mr. Hayes, do you recognize this document?

5    A.  No.

6    Q.  Would it be accurate to describe this document as a Daily

7    News article about Mr. Parker's settlement, dated April 11, at

8    1:46 pm?

9              MS. LACKMAN:  Objection.  He said --

10             THE COURT:  Sustained.  Sustained.

11             MR. FREEMAN:  Plaintiff marks for identification

12   Plaintiff's Exhibit 17.  Your Honor, may I have permission to

13   approach the witness?

14             THE COURT:  Yes.

15             (Pause)

16   BY MR. FREEMAN:

17   Q.  Mr. Hayes, do you recognize this document?

18   A.  No.

19             MR. FREEMAN:  We will withdraw.

20             (Continued on next page)

21

22

23

24

25

18DAAMAN2                    Hayes - Direct

1    BY MR. FREEMAN:

2    Q.  Mr. Hayes, when did you learn there was a copyright

3    infringement suit involving your article about Mr. Parker?

4    A.  I don't recall the exact date.  I believe it was five, six

5    months after the article was published.

6    Q.  And do you recall who informed you of the infringement

7    lawsuit?

8    A.  A member of BuzzFeed's legal team.

9    Q.  Was it Ms. Yaqubi?

10   A.  Possibly.

11   Q.  Was it Mr. Brehm, Mr. Gregory Brehm?

12   A.  Possibly.

13   Q.  And were you provided any specific instructions at that

14   time?

15   A.  I don't recall specifically what instructions I was

16   provided.

17   Q.  So after this lawsuit was filed, did BuzzFeed provide you

18   any further training about how to credit photographers for

19   their work?

20   A.  I don't recall the last time I had a photo training at

21   BuzzFeed.  It was probably sometime within the last year.

22   Q.  And so was there any discussion as to whether you needed to

23   obtain written licensing agreements from photographers to

24   publish their work?

25             MS. LACKMAN:  Objection.  Foundation.

18DAAMAN2                          Hayes - Direct

1           THE COURT:  Sustained.

2           MR. FREEMAN:  Plaintiff would like to mark Plaintiff's

3    Exhibit 81.

4           Your Honor, may I have the Court's permission to

5    approach the witness?

6           THE COURT:  Yes.

7           (Pause)

8    Q.  Mr. Hayes, do you recognize this document?

9    A.  Yes.

10   Q.  This is an e-mail from you to Ms. Fisher dated September

11   12th of 2017.

12   A.  September 13th.

13   Q.  I am sorry.  September 13.  Is that correct?

14   A.  Yes.

15          MR. FREEMAN:  Plaintiff respectfully moves the Court

16   for admission of Plaintiff's Exhibit 81.

17          MS. LACKMAN:  No objection.

18   Q.  Was this an e-mail that you sent to Ms. Fisher under the

19   instructions of the legal department at BuzzFeed?

20   A.  I don't recall if I was instructed to or upon learning

21   about this litigation I decided to reach out myself.

22   Q.  I see.  And in the third line, the third paragraph there

23   you say:  "It's my recollection that your firm provided this

24   photo to us, but I can't seem to find the e-mail in my in-box."

25   A.  Yes.

1  Q.  So how did you recall that Ms. Fisher provided you the

2  photo of Raymond Parker when you already knew that you had

3  downloaded it from The New York Post?

4          MS. LACKMAN:  Objection.

5          THE COURT:  Overruled.

6  A.  At the time I had sent this e-mail, which was roughly four

7  months after the publishing of the article, my initial

8  recollection was that Ms. Fisher had e-mailed me the photo.

9  Q.  And you later determined that inn fact she had not sent you

10  the e-mail of the photograph, correct?

11  A.  Yes.

12          MR. FREEMAN:  Thank you, Mr. Hayes.  There are no

13  further questions.

14          THE COURT:  All right.  Ms. Lackman.

15  CROSS-EXAMINATION

16  BY MS. LACKMAN:

17  Q.  Mr. Hayes, I have a few questions for you.

18          Earlier we were talking about, Mr. Freeman was talking

19  with you about The New York Post article from January 2017.

20          Do you recall that?

21  A.  Yes.

22  Q.  Do you recall, did Ms. Fisher mention that New York Post

23  article to you when you spoke?

24  A.  I don't believe she did.

25  Q.  Do you recall what -- did she say anything during the call

18DAAMAN2                         Hayes - Cross

1    regarding the photograph of Mr. Parker at issue in this case?

2    A.  Yes.  She advised me to use the photograph that The New

3    York Post used in the article about Mr. Parker.

4    Q.  And in your experience have other attorneys provided or

5    provided this type of permission to use a photograph of their

6    clients?

7    A.  Yes.

8    Q.  So when Mr. Freeman was asking you about press kits, for

9    example, you weren't talking about a certain situation where an

10   attorney might provide you as the press with some authority or

11   information?

12   A.  I'm still unclear what he meant by press kit.  I don't

13   receive press kits typical from attorneys.  I receive press

14   releases, photos, case exhibits, that sort of thing.

15   Q.  Did you send the article to Ms. Fisher for -- did you send

16   the article to Ms. Fisher when it was completed?

17   A.  Yes.

18   Q.  And she responded to you?

19   A.  Yes.

20   Q.  Did she object to the use of the photograph at any time?

21   A.  No.

22   Q.  Did she object to the credit that was used in the article?

23   A.  No.

24   Q.  Can we go back to the exhibit -- I think you have it in

25   front of you -- Exhibit 77.

1   A.  Got it.

2   Q.  And that was the metadata that we were talking about,

3   right?

4   A.  Yes.

5   Q.  OK.  Do you see Mr. Mango's name anywhere in this metadata?

6   A.  No.

7   Q.  Did you remove any metadata when you downloaded the

8   photograph?

9   A.  I have no idea how to remove metadata from photographs.

10  Q.  OK.  When you downloaded the photograph, did it take just

11  the image or did the credit come with it?

12  A.  I believe it took just the image.

13          MS. LACKMAN:  Just checking to see if I have any

14  further questions.

15          (Pause)

16  Q.  Actually, let's look at -- I'd like to draw your attention

17  to an exhibit that is in the plaintiff's binder but also, I

18  believe, in ours.

19          MS. LACKMAN:  I'd like to mark for identification

20  Plaintiff's Exhibit A.

21          We've put everything in the binder for the witness

22  that's sitting there, if that's all right.

23          THE COURT:  Yes.

24  Q.  Mr. Hayes, I am showing you what's been previously marked

25  Exhibit A.

1           Do you recognize this e-mail chain?

2   A.  Yes.

3           MS. LACKMAN:  I'd like to move for the admission of

4   the e-mail chain into evidence.

5           THE COURT:  Is there any objection to any of the

6   exhibits in the defendant's binder?

7           MR. FREEMAN:  No, your Honor.

8           THE COURT:  All right.  Then just proceed with each

9   exhibit, Ms. Lackman, without needing to produce it

10  individually.

11          MS. LACKMAN:  Sure.  It's a long chain.  So we'll

12  proceed.

13  Q.  If you turn to -- I apologize.  This was in this case twice

14  and so I'm using different version.

15          If you turn almost three-quarters of the way in,

16  you'll start seeing Bates numbers on bottom that start with

17  DEF.

18          We'll have to compliment Mr. Freeman on his marking of

19  exhibit.  In this way it makes a little more sense.  I

20  apologize for the confusion.  But if you could turn to where it

21  starts at DEF 00050.

22          Do you see that?

23  A.  Yes.

24  Q.  I'll ask you some questions pertaining to this chain.  Can

25  you briefly describe what's happening in the e-mail chain that

18DAAMAN2                     Hayes - Cross

1   starts at Defendant 00050?

2   A.   The first e-mail is an e-mail from myself to Liane Fisher.

3   Q.   OK.  If you turn to the next page, at the top there's an

4   e-mail dated September 21, 2017 at 12:11.

5          Do you see that?

6   A.   Yes.

7   Q.   Do you recall seeing this e-mail message?

8   A.   Yes.

9   Q.   And do you see the message "I will forward to you the

10  e-mail when I'm in the office tomorrow?"

11  A.   Yes.

12  Q.   When you saw that, what was your impression regarding what

13  had transpired regarding your obtaining the photo?

14  A.   My impression was that Ms. Fisher had searched her e-mail

15  inbox and found an e-mail where she sent me a photo of

16  Mr. Parker.

17  Q.   If she had sent the photo to you, why wouldn't you have had

18  it in your files?

19  A.   At the time I would regularly purge my inbox of large

20  e-mails, e-mails that contain attachments, in order to conserve

21  server space in our e-mail system.

22  Q.   OK.  Thank you.

23          My last question is, do you have any understanding as

24  to why Ms. Yaqubi was involved in this e-mail chain?

25  A.   I believe Ms. Yaqubi initially reached out to Ms. Fisher or

18DAAMAN2                          Hayes - Cross

1  reached out to Ms. Fisher during this time because I was on

2  leave, on paternity leave at the time that this was

3  transpiring.

4  Q.  And then just to clarify something we were talking about

5  earlier about credits.  So when you provide credit to the

6  source, what does that mean to you?

7  A.  In the context of a photo?

8  Q.  Yes.  Thank you.

9  A.  It means that I am crediting the source or owner of the

10  photo as I understand it to be.

11  Q.  And with reference to earlier, there was discussion about

12  sharing the photo.

13          Do you recall that?

14  A.  Yes.

15  Q.  About you asking Ms. Fisher if she could share the photo.

16  A.  Yes.

17  Q.  And you and Ms. Fisher didn't discuss licensing?

18  A.  No.

19  Q.  Do you have any understanding of what licensing means?

20  A.  I believe that licensing refers to the process of sharing a

21  photo with somebody or -- let me rephrase.  The term licensing

22  means sharing content with somebody.

23  Q.  So can you have permission to use a photo without licensing

24  it?

25  A.  I believe that you can get permission to use a photo from

1   the source or owner of a photo.

2   Q.  Without engaging in licensing discussions?

3   A.  Yes.

4   Q.  Actually, one other question.  I apologize.

5          The photograph of Mr. Parker -- and you can feel free

6   to look at it if you like.  It's one of the exhibits that was

7   shown to you.  If you want to look at the photograph either in

8   your article or in The New York Post article.

9          Do you have any reason to believe that this photo was

10  taken by a professional photographer?

11  A.  It appears that it could have been taken by a photographer.

12  It also appears that it could have been taken by somebody using

13  a control phone.

14  Q.  Did you have any reason to believe when you saw this

15  photograph that it was something that came from Ms. Fisher's

16  firm?

17  A.  No.

18  Q.  And, to your knowledge, has BuzzFeed ever been sued for any

19  photograph in any of the articles that you've written over the

20  years?

21  A.  No.

22  Q.  And do you have any rough estimate of how many articles

23  you've written over the years for BuzzFeed?

24  A.  Over a thousand.

25          MS. LACKMAN:  Thank you.

1          I have no further questions.

2          THE COURT:  Mr. Freeman.

3          MR. FREEMAN:  Your Honor, may I ask a few more

4     questions?

5          THE COURT:  Yes.

6     REDIRECT EXAMINATION

7     BY MR. FREEMAN:

8     Q.  Mr. Hayes, you just testified that Ms. Fisher and you

9     engaged in a telephone conversation, is that correct?

10    A.  Yes.

11    Q.  And did that telephone conversation take place after you

12    e-mailed Ms. Fisher and asked her to share a photograph?

13    A.  I don't recall exactly when the phone conversation

14    happened.

15    Q.  OK.  Would you kindly take a look back at an exhibit marked

16    74.  It's an e-mail from Ms. Fisher to you.

17          Do you see it?

18    A.  Um-hmm.

19    Q.  In the Ms. Fisher e-mail you said:  "I'd be happy to

20    comment on the matter.  I'll call you within the hour."

21          Do you see that?

22    A.  Yes.

23    Q.  The time stamp on the e-mail is 11:16 a.m.?

24    A.  Yes.

25    Q.  Can you please turn to Plaintiff's Exhibit 75.  I'm sorry.

18DAAMAN2                      Hayes - Redirect

1    Please turn to 76.  This is the e-mail from you to Liane Fisher

2    timestamped 11:18 a.m.?

3    A.  Yes.

4    Q.  Is this where you asked Ms. Fisher if she can share a

5    picture of Raymond?

6    A.  Yes.

7    Q.  Does this reflect your recollection that the telephone

8    conversation that you had with Ms. Fisher took place after you

9    sent this e-mail?

10   A.  I would be willing to guess that, yes, it took place after

11   considering that it's roughly two minutes after she said she

12   was going to call me.

13   Q.  OK.  And you earlier testified that Ms. Fisher never

14   actually sent you a photograph of Mr. Parker, correct?

15   A.  Yes.

16   Q.  So I just want to get this straight.  So you e-mailed her

17   at 11:18 a.m. and asked for a picture.  She didn't send it to

18   you.  And then you went to The New York Post, downloaded it,

19   and then you had a conversation with Ms. Fisher?

20   A.  No.

21   Q.  So do you know, did you have the conversation with

22   Ms. Fisher before or after you downloaded the photograph from

23   to The New York Post?

24   A.  Before.

25   Q.  You had the conversation with Ms. Fisher before you

18DAAMAN2                    Hayes - Redirect

 1   downloaded it.

 2          So is it your testimony that you asked Ms. Fisher

 3   whether you were authorized to publish a photograph you

 4   obtained from The New York Post?

 5          MS. LACKMAN:  Objection.

 6          THE COURT:  Overruled.

 7   A.  It's my recollection that I asked Ms. Fisher on the phone

 8   if she could provide me with a photograph and she advised me to

 9   use the one from The New York Post.

10   Q.  Is it your custom to publish photographs on BuzzFeed's

11   website on the basis of oral representations versus a written

12   licensing agreement?

13   A.  As I already said, we have multiple ways we do it.

14   Q.  So would your answer be that you do customarily rely on

15   oral licensing agreements?

16          Let me rephrase that.

17          Is it your testimony that you customarily rely on oral

18   permission to publish a photograph on BuzzFeed's website?

19   A.  I don't customarily rely on any specific process.  We have

20   multiple processes.

21          MR. FREEMAN:  Thank you.  No further questions.

22          Your Honor, I would like to -- I'm done with

23   questioning.  I'm not sure if Ms. Lackman is.

24          THE COURT:  Mr. Hayes, I'd like to ask a couple of

25   questions to clarify your testimony.

18DAAMAN2                        Hayes – Redirect

1              If I understood what you testified correctly, you

2      wanted a photo of Mr. Parker.  You asked Ms. Fisher if she

3      could provide one.  Then is it your testimony that she advised

4      you that there was a photograph of Mr. Parker in The New York

5      Post?

6              THE WITNESS:  Yes.

7              THE COURT:  Did she give you direction as to how to

8      find it or did she just say there is a photograph in The New

9      York Post article?

10             THE WITNESS:  I don't recall exactly what she said,

11     but she advised me of The New York Post photo.

12             THE COURT:  But the point is that the first that you

13     heard about the existence of the photo of Mr. Parker was when

14     Ms. Fisher brought it to your attention.

15             THE WITNESS:  Yes.

16             THE COURT:  And then in Exhibit 77 you went to The New

17     York Post site and you created this photograph that's dated

18     11:48 a.m., is that correct?

19             THE WITNESS:  Yes.

20             THE COURT:  Your testimony is that the photograph that

21     you used was the one that's in Exhibit No. 77?

22             THE WITNESS:  Yes.

23             THE COURT:  It did not have the attribution?

24             THE WITNESS:  No, it did not.

25             THE COURT:  But when you published your story in

18DAAMAN2                    Hayes - Redirect

1    Exhibit No. 20, there is a photograph of Mr. Parker and it has
2    the attribution to Fisher & Taubenfeld.
3              THE WITNESS:  Yes.
4              THE COURT:  So in other words, you had a photograph
5    from The New York Post that did not have a title or
6    attribution, but then when you created the photo for the story,
7    you added the title and the attribution, is that correct?
8              THE WITNESS:  Yes.
9              THE COURT:  Why did you decide to place Fisher &
10   Taubenfeld?  When did you decide to do that?
11             THE WITNESS:  It was my understanding that this photo
12   belonged to Ms. Fisher.  So I was crediting her law firm.
13             THE COURT:  But what gave you the understanding that
14   it was the photograph belonging to the firm?
15             THE WITNESS:  I asked her to provide me with a
16   photograph and this was the photo that she advised me to use.
17             THE COURT:  Well, she advised you to use a photograph
18   in The New York Post.
19             THE WITNESS:  She advised me to use a photograph that
20   was included in an article on newyorkpost.com, yes.
21             THE COURT:  And when you received photographs -- have
22   you ever encountered a situation before in which you have
23   obtained a picture that did not have attributions of a
24   photographer?
25             THE WITNESS:  I'm not sure I understand the question.

1                THE COURT:  Have you ever been in a situation where

2     you have needed to use a photograph and you obtained one that

3     did not have the attribution to the photographer?

4                THE WITNESS:  I have, yes.

5                THE COURT:  And what do you normally do in those

6     cases?

7                THE WITNESS:  Credit the source of the photo.

8                THE COURT:  And you determined the source to be

9     whoever directed you to find the photograph or who gave it to

10    you?

11               THE WITNESS:  If they're a credible source, yes.

12               THE COURT:  All right.  Thank you.

13               MR. FREEMAN:  No further questions for Mr. Hayes, your

14    Honor.

15               THE COURT:  You may step down.

16               (Witness excused)

17               THE COURT:  Do you have a next witness?

18               MR. FREEMAN:  Yes.  Plaintiff would like to call

19    Ms. Liane Fisher to the stand.

20               THE COURT:  How long do you think you'll need with the

21    witness?

22               MR. FREEMAN:  This will be very brief.  I will say no

23    more than ten minutes.

24     LIANE FISHER,

25         called as a witness by the Plaintiff,

18DAAMAN2                    Fisher - Direct

1        having been duly sworn, testified as follows:

2   DIRECT EXAMINATION

3   BY MR. FREEMAN:

4   Q.   Thank you for appearing today, Ms. Fisher.

5           What is your occupation?

6   A.   I'm an attorney.

7   Q.   And how long have you been admitted to practice?

8   A.   Since 2006.  So 12 years.

9   Q.   And do you specialize in any area of law?

10  A.   Employment law.

11  Q.   Have you litigated any copyright cases?

12  A.   No.

13  Q.   During the course of your legal career have you ever sent

14  out a press release announcing a settlement that you've

15  obtained on behalf of a client?

16  A.   No.

17  Q.   Have you ever prepared a press kit containing photographs

18  of your client?

19  A.   No.

20  Q.   Is it your custom and practice to maintain photographs of

21  the clients that you represent?

22  A.   No.

23  Q.   Have you ever sent a photograph of one of your clients to

24  press?

25  A.   No.

18DAAMAN2                    Fisher - Direct

1   Q.  Who is Raymond Parker?

2   A.  He is a former client of mine.

3   Q.  On April 10 of 2017, did you obtain a settlement on

4   Mr. Parker's behalf?

5   A.  Yes.

6   Q.  Did your law firm send out a press release announcing the

7   settlement?

8   A.  No.

9   Q.  At the time you settled the lawsuit, did you possess a

10  photograph of Mr. Parker on your computer or other digital

11  device?

12  A.  No.

13  Q.  Did you possess a photograph of Mr. Parker in hard copy?

14  A.  No.

15  Q.  On June 21, 2018, do you recall responding to a subpoena to

16  produce documents in connection with this litigation?

17  A.  On or about that date, yes.

18  Q.  And did you produce all documents in your possession

19  concerning your e-mail communications with BuzzFeed?

20  A.  Yes.

21          MR. FREEMAN:  I'd like to mark Plaintiff's Exhibit 73.

22  Actually, this is already in evidence.  But, your Honor, may

23  I --

24          THE COURT:  Yes.

25          MR. FREEMAN:  -- approach the witness?

18DAAMAN2                    Fisher - Direct

1              (Pause)

2    Q.  Ms. Fisher, do you recognize this document?

3    A.  I do.

4    Q.  This is an e-mail from Michael Hayes?

5    A.  Yes.

6    Q.  And prior to receiving this e-mail had you known Michael

7    Hayes?

8    A.  No.

9    Q.  So Mr. Hayes was asking you to comment on Mr. Parker's

10   settlement?

11   A.  Yes.

12            MR. FREEMAN:  Plaintiff respectfully refers the Court

13   to Plaintiff's Exhibit 74, which is already marked into

14   evidence.

15            May I approach the witness, your Honor?

16            THE COURT:  Yes.

17            (Pause)

18   Q.  Ms. Fisher, do you recognize this document?

19   A.  Yes.

20   Q.  This is your response to Mr. Hayes's e-mail indicating that

21   you would be happy to comment on Mr. Parker's case?

22   A.  Correct.

23            MR. FREEMAN:  Plaintiff respectfully refers the Court

24   to Plaintiff's Exhibit 75, which is already marked in evidence.

25            Your Honor, may I approach the witness?

1          THE COURT:  Yes.

2          (Pause)

3    Q.  Ms. Fisher, do you recognize this document?

4    A.  I do.

5    Q.  And this is Mr. Hayes's response where he says, quote, the

6    sooner the better?

7    A.  Yes.

8    Q.  Was it your impression upon reading this that Mr. Hayes was

9    in a rush to talk to you?

10   A.  From reading this, yes.

11         MR. FREEMAN:  Plaintiff respectfully refers the Court

12   to Plaintiff's Exhibit 76, which is already marked in evidence.

13         Your Honor, may I approach the witness?

14         THE COURT:  Yes.

15         (Pause)

16   Q.  Ms. Fisher, do you recognize this document?

17   A.  I do.

18   Q.  So one minute after Mr. Hayes writes "the sooner the

19   better," he asks you to, quote-unquote, share a photograph of

20   Mr. Parker.

21         Do you see that?

22   A.  I do.

23   Q.  Do you remember receiving this e-mail?

24   A.  Honestly, I only remember it because I reviewed all my

25   e-mails since this case was brought to my attention.

18DAAMAN2                         Fisher - Direct

1    Q.  And in response to this did you e-mail a photograph of

2    Mr. Parker to Mr. Hayes?

3    A.  I did not.

4    Q.  And did you send a photograph to Mr. Hayes by hand via

5    courier?

6    A.  I did not.

7    Q.  At some point on April 11, 2017 did have you a telephone

8    conversation with Mr. Hayes?

9    A.  I believe so.

10   Q.  During the telephone call did Mr. Hayes ask you again to

11   e-mail him a photograph of Mr. Parker?

12   A.  I don't recall.

13   Q.  Did he ask you for authorization to publish a photograph of

14   Mr. Parker?

15   A.  I don't recall.

16   Q.  Did he notify you that he had already retrieved a

17   photograph of Mr. Parker from The New York Post?

18   A.  I don't believe so.

19   Q.  Did he say anything at all about a photograph of

20   Mr. Parker?

21   A.  I don't remember.

22   Q.  Let me ask you this.  Had you seen a --

23        MR. FREEMAN:  Well, actually, let me refer the Court

24   to Plaintiff's Exhibit 13.

25        Your Honor, may I have the Court's permission to

18DAAMAN2                    Fisher - Direct

1    approach the witness?

2              THE COURT:  Yes.

3              (Pause)

4    Q.  Ms. Fisher, do you recognize this document?

5    A.  I do.

6    Q.  And prior to speaking to Mr. Hayes by telephone on

7    April 11, 2017, had you seen this New York Post article?

8    A.  Yes.

9    Q.  And during your telephone conversation with Mr. Hayes, did

10   you direct him to obtain a photograph of Mr. Parker from The

11   New York Post?

12   A.  I don't remember, but I don't believe so.

13   Q.  OK.

14             MR. FREEMAN:  Plaintiff respectfully refers the Court

15   to Plaintiff's Exhibit 76, which was already marked into

16   evidence.

17             Your Honor, may I approach the witness?

18             THE COURT:  Yes.

19             (Pause)

20   Q.  Ms. Fisher, do you recognize this document?

21   A.  I do.

22   Q.  This is the e-mail from Mike Hayes to you at 12:24 p.m.?

23   A.  No.  It's marked -- the timestamp is 11:18.

24   Q.  Wait.

25   A.  I have 76 twice now.

18DAAMAN2                      Fisher - Direct

1  Q.  I'm sorry.

2          (Pause)

3          MR. FREEMAN:  May I approach the witness, your Honor?

4          THE COURT:  Yes.

5          (Pause)

6  Q.  Ms. Fisher, do you recognize this document?

7  A.  I do.

8  Q.  This is the e-mail from Mike Hayes to you at 12:24 p.m.?

9  A.  Yes.

10  Q.  And is this a link to an article published on BuzzFeed's

11  website about Raymond Parker?

12  A.  It is.

13          MR. FREEMAN:  Plaintiff respectfully refers the Court

14  to Plaintiff's Exhibit 20.

15          Your Honor, may I approach the witness?

16          THE COURT:  Yes.

17          (Pause)

18  Q.  Ms. Fisher, do you recognize this document?

19  A.  I do.

20  Q.  Is this the news article that's published by BuzzFeed

21  concerning Raymond Parker's settlement?

22  A.  Yes.

23  Q.  Underneath the photograph of Mr. Parker the second line

24  identifies your law firm, Fisher & Taubenfeld.

25          Do you see that?

18DAAMAN2                    Fisher - Cross

 1   A.  Yes.

 2   Q.  Back on April 11, 2017 when Mr. Hayes e-mailed you a link

 3   to the BuzzFeed article, did you read this article?

 4   A.  I don't remember, but I would imagine that I did.

 5   Q.  And at the time did you see Fisher & Taubenfeld listed

 6   underneath the photograph of Mr. Parker?

 7   A.  I don't remember.

 8   Q.  Had you seen it, would you have understood that to mean

 9   that Fisher & Taubenfeld had legally authorized BuzzFeed to

10   publish the photograph of Mr. Parker?

11            MS. LACKMAN:  Objection.

12            THE COURT:  Sustained.

13            Rephrase the question.

14   Q.  Had you seen the line Fisher & Taubenfeld underneath the

15   photograph, would you have understood to mean that Fisher &

16   Taubenfeld had legally authorized BuzzFeed to use the

17   photograph?

18            MS. LACKMAN:  Same objection.

19            THE COURT:  Overruled.

20   A.  I don't think I would have understood the import of that

21   no.

22            MR. FREEMAN:  Thank you.

23            No further questions, your Honor.

24   CROSS-EXAMINATION

25   BY MS. LACKMAN:

18DAAMAN2                    Fisher - Cross

1   Q.  Good morning, Ms. Fisher.

2            Do you recall BuzzFeed reaching out to you around

3   September 2017 regarding this photograph?

4   A.  Yes.

5   Q.  And at the time you thought you'd sent the photograph to

6   BuzzFeed, correct?

7   A.  No, I did not.

8   Q.  Why did you offer to check your e-mail if you had never

9   sent it to them?

10  A.  I was in the middle of something at the time when I

11  received the e-mail, and this is my interpretation of what I

12  said in my e-mail, looking back retroactively.

13           So I received the e-mail.  I was in the middle of

14  something.  The manner in which the question was asked of can

15  you send me the picture seemed to indicate that I did, and then

16  I went back and I checked and I hadn't.  I haven't ever sent a

17  picture to any reporter ever in my practice.  But having

18  received the e-mail and having the language phrased in the way

19  it was, I thought that it was possible.

20  Q.  And you were in the middle something and this was on -- and

21  if we need to look at e-mails, we can, if that helps you --

22  September 21st?

23  A.  I would need to look at the e-mail.

24  Q.  If you look at the binder that's in front of you, it's

25  within Exhibit A.  If you turn, it's three pages from the end.

1  So the Bates number on the bottom is 51.  It is all one long

2  e-mail chain.  There are two long email chains, and this part

3  is one.

4          So at the top do you see the e-mail that starts with

5  "my apologies for the delay in responding?"

6  A.  Yes.

7  Q.  So the communications we were just talking about, this is

8  the communication that you sent where you said you were in the

9  middle of something?

10  A.  Yes.  I was on trial.

11  Q.  OK.  And then you went back -- you were in the office the

12  next day?

13  A.  I can't recall.

14  Q.  If you look down at page -- do you see an e-mail dated

15  September 22, 2017 at 1:36 p.m.?

16  A.  Yes.

17  Q.  You say, "Hi, Wajmah.  I cannot locate the e-mail where I

18  forwarded you a picture of Mr. Parker."

19          Do you see that?

20  A.  I see that.

21  Q.  Why did you say I cannot locate the e-mail where I

22  forwarded you a picture of Mr. Parker if you had not thought

23  you forward a picture of Mr. Parker?

24  A.  I'm sorry.  Could you rephrase?

25  Q.  Yeah.

18DAAMAN2                         Fisher – Cross

1          Why would you say I cannot locate the e-mail where I

2     forwarded you a picture of Mr. Parker?  Why would you say that?

3     Why didn't you say something like I didn't send you an e-mail?

4     A.  I had no recollection, and if you read the rest of my

5     e-mail, it says:  "I believe Mr. Parker may have himself

6     provided a picture.  Do you think that's possible?"

7     Q.  So you now believe based on this correspondence that you

8     did not send the photo?

9     A.  I believe wholeheartedly that I did not send an e-mail with

10    a picture.

11    Q.  Even though you searched your e-mails for it?

12    A.  I'm sorry.  Can you ask the question again?

13    Q.  Do you believe wholeheartedly you didn't send it even

14    though at the time you searched your e-mails to try to find it?

15    A.  Yeah.  I mean, it was the manner in which the question was

16    asked of me, rather authoritatively, as though I had sent an

17    e-mail, so it left me questioning maybe I had sent an email

18    with a picture, which would never have been my practice, which

19    I have never done before.  But I looked and then I confirmed

20    that I had not sent an e-mail with a picture.

21    Q.  And you said "I believe Mr. Parker may have himself

22    provided the picture," correct?

23    A.  "Is that possible," correct.

24    Q.  You said you saw The New York Post article, right?

25    A.  I did.

18DAAMAN2                    Fisher - Cross

1   Q.  You didn't tell Ms. Yaqubi that the photo came from the New

2   York Post?

3   A.  No.

4   Q.  And you didn't tell her that you had no permission to share

5   the photo with Mr. Hayes?

6   A.  No, I definitely did.

7           Can you just ask the question again?

8   Q.  Sure.  You never told Ms. Yaqubi that you had no permission

9   to give for Mr. Hayes to use the photo?

10  A.  I did not tell her that, no.

11  Q.  When you saw the first New York Post article in January,

12  was your firm mentioned?

13  A.  In the original New York Post article?

14  Q.  Yes?

15  A.  I don't believe so, no.

16  Q.  Did that situation of an article being published without

17  your comment reflect a lost opportunity to give some

18  well-deserved publicity to the work you were doing on the case?

19  A.  It was a decision that my firm made not to comment.

20  Q.  Back in January?

21  A.  Correct.

22  Q.  When BuzzFeed contacted you in April, though, you did

23  comment?

24  A.  Yes.

25  Q.  Were you happy about the opportunity to get press coverage

18DAAMAN2                    Fisher - Cross

1    for it?

2    A.  Yes.

3    Q.  And it was in your interest -- was it in your interest that

4    it would be helpful in order to increase the chance of your

5    firm being mentioned?

6    A.  Yeah.  Sure.

7    Q.  So if you don't recall the specifics of the conversation

8    with Mr. Hayes, what is your recollection based on?

9    A.  My recollection of what?

10   Q.  Your recollection of your communications with Mr. Hayes in

11   April 2017.

12   A.  I don't have a specific recollection of what we talked

13   about.

14   Q.  When you indicated that you would get back to Mr. Hayes

15   within the hour when he first contacted you, do you have any

16   reason -- do you know whether you did get back to him within

17   the hour or relatively promptly?

18   A.  I believe we spoke relatively soon to when I had sent that

19   e-mail.  I don't know if it was exactly within the hour.

20            MS. LACKMAN:  I have no further questions.

21            THE COURT:  Mr. Freeman.

22            MR. FREEMAN:  I have no further questions, your Honor.

23            THE COURT:  Ms. Fisher, coming back to your telephone

24   discussion with Mr. Hayes on April 11th, how clear is your

25   recollection as to whether or not you specifically told him

18DAAMAN2                    Fisher - Cross

1   that there was a photograph of Mr. Parker in The New York Post?

2          THE WITNESS:  Your Honor, I really don't remember the

3   specifics of the conversation.  I just can't imagine that I

4   talked to him or gave him permission to use a picture that I

5   myself had no authority to give permission for.  But I really

6   don't remember.

7          THE COURT:  The issue is not so much giving permission

8   but whether you alerted him that such a picture existed.

9          THE WITNESS:  I don't remember, but I don't believe we

10  had that conversation.

11         THE COURT:  Thank you.

12         MS. LACKMAN:  Could I ask one more question?

13         THE COURT:  Yes.

14  BY MS. LACKMAN:

15  Q.  Ms. Fisher, have you ever taken a course in intellectual

16  property law?

17  A.  I don't remember if I took it in law school.

18  Q.  Have you ever practiced intellectual property law?

19  A.  No.

20  Q.  You are aware that there are logos of several bar

21  associations featured at the bottom of your website, correct?

22  A.  Yes.

23  Q.  Do you have permission to use logos of bar associations?

24  A.  I don't know.  I didn't create the website.

25  Q.  Have you ever inquired as to whether permission should be

18DAAMAN2                          Fisher - Cross

 1  obtained to use a photo of bar associations on a website?
 2  A.  No.
 3          MS. LACKMAN:  No further questions.
 4          THE COURT:  All right.  Thank you.
 5          You are excused.  You may step down.
 6          THE WITNESS:  Thank you, your Honor.
 7          (Witness excused)
 8          THE COURT:  Mr. Freeman.
 9          MR. FREEMAN:  Yes.  Are we going to proceed?
10          THE COURT:  Why don't we take a ten-minute break.
11          MR. FREEMAN:  Yes, your Honor.  OK.  Thank you.
12          (Recess)
13          THE COURT:  Thank you.
14          All right, Mr. Freeman.
15          MR. FREEMAN:  Plaintiff would like to call to the
16  witness stand Mr. Gregory Brehm.
17          THE COURT:  Mr. Freeman, is Mr. Hayes still available?
18          MS. LACKMAN:  We can call him back if the Court wants
19  him.
20          THE COURT:  I think there was one question I omitted
21  to ask.  So if we could re-call him immediately either in the
22  afternoon or tomorrow.
23          MS. LACKMAN:  Sure.  We can call him back.
24          THE COURT:  All right.  Thank you.
25   GREGORY BREHM,

1           called as a witness by the Plaintiff,

2           having been duly sworn, testified as follows:

3   DIRECT EXAMINATION

4   BY MR. FREEMAN:

5   Q.  Mr. Brehm, thank you for appearing today.

6           What is your occupation?

7   A.  Attorney.

8   Q.  And where do you currently work?

9   A.  BuzzFeed, Inc.

10  Q.  What is your title?

11  A.  Associate general counsel.

12  Q.  How long have you been admitted to practice?

13  A.  Since 1992, I believe I was sworn in.

14  Q.  How long have you worked for BuzzFeed?

15  A.  Since December 2014.

16  Q.  And previous to joining BuzzFeed, can you describe your

17  experience in the area of copyright law.

18  A.  Yeah.  I started as an attorney -- sorry.  My first law

19  firm in 1991.  I was sworn in in probably January or February

20  of 1992.  I practiced copyright law pretty much since the

21  beginning, from 1992 through I believe it was 2006 or 2007.

22          I took time off from the practice of law.  I opened up

23  a company that made movies and short films where copyright law

24  was still a major portion of what I did.  I came to BuzzFeed in

25  2014.  And all during that time I have been involved in

18DAAMAN2                    Brehm - Direct

 1  copyright law.

 2  Q.  Is your experience primarily in transaction law or --

 3  A.  No.  I was a litigator for 15 years.

 4  Q.  But in connection with your experience at the film company,

 5  did you ever draft licensing agreements?

 6  A.  Yes, absolutely.

 7  Q.  For photographers as well as for audio visual clips?

 8  A.  For many things.  I've drafted lots of license agreements

 9  over time.

10  Q.  Is part of your job as VP and associate general counsel at

11  BuzzFeed to provide training to news editors?

12  A.  Yes.  I provide the training and I oversee the training

13  program.

14  Q.  And does this training consist of how to credit

15  photographers that are published on BuzzFeed's website?

16          THE WITNESS:  Judge, I'm sorry.  I don't feel

17  comfortable going into the details of the training that we

18  provide simply for attorney/client privileges issues.

19          THE COURT:  I'm sorry.  I am going to overrule that.

20  If you have a training program that's the policy of the

21  company, there's nothing privileged about that.  It is just the

22  company policy, isn't it?

23          THE WITNESS:  There is a training program, your Honor,

24  the specific advice I give to my --

25          THE COURT:  I'm not talking about specific advice.

18DAAMAN2                         Brehm - Direct

 1          THE WITNESS:  I have a training program, yes, and we

 2   have policies, yes.

 3   Q.  Included in those policies is, let's say, a section on how

 4   to credit photographs that are published on BuzzFeed's website?

 5   A.  Yes.

 6   Q.  Does this training also consist of how to license

 7   photograph from photographers?

 8          THE WITNESS:  Your Honor, I don't how far I can go

 9   without opening the door --

10          THE COURT:  You can go that far.

11   A.  Yes.

12   Q.  And does BuzzFeed disseminate a training manual or employee

13   handbook that instructs news editors on matters pertaining to

14   copyright ownership?

15   A.  There are written documents dealing with copyright use and

16   training that are disseminated to employees, yes.

17   Q.  During the course of this litigation, did Ms. Lackman ask

18   you to produce those documents?

19   A.  Not that I recall.

20   Q.  Interesting.

21          What other measure does the legal department at

22   BuzzFeed take to ensure BuzzFeed's use of other people's

23   copyrighted works has been authorize?

24   A.  I'm sorry.  Could you repeat the question?

25   Q.  Sure.

1          Aside from training manuals or internal memos or

2    employee handbooks, are there other measure in place at

3    BuzzFeed that are designed to ensure that BuzzFeed's use of

4    copyrighted materials have been authorized?

5    A.   Yes.

6    Q.   Does BuzzFeed maintain subscription agreements with stock

7    photo agencies, such as Getty Images?

8    A.   Yes.

9    Q.   And if a photograph is not available through a stock photo

10   agency, what procedures are in place for BuzzFeed to license

11   such photographs?

12   A.   There are legions of procedures in place for someone to

13   license photographs.

14   Q.   Does BuzzFeed employ its own staff of photographers?

15   A.   Yes.

16   Q.   Does BuzzFeed license photographs directly from freelance

17   photographers.

18   A.   BuzzFeed hires freelance photographers under various

19   agreements.

20   Q.   At BuzzFeed, is it customary for you to use written

21   licensing agreements with photographers?

22   A.   Yes.  Not to the exclusion of other agreements, but yes, we

23   do have written agreements with photographers.

24   Q.   And does the legal department at BuzzFeed train its news

25   editors that it's permissible to obtain oral authorization from

1    third parties?

2    A.   Under certain circumstances, yes.

3    Q.   Who currently supervises your work at BuzzFeed?

4    A.   Our general counsel stepped down on July 2.  I report

5    directly to the CEO now.

6    Q.   Do you supervise the work of Mike Hayes?

7    A.   I am not in Mike's direct chain of supervision, no.

8    Q.   So you never personally informed Mr. Hayes that he needs to

9    credit the work of photographers?

10   A.   I have given trainings and my team has given trainings over

11   the years, a multitude of times, and Mike has attended.  I do

12   not recall whether Mike has been in attendance for my specific

13   trainings, for the subject matter of the training that Mike was

14   in attendance for.

15   Q.   Who was Wajmah Yaqubi?

16   A.   Yaqubi one of my direct reports.

17   Q.   Is she the director of rights and clearances?

18   A.   I believe that is her title, yes.

19   Q.   You supervise her work at BuzzFeed?

20   A.   Yes, I do.

21   Q.   Is Mike Hayes required to clear photographers directly with

22   Ms. Yaqubi before he publishes them to BuzzFeed's website?

23   A.   No.

24   Q.   Is Mike Hayes able to publish a photograph on BuzzFeed's

25   website without obtaining any clearance from legal?

1  A.  Mike does not need to contact the legal department to

2  publish a photograph, no.

3          MR. FREEMAN:  OK.  Plaintiff respectfully refers the

4  Court to Plaintiff's Exhibit 20, which has been previously

5  marked in evidence.

6          Your Honor may I approach the witness?

7          THE COURT:  Yes.

8          (Pause)

9  Q.  Mr. Brehm, do you recognize this news article?

10  A.  Yes, I do.

11  Q.  When you learned about the present lawsuit of copyright

12  infringement, did you speak to Mr. Hayes?

13  A.  I have spoken with Mr. Hayes since learning about this.

14  Q.  And did you speak to Ms. Yaqubi?

15  A.  Yes.

16  Q.  Did you instruct either Mr. Hayes or Ms. Yaqubi to contact

17  Liane Fisher of Fisher & Taubenfeld to determine whether

18  Ms. Fisher had licensed the photograph to BuzzFeed?

19  A.  Yes.  To break that down specifically, when we received the

20  lawsuit we reached out to Mike of course immediately.  Mike was

21  out on paternity leave at the time.  So we didn't have easy

22  conversation with him or easy contact with him.

23          I do not believe we instructed Mike to reach out to

24  Ms. Fisher.  I am honestly not sure how that happened.  I was

25  aware that he did after the fact.  Certainly at a certain point

1   he was -- again, we were having a difficult time conversing

2   with him because he was out on leave.  I asked Ms. Yaqubi to

3   follow up with Ms. Fisher and instructed her to send the e-mail

4   that we've seen in one of your other exhibits, yes.

5   Q.  That was around September 13 through September 20, 2017?

6   A.  That strikes me as the right timeframe.

7   Q.  And was Ms. Yaqubi or Mr. Hayes able to determine at that

8   time in September of 2017 whether Ms. Fisher had granted

9   BuzzFeed a license for the photograph?

10  A.  Were we able to determine at that time, no, we were not.

11  Q.  You were not.

12       So when did you reach the conclusion that BuzzFeed did

13  not have a license to publish Mango's photograph?

14       MS. LACKMAN:  Objection.  Calls for a legal

15  conclusion.

16       THE COURT:  Overruled.

17  A.  I don't recall specifically.  I don't recall specifically,

18  no.

19       MR. FREEMAN:  Plaintiff respectfully refers the Court

20  to Exhibit No. 81.

21       May I have the Court's permission to approach the

22  witness?

23       THE COURT:  Yes.

24       (Pause)

25  Q.  Do you recognize this e-mail?

18DAAMAN2                        Brehm - Direct

1    A.  Yes.

2    Q.  And is it accurate to state that this is the e-mail from

3    Mike Hayes to Liane Fisher inquiring about whether Ms. Fisher

4    had provided the photograph for this story?

5    A.  I believe so.

6              MR. FREEMAN:  Plaintiff would like to identify

7    Plaintiff's Exhibit 85.

8              Your Honor, may I have the Court's permission to

9    approach the witness?

10             THE COURT:  Yes.

11             (Pause)

12   Q.  Mr. Brehm, you recognize this e-mail?

13   A.  Yes.

14   Q.  And is it accurate to state that Ms. Fisher informed

15   Ms. Yaqubi that she did not forward a picture of Mr. Parker to

16   Mr. Hayes?

17   A.  I'm sorry.  Can you repeat the question?

18   Q.  Does this e-mail from Ms. Fisher to Ms. Yaqubi, who I think

19   you've testified you supervise, does that e-mail state that

20   Ms. Fisher cannot locate any e-mail in which she had forwarded

21   a picture of Mr. Parker to Mr. Hayes?

22   A.  The e-mail says, "I cannot locate the e-mail where I

23   forwarded you a picture of Mr. Parker."  Mr. Parker it says,

24   actually.

25   Q.  And at that point in time did you reach the conclusion that

1   BuzzFeed did not have a license to publish Mango's photograph?

2   A.  No.  Sorry, counsel.  The e-mail in fact confirmed with us

3   that this was a question.  She said she couldn't locate the

4   e-mail where she forwarded you the picture of Mr. Parker.  In

5   our minds we still had every reason to believe at that time --

6   Mr. Hayes was still fairly certain -- that he received it

7   directly from Ms. Fisher.  And Ms. Fisher by saying I cannot

8   locate the e-mail seemed to suggest that she, like we, were

9   having difficulty finding the e-mail where it was transferred.

10  Q.  And she indicated here that perhaps Mr. Parker was the one

11  who had provided the photograph.  Did you ever follow up with

12  Mr. Parker?

13  A.  We did not.

14  Q.  After this lawsuit was filed on September 5, 2017, did you

15  disseminate an internal memorandum to the news editors at

16  BuzzFeed asking them to take further precautionary measures to

17  insure that photographers were properly credited in BuzzFeed

18  news articles?

19  A.  Did I?

20  Q.  Or the legal department.

21  A.  No.  We had no reason to do that.

22  Q.  And during the course of this litigation were you asked to

23  produce any documents concerning press kits that BuzzFeed

24  received from attorneys over the last year?

25  A.  I do not recall that specific question.

1            Counsel, if you are asking whether I reviewed your

2    document requests or I saw your document requests, I did.  I do

3    not recall specifically whether that request was in there.

4            MR. FREEMAN:  I'd like to mark as -- I'd like to

5    identify Plaintiff's Exhibit 93.

6            Your Honor, may I have permission to approach the

7    witness?

8            THE COURT:  Yes.

9            (Pause)

10           MS. LACKMAN:  I have an objection on this as I stated

11   before.

12           MR. FREEMAN:  Let me see if I can set the foundation.

13           THE COURT:  Yes.

14   Q.  Mr. Brehm, do you recognize this document dated July 9th of

15   2018?

16   A.  I do not.

17   Q.  You do not.

18           Does Ms. Lackman customarily provide you with

19   correspondence between plaintiff's counsel and defendant's

20   counsel?

21   A.  I believe so.

22   Q.  And you were present at mediation back in February,

23   correct?

24   A.  Yes.

25   Q.  Have you been kept apprised of developments in this case?

18DAAMAN2                          Brehm – Direct

1    A.  Yes.

2           MR. FREEMAN:  Your Honor, I'd like to move, plaintiff

3    respectfully moves for admission of Plaintiff's Exhibit 93.

4           MS. LACKMAN:  Objection.  Relevance.

5           No motion to compel was filed.  There is no further

6    correspondence.  The witness doesn't know anything about this

7    or doesn't recall anything about this.  He is aware of the

8    request.  I am sure I have other reasons as to why this is

9    inadmissible, but this is hearsay.  I'm not testifying to it,

10   and it also does not bear any relevance to the issues in the

11   case.  Whether or not he asked for documentation is of no

12   moment.  He never raised the matter with the Court.

13          THE COURT:  All right.  Thank you.

14          The most important thing, Mr. Freeman, is that the

15   witness has said he has no recollection of this.  This is not

16   the person through whom to introduce the document.

17          Sustained.

18          MR. FREEMAN:  OK.

19   Q.  Mr. Brehm, how many times has BuzzFeed been sued for

20   copyright infringement in the last two years?

21   A.  I honestly don't know an exact number.

22   Q.  Is it more than three times?

23          MS. LACKMAN:  Objection.

24          THE COURT:  Overruled.

25   A.  Counsel, your law firm has sued my, has sued my company

18DAAMAN2                    Brehm - Direct

1    more than three times.

2    Q.  More than five times?

3    A.  Your law firm may have sued my company more than five

4    times.

5            MR. FREEMAN:  Plaintiff identifies exhibit marked

6    Plaintiff's Exhibit 48.

7            My apologies I forgot to ask if I could approach.

8            THE COURT:  Yes.

9    Q.  Mr. Brehm, do you recognize this lawsuit, <u>Massey v.</u>

10   <u>BuzzFeed</u>, 17 CV 1553?

11   A.  I am aware of the lawsuit, yes.

12   Q.  It's a copyright infringement action involving a

13   photograph, correct?

14   A.  Yes.

15           MR. FREEMAN:  Your Honor, plaintiff respectfully moves

16   the Court to admit Plaintiff's Exhibit 48 into evidence.

17           MS. LACKMAN:  Objection.  Relevance.  The fact that

18   someone sued someone for whatever reason.

19           THE COURT:  Sustained.

20           MS. LACKMAN:  Thank you.

21           MR. FREEMAN:  Your Honor, may I respond?

22           THE COURT:  Sustained.

23           MR. FREEMAN:  No further questions, your Honor.

24           THE COURT:  Ms. Lackman.

25   CROSS-EXAMINATION

18DAAMAN2                      Brehm - Cross

1    BY MS. LACKMAN:

2    Q.  Just a couple question questions.

3         How many articles, news articles a day roughly does

4    BuzzFeed publish?

5    A.  Sorry.  News articles, I'm not certain.  I know we publish

6    on average more than 600 pieces of content a day, many of

7    which, if not most or all of which contain photographs.  Many

8    of which contain far more than one photograph.

9    Q.  So in your experience would it be difficult for BuzzFeed's

10   legal department to review 600 articles a day for copyright

11   infringement?

12   A.  Yes.  This is not to say that we are not staffed up.  The

13   staffing on the legal department with respect to rights and

14   clearances is significant.  I oversee the department.  There

15   are three other attorneys who work within rights and

16   clearances.  There is a staff of at least four other rights and

17   clearance specialists.  That's a team of eight.

18        I'm sorry.  I am losing count of fingers.

19        I believe there are at least eight people involved in

20   the rights and clearances process from the legal department.

21   The legal department trains editors, trained every person who

22   is a content maker at BuzzFeed, undergoes copyright training on

23   a regular basis, on a repeated basis, and for spot issues,

24   because we cannot review 600 pieces of content a day.  But the

25   review process is thorough.

18DAAMAN2                    Brehm - Cross

1   Q.  So your understanding is that the training process is

2   supposed to work, that people are supposed to learn something

3   by virtue of the training process and thereby not have to ask

4   you everyday to review everything?

5   A.  Yes.  That is exactly what we have done.  Our intent is to

6   a train people to make their own informed decisions and to make

7   appropriate ones.

8   Q.  At some point during this litigation you became aware of

9   the fact that the photograph used in the article came from the

10  New York Post, is that correct?

11  A.  That is correct.

12  Q.  So on learning that there was no need to ask Mr. Parker,

13  right?

14  A.  Correct.  We also knew -- sorry.  We also knew that no one

15  internally at BuzzFeed had reached out to Mr. Parker nor did we

16  think that the photograph was a selfie.  Mr. Parker didn't take

17  that photograph.

18  Q.  And then briefly on the Massey case that Mr. Freeman

19  mentioned, do you recall that?

20  A.  I do.

21  Q.  And that matter was resolved before trial?

22  A.  Yes, along with several other matters that counsel has

23  raised.

24          You asked the question had lawsuits been brought

25  against us.  Counsel's firm brought lawsuits against us and

18DAAMAN2                          Brehm - Redirect

1   dropped them, brought lawsuits against us and settled them,

2   brought lawsuits against us like the one here that's going to

3   trial.  There may be others.

4   Q.  And the case involving Mr. Massey's photograph, BuzzFeed

5   asserted a defense of fair use, is that correct?

6   A.  That's correct.

7   Q.  Because the story at issue talked about the photograph,

8   right?

9   A.  Discussed it in detail.

10          MS. LACKMAN:  I have no further questions.

11          MR. FREEMAN:  Just one quick.

12          THE COURT:  Yes.

13          MR. FREEMAN:  Plaintiff identifies Plaintiff's Exhibit

14   96.

15          Your Honor, may I approach the witness?

16          THE COURT:  Yes.

17          (Pause)

18   REDIRECT EXAMINATION

19   Q.  Mr. Brehm, do you recognize this document?

20   A.  Yes.

21          MR. FREEMAN:  Your Honor, plaintiff respectfully moves

22   to admit Plaintiff's Exhibit 96 into evidence.

23          THE COURT:  This is a stipulation?

24          MR. FREEMAN:  Yes.

25          THE COURT:  Presumably it's already in evidence.

18DAAMAN2                          Brehm - Redirect

1           MR. FREEMAN:  Actually, it was never placed on ECF.

2      So I figured just for housekeeping measures.

3           THE COURT:  Admitted.

4           (Plaintiff's Exhibit 96 received in evidence)

5           THE COURT:  Proceed.

6           MR. FREEMAN:  That is it.  I just wanted to put it in.

7           THE COURT:  All right.

8           MR. FREEMAN:  Thank you, Mr. Brehm.  I appreciate it.

9           THE COURT:  Mr. Brehm, I have a couple questions for

10     you.

11          For this purpose, if you can turn to the plaintiff's

12     exhibit binder and begin with No. 77.

13          THE WITNESS:  I'm sorry.  I don't have the binder in

14     front of me, your Honor.

15          MR. FREEMAN:  Which number was it?

16          THE COURT:  Begin with 77.

17          (Pause)

18          MS. LACKMAN:  The metadata shot?

19          THE COURT:  Yes.

20          Also give him 20 and 13.

21          (Pause)

22          THE WITNESS:  I have 20.

23          THE COURT:  Thirteen?

24          THE WITNESS:  I am not sure which 13 is, your Honor.

25          MS. LACKMAN:  The New York Post article from January.

18DAAMAN2                    Brehm - Redirect

1              (Pause)

2              THE COURT:  All right.  Mr. Brehm, starting with

3     Exhibit 77.

4              THE WITNESS:  Yes.

5              THE COURT:  Do you understand what that document

6     purports to show and to what extent is that the process for

7     obtaining information and photographs from the internet, as

8     indicated here, part of the training that is provided to your

9     writers and editors?

10             THE WITNESS:  I'm not sure of the exact question, your

11    Honor.  I am familiar with what that file is, what this

12    document is.

13             THE COURT:  Does this file represent a common

14    procedure by which your editors and writers obtain photographs?

15             THE WITNESS:  I'm not -- I'm sorry.  Do we obtain

16    photographs from the internet for publication?

17             THE COURT:  Does this represent --

18             THE WITNESS:  Sorry, Judge.  What this information is,

19    just so you know, this is a file information.  So any document

20    you have or any piece of data that you have, any file that you

21    have on a computer will have a similar type of thing.  This is

22    just the information from the file.

23             This was the information from a photograph on a

24    document.  A Microsoft Word document or a downloaded PDF

25    document will have a similar file.  So this document,

1     Plaintiff's Exhibit 77, is merely a printout of all of the data

2     that was attached to that file document.

3               THE COURT:  But in order to obtain that data somebody

4     has to input something into the computer.  There's a process by

5     which to do that.

6               THE WITNESS:  It is done on another end.  The person

7     who places the data on the internet or the person who created

8     the file that we're discussing, that could be a file that was

9     created by you or me or anyone in the room, or by The New York

10    Post or by someone else whoever creates that file attaches the

11    data that appears in this printout.

12              THE COURT:  But in this case Mr. Hayes obtained access

13    to that data.

14              THE WITNESS:  Yes, he did.

15              THE COURT:  So he knew how to do that.

16              THE WITNESS:  Yes.  Well --

17              THE COURT:  Presumably.

18              THE WITNESS:  A matter of clicking, your Honor.

19              THE COURT:  All right.  Is the process by which you

20    obtained photographs like this part of the training that your

21    editors and writers go through?

22              THE WITNESS:  We discuss ways to obtain photographs

23    appropriately and legally, so yes.

24              THE COURT:  All right.  So now turn to exhibit No. 20.

25    This is the photograph that actually appeared in the BuzzFeed

18DAAMAN2                          Brehm - Redirect

article.  You will note that on the lower left-hand part of the

photograph it includes the name of Mr. Parker and Fisher &

Taubenfeld.

          If you turn back to 77, there's no indication of the

title or the source.

          THE WITNESS:  I would say that there is a title.  The

name of the document is raymond-parker.jpeg, which I think

appears about a little over halfway -- a little less than

halfway down the page on the first page of Plaintiff's Exhibit

77.

          As for the reference to Fisher & Taubenfeld, your

Honor, that reflected to us, and throughout the investigation

was consistent with my case, is recollection that he received

permission to use this photograph from Liane Fisher in his

telephone call and was appropriately trying to credit the

person who he received permission from.

          THE COURT:  Well, let's move back a couple of steps.

When your editors and writers obtain photographs such as

exhibit No. 77 that do not include attribution to a

photograph -- does that happen?  Is it common?

          THE WITNESS:  I do not know if it happens or how often

it happens.  It is certainly possible that it happens.

          THE COURT:  What does your policy and training

provide, instructions for the editors and writers to do in a

case like that?

18DAAMAN2                          Brehm - Redirect

1          THE WITNESS:  The overarching instruction will be not

2     to use a photograph without permission unless there are certain

3     circumstances to which fair use applies or others that I could

4     contemplate.

5          There's also a second step.  That second step is to

6     always attempt to determine the person who -- to determine the

7     origin of the photograph.

8          THE COURT:  Well, that's what I'm referring to.

9          THE WITNESS:  Right.

10          THE COURT:  Permission assumes that you know who to

11     ask permission of, but in this case there is no indication of

12     anybody.

13          THE WITNESS:  There was not in this file.

14          THE COURT:  So what does your training provide your

15     editors and writers to do when they find the photograph by this

16     means that does not have attribution of the owner?

17          THE WITNESS:  Judge, I hope you would not be surprised

18     to know that with 600 pieces of content a day we can't

19     anticipate all mean by which people will find photographs.

20          What we suggest is that if you find a photograph that

21     you cannot immediately attribute or directly attribute to

22     someone, that you endeavor to find that source or to find -- to

23     find the source of the photograph.

24          There's a whole body of law built around orphan works.

25     It is not unusual to find a photograph where you cannot

18DAAMAN2                        Brehm - Redirect

1    identify the actual author or the owner of the copyright.

2            We inform people to make best efforts and to reach out

3    to legal for help when they feel that there is any question

4    with respect to having the authority to use the photograph or

5    not.

6            THE COURT:  OK.  In this case Mr. Hayes by looking at

7    the metadata information knew that this photograph came from

8    The New York Post.

9            THE WITNESS:  To be candid, Judge, I don't know that

10   Mr. Hayes ever saw that metadata before this lawsuit was filed.

11           THE COURT:  Look at Exhibit 77.

12           THE WITNESS:  I see.

13           THE COURT:  It was created, on top, Tuesday April 11,

14   11:48 a.m.

15           THE WITNESS:  That is certainly the time that Mr.

16   Parker downloaded this photograph.  That would seem the time

17   that the file was created on his computer.

18           THE COURT:  On Mr. Parker's computer?

19           THE WITNESS:  Sorry.  On Mr. Hayes's computer.

20           THE COURT:  So --

21           THE WITNESS:  Judge, if you are asking did Mr. Hayes,

22   do I think Mr. Hayes knew he got the photograph from the Post,

23   I believe he did.  I think that's very clear.

24           THE COURT:  Excuse me.  Let me finish, please.

25           THE WITNESS:  Sure.

18DAAMAN2                     Brehm - Redirect

 1          THE COURT:  Mr. Hayes created the document at

 2   11:48 a.m. and down below it says he got it from The New York

 3   Post.

 4          THE WITNESS:  Yes.

 5          THE COURT:  Now, if you turn to Exhibit 13.  Do you

 6   have 13?

 7          THE WITNESS:  I don't.

 8          MS. LACKMAN:  The January article from The Post.

 9          THE WITNESS:  Yes, I do.

10          THE COURT:  Look at lower left-hand corner.

11          THE WITNESS:  OK.

12          THE COURT:  So The New York Post's picture of

13   Mr. Parker attributed the photograph to Mr. Mango, correct?

14          THE WITNESS:  Yes.

15          THE COURT:  So if Mr. Hayes had called The New York

16   Post realizing that the picture that he saw did not have

17   attribution of the photographer and that it came from The New

18   York Post and he called The New York Post, they may have told

19   him that the photograph came from Mr. Mango.  Is; that a fair

20   statement?

21          THE WITNESS:  Yes.

22          THE COURT:  But he did not.

23          THE WITNESS:  He did not.

24          THE COURT:  He instead assumed that it came from

25   Fisher & Taubenfeld.

18DAAMAN2                    Brehm - Redirect

1           THE WITNESS:  Your Honor, I believe it was more than

2   an assumption on his part.  It was his understanding that

3   Fisher & Taubenfeld had the authority to grant that to him.

4   Sitting here today --

5           THE COURT:  Excuse me, please.  That was based on the

6   discussion on the telephone with Ms. Fisher earlier in the

7   morning.

8           THE WITNESS:  Yes.

9           THE COURT:  But you heard Ms. Fisher testify that she

10  does not have recollection of having told him that that

11  photograph was in The New York Post.

12          THE WITNESS:  Right.  But I also heard Mr. Hayes

13  telling, consistent with the story he told me in the beginning,

14  that he recalls Ms. Fisher giving him that permission.  He

15  believed in it so wholeheartedly that he asked for the e-mail

16  regarding that.

17          Ms. Fisher responded back with the exhibit we've just

18  read, Judge, which said I can't locate the e-mail where I sent

19  it to you.  Ms. Fisher seemed to innately recall that she gave

20  him permission for something as well.

21          All of this was, unfortunately, six months later.

22          THE COURT:  All right.  Thank you.  You may step down.

23  You are excused.

24          MS. LACKMAN:  Can I do a little clean-up?

25          THE COURT:  Yes.

1           MR. FREEMAN:  No further questions.

2    RECROSS EXAMINATION

3    BY MS. LACKMAN:

4    Q.   Looking back at Exhibit 77, is the data that's shown

5    ordinarily visible to someone looking at, for example, The New

6    York Post article?

7    A.   No.

8    Q.   Do people who obtain photos routinely open up the file

9    information to check it?

10   A.   Not that I'm aware.

11   Q.   Do you have any understanding as to what the circumstances

12   were for obtaining what's shown in Exhibit 77?

13   A.   The data that's shown in Exhibit 77, I do.

14   Q.   OK.  And what is that?

15   A.   This was done in response to discovery requests regarding

16   the photograph at issue.  We did our very best to find the

17   e-mail exchange which Mr. Hayes recalled and to which

18   Ms. Fisher alluded.  We could not find that anywhere.  We went

19   to Mr. Hayes's computer to find the earliest version or any

20   version of the photograph.  When we found that photograph on

21   his computer, we accessed this data.  The metadata we would

22   call it.  We printed that out and supplied it as part of our

23   document production.

24   Q.   So the date that shows the created date, does that reflect

25   the date that the file that we're looking at was created?

A.  That reflects the -- sorry -- the created date.

Q.  April 11, 2017, do you have an understanding of what that

date reflects?

A.  Yes.

Q.  And that's what understanding?

A.  Sorry.  The understanding is that that photograph of

Raymond Parker appeared on Mr. Hayes's computer for the first

time or was saved on Mr. Hayes's computer for the first time on

Tuesday, April 11, at 11:48 a.m.

Q.  So this is the file that is automatically created upon

download?

A.  That is my understanding.

Q.  In order to access the metadata, when you went to -- when

that file was obtained, was it sitting in that format visible

or did something have to be done to pull it up?

A.  I do not know how this was specifically pulled up.  You

usually have to access it through a separate program.  It is

not something that immediately appears.

        This may have been under the info section where your

computer operating system can provide you with information on

files on the computer.  I would be speculating as to how that

was done.

Q.  Is this metadata created automatically by a computer upon

saving?

A.  That is my understanding.

1   Q.  So if I have a folder of photographs, I am not going to see

2   the metadata unless I specifically inquire?

3   A.  Correct.

4   Q.  In the circumstance such as this where a party has already,

5   at least under Mr. Hayes's view, already provided authority, is

6   there any reason to inquire, to followup and say, no, that's

7   not in the metadata or anything like that?

8   A.  We would assume once given authority from a reputable

9   source that could be reasonably relied upon and not knowing

10  anything contrary to that, that it would be acceptable to cease

11  your investigation into that.

12          We saw nothing inconsistent with the permission that

13  was granted.

14  Q.  And did Mr. Hayes tell you that Ms. Fisher said that he

15  should use the photo that --

16  A.  Mr. Hayes was under the impression from the very first time

17  we spoke to him that he had been given permission by Ms. Fisher

18  to use the photograph.

19  Q.  And did he mention to you whether or not he knew of The New

20  York Post article prior to talking to Ms. Fisher?

21  A.  He did not discuss timeframes with us.

22  Q.  Exhibit 13.  Take a look at that.

23  A.  Sure.

24  Q.  Do you see the writeup that is on that exhibit?

25  A.  I do.

18DAAMAN2                    Brehm - Recross

1   Q.   Does Mr. Mango's name appear in the same font style or

2   color as Mr. Parker's name?

3   A.   No, it does not.

4   Q.   I noticed you removed your glasses when you picked up that

5   exhibit.  Is there some reason for that?

6   A.   I did.  Like counsel, I'm over the age of 40 and I cannot

7   read that line sitting here with my glasses on.  I can read

8   every other line on page.  I cannot read the second line under

9   the term Raymond Parker.  I could not read Mr. Mango's name

10  without taking my gases up and holding it up.

11  Q.   Is it conceivable that Mr. Hayes couldn't have seen the

12  credit when he looked at it?

13  A.   In my mind it is, but he is here.

14  Q.   OK.  All right.

15              MS. LACKMAN:  I have no further questions.

16              MR. FREEMAN:  No further questions, your Honor.

17              THE COURT:  Mr. Brehm, another question.  The question

18  is maybe more a question of computer technology than copyright

19  law.  But in Exhibit 77 when someone is obtaining the metadata

20  and uploading a photograph -- the photograph came from Exhibit

21  13 which was a New York Post file.  When someone creates the

22  photograph for the metadata, does the computer automatically

23  cut off the gutter credits?

24              THE WITNESS:  We will look at this metadata from time

25  to time as part of investigations into usage questions and

18DAAMAN2                    Brehm - Recross

1    rights.  I've never seen gutter credits attached to metadata.

2    You will frequently see, your Honor, I will say this, you will

3    frequently see a photographer's credit or photographers when

4    they upload photographs, for example, onto photo-sharing sites

5    can load metadata along with their photographs.

6           Many photographers, and Mr. Mango will probably be

7    able to testify to this better than I can.  The metadata

8    captured in a photograph will tell you the type of camera that

9    was used, the date that it was taken, the time that it was

10   taken.  Often metadata includes reference to a photographer.

11   This did not.

12          THE COURT:  OK.  Thank you.  You are excused.  You may

13   step down.

14          (Witness excused)

15          THE COURT:  Mr. Freeman.

16          MR. FREEMAN:  Thank you, your Honor.  So there's one

17   more witness left in our case.  I believe in the entire case.

18          MS. LACKMAN:  Correct.  Actually, Mr. Hayes is back if

19   the Court has maybe --

20          THE COURT:  Yes.  Mr. Hayes take the stand again.

21          Mr. Hayes, you remain under oath, the same oath that

22   you took this morning.

23    MICHAEL HAYES, recalled.

24          THE COURT:  Just a follow-up question, Mr. Hayes,

25   something that I raised earlier but did not pursue fully

18DAAMAN2                        Brehm - Recross

1   relating to Exhibit No. 77, which was a picture with the

2   metadata.  This goes essentially to the question that I was

3   asking Mr. Brehm.  The photograph that appears in Exhibit 77

4   does not have the gutter credits, correct?

5              THE WITNESS:  Yes.

6              THE COURT:  And this is the way you saw the photograph

7   originally?

8              THE WITNESS:  Yes, I believe so.

9              MS. LACKMAN:  I'm sorry, Judge.  For clarification, is

10  the Court talking about seeing the metadata original or seeing

11  the photograph original?

12             THE COURT:  I am assuming that the metadata and

13  photograph are part of the same document.  Is it not --

14             MS. LACKMAN:  Not necessarily.

15             THE COURT:  -- in this case?

16             MS. LACKMAN:  As Mr. Brehm testified, this is a file

17  that accompanies the photograph.  It is not ordinarily visible

18  unless you seek it out.

19             THE COURT:  All right.

20             Let me ask Mr. Hayes directly.  When you saw the

21  metadata that's part of Exhibit No. 77, did that exhibit or

22  that document that you examined contain the photograph of

23  Mr. Parker that's at the bottom of Exhibit No. 77?

24             THE WITNESS:  I am a little confused by your question.

25             THE COURT:  Let me start again.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18DAAMAN2                    Brehm - Recross

1          You asked Ms. Fisher for a photograph of Mr. Parker

2     and she said I'll look to see if I could find one, correct?

3          THE WITNESS:  I don't recall exactly.

4          THE COURT:  It was an e-mail exchange in which you

5     said can you share a photograph.

6          THE WITNESS:  Correct.

7          THE COURT:  So you were looking for a photograph.

8          THE WITNESS:  Correct.

9          THE COURT:  And at some point, whether or not from

10    Ms. Fisher or otherwise, you found that there was a photograph

11    of Mr. Parker in The New York Post files.

12         THE WITNESS:  As I believe I testified earlier, I

13    spoke to Ms. Fisher on the phone and followed up on my inquiry

14    about a photograph.  At that point she advised me to use this

15    photograph.

16         THE COURT:  Let's put aside what she advised you.  The

17    question is, you went to The New York Post files, correct?

18         THE WITNESS:  After speaking to Ms. Fisher, yes.

19         THE COURT:  Let's put Ms. Fisher aside.

20         You went to The New York Post files and you obtained

21    information from The New York Post files indicating that there

22    was a photograph of Mr. Parker in those files.

23         THE WITNESS:  I went to --

24         MS. LACKMAN:  I'm sorry, Judge.  I hate to object to

25    the question, but he testified that he went to the article, not

1    to anyone's files.

2              MR. FREEMAN:  We agree with that, your Honor, for

3    clarification.

4              THE COURT:  All right.  In The New York Post files you

5    found the article.

6              MR. FREEMAN:  Online.  The New York Post article is

7    posted online.  So anyone could just visit it.  What we believe

8    he did is he just right clicked on the photograph that was

9    actually displayed on The New York Post article and downloaded

10   it.  Like we could do that right now if we had access to the

11   internet.

12             MS. LACKMAN:  We actually do.  It would help the Court

13   to show and try to recreate the process.

14             THE COURT:  We're not there yet.

15             When you downloaded the photograph, Mr. Hayes, did the

16   photograph as it appeared in that New York Post online contain

17   what is in Exhibit 13?  You saw a story, correct?  You

18   downloaded the whole story?

19             THE WITNESS:  No, I downloaded the photograph from the

20   URL.

21             THE COURT:  Did the photograph contain the name of

22   Mr. Parker and the name of Gregory Mango?

23             THE WITNESS:  Not to my knowledge.

24             THE COURT:  So what you saw, essentially, was what is

25   in Exhibit 77?

1      THE WITNESS:  What I saw is essentially the image

2  contained in Exhibit 77, yes.

3      THE COURT:  So the exhibit of course as you saw it did

4  not contain the gutter information.

5      What is your understanding of your practice or the

6  company policy of what to do when you come upon a photograph

7  that does not have the gutter credits?

8      THE WITNESS:  My understanding is the company policy

9  is to attribute the photo to the source of the photographic

10  gutter.

11      THE COURT:  All right.  But now, Mr. Hayes, at that

12  point you knew that the source of the photo was The New York

13  Post because that's where you got it.

14      THE WITNESS:  I was advised by Ms. Fisher that she had

15  the authority to distribute this photo to media outlets and

16  when she told me to use that photo, I followed her

17  instructions.

18      THE COURT:  She specifically told you that she had the

19  authority to distribute this particular photo?

20      THE WITNESS:  That is my recollection, yes.

21      THE COURT:  So even though The New York Post site did

22  not have the gutter credits, you did not call The New York Post

23  to find out if they had the name of the photographer?

24      THE WITNESS:  I didn't think it was necessary after

25  speaking to Ms. Fisher that I needed to do that.

18DAAMAN2                        Brehm - Recross

1            THE COURT:  So your testimony is that you understood

2     Ms. Fisher to have told you that she had the authority to

3     essentially license your use of that photograph.

4            THE WITNESS:  Yes.

5            THE COURT:  Thank you.

6            Mr. Freeman.

7            MR. FREEMAN:  Yes.  A quick point of clarification,

8     your Honor.  I believe Mr. Hayes testified that he visited the

9     URL for The New York Post article, which is actually in

10    Plaintiff's Exhibit 13, where we could visit it today.  So on

11    Plaintiff's Exhibit 13 Gregory Mango's name is listed on the

12    gutter credit.  So the idea is that, well, if he went to The

13    New York Post URL and he saw the photograph, which is where he

14    downloaded it, then he also must have seen the CMI, the gutter

15    credit to Mr. Mango.  He then downloaded the photograph onto

16    his desktop.  At that point you can then right click on the

17    photograph, the JPEG file, and that's where you get Exhibit 77.

18           Now, in 77 Gregory Mango's gutter credit is not

19    listed.  It's only listed on the face of website that is

20    screenshotted in Plaintiff's Exhibit 13.

21           THE COURT:  All right.  Let me then come back again to

22    Mr. Hayes.  Was Exhibit No. 13 the first time that you saw the

23    photograph of Mr. Parker?

24           THE WITNESS:  I believe so, yes.

25           THE COURT:  You saw the entire article in The New York

1   Post, not just the photograph.

2           THE WITNESS:  I don't recall if I read the entire

3   article at the time I saw the photo.

4           THE COURT:  But did you read the whole article?

5           THE WITNESS:  At some point I probably read the

6   article.

7           THE COURT:  If you read The New York Post article

8   that's in Exhibit No. 13, why would the photograph as it

9   appears in Exhibit 13 not have been what you first saw in its

10  entirety?

11          THE WITNESS:  I don't understand the question.

12          THE COURT:  When you went to The New York Post site to

13  look at the article that you say Ms. Fisher had directed you

14  to, you saw this article and the article contained a narrative

15  down at the bottom, but it also contained a photograph,

16  correct?

17          THE WITNESS:  Yes.

18          THE COURT:  Was the photograph that it contained

19  exactly the same one that is in Exhibit 13?

20          THE WITNESS:  Yes.

21          THE COURT:  That exhibit says Raymond Parker, Gregory

22  P. Mango.

23          THE WITNESS:  Yes.

24          THE COURT:  So in that event when you created Exhibit

25  No. 77 and lopped off the gutter credit --

18DAAMAN2                     Brehm - Recross

1           THE WITNESS:  I never lopped off any gutter credits.

2           THE COURT:  Well, you download the picture that

3     effectively removed the gutter credit.

4           THE WITNESS:  That's incorrect, Judge.

5           THE COURT:  Then correct me.  How --

6           THE WITNESS:  Exhibit 77 isn't an exact verbatim copy

7     of the file that was on The New York Post website.  The fact

8     that there is no gutter credit in Exhibit 77 should indicate to

9     you that there's no gutter credit or, in the metadata for a

10    photo that is on The New York Post website.

11          THE COURT:  All right.  Mr. Hayes, chronologically

12    before you created what's Exhibit No. 77, before had you

13    already seen Exhibit No. 13, which is the sister story itself,

14    with the photograph?

15          THE WITNESS:  Exhibit 77 was created this past fall

16    when we were investigating the source of the photo.  It is my

17    recollection that I created what is represented at the

18    screenshot in Exhibit 77.

19          I did the work personally to seek out the information

20    about this photo, and that was done roughly sometime last fall

21    when we were investigating the source of the photo.

22          THE COURT:  Then we have to step back not to last fall

23    but to April 11, 2017 sometime in the morning.  Sometime before

24    noon.

25          Let's go back to that date.  You need a photograph of

18DAAMAN2                    Brehm - Recross

1    Mr. Parker.

2             THE WITNESS:  Yes.

3             THE COURT:  You say you asked Ms. Fisher for a

4    photograph.

5             THE WITNESS:  Yes.

6             THE COURT:  You say she directed you to The New York

7    Post.

8             THE WITNESS:  Yes.

9             THE COURT:  You went to The New York Post site and you

10   saw Exhibit No. 13.

11            THE WITNESS:  Yes.

12            THE COURT:  Exhibit No. 13 has gutter credits.

13            THE WITNESS:  Yes.

14            THE COURT:  The gutter credit includes Gregory Mango.

15            THE WITNESS:  Yes.

16            THE COURT:  Now you write your story in Exhibit No. 20

17   and you have the photograph that you had seen in The New York

18   Post, correct?

19            THE WITNESS:  Yes.

20            THE COURT:  And now instead of saying Gregory Mango,

21   it says Fisher & Taubenfeld.  How did that come about?

22            THE WITNESS:  First off, as I testified, Ms. Fisher

23   was the one who instructed me to use the photo.  So I

24   believe --

25            THE COURT:  Sorry, Mr. Hayes.  Having seen Exhibit No.

18DAAMAN2                    Brehm - Recross

1      13, you knew that The New York Post attributed the photograph

2      to Mr. Mango.

3               THE WITNESS:  I don't know that when I saw this

4      article for the first time in April.  I did not see Mr. Mango's

5      name there.  Again, it's very faint as it appeared, and it is

6      my recollection that I did not see his name at that time.

7               THE COURT:  It may be faint, Mr. Hayes, but you don't

8      really need a magnifying glass to see that there is an

9      attribution of a name there and that it is not Fisher &

10     Taubenfeld.

11               How did Fisher & Taubenfeld or Fisher & Taubenfeld's

12     name come up substituting for Gregory Mango?  How did that

13     happen?

14               THE WITNESS:  As I said several times this morning,

15     Ms. Fisher --

16               THE COURT:  I understand what you thought.

17     Technically, who typed in that name?

18               THE WITNESS:  As I believe I testified earlier, when I

19     created this article I attributed the photo to Fisher &

20     Taubenfeld.

21               THE COURT:  You had a photograph of Mr. Parker that

22     presumably had Gregory Mango's name in the gutter and either

23     you or someone else then substituted Mr. Mango's name with

24     Fisher & Taubenfeld.

25               MS. LACKMAN:  Judge, I am sorry.  I think the parties

18DAAMAN2                        Brehm - Recross

1    may be talking past each other.

2                THE COURT:  Let me see if he can answer that question

3    first.

4                THE WITNESS:  Could you repeat the question?

5                THE COURT:  At some point in the morning, around

6    noontime of April 11, you saw The New York Post article that

7    had a picture of Mr. Parker and The New York Post article

8    attributes the photograph to Gregory Mango.

9                THE WITNESS:  That is it how it appears in Exhibit 13,

10   yes.

11               THE COURT:  All right.  And you wanted that

12   photograph.

13               THE WITNESS:  I wanted a photograph of Mr. Parker.

14               THE COURT:  You came across this one.

15               THE WITNESS:  I was directed to this photo about --

16               THE COURT:  You came across the photograph.  However

17   you came across it, you came across the photograph.

18               THE WITNESS:  Yes.

19               THE COURT:  And the photograph as appears in 13 has

20   Mr. Mango.  As it appears in your article, it has Fisher &

21   Taubenfeld.

22               THE WITNESS:  Yes.

23               THE COURT:  Did you yourself substitute Fisher &

24   Taubenfeld or did you have someone else do that?

25               MS. LACKMAN:  I have to object to the question, but

18DAAMAN2                          Hayes - Redirect

1   you can answer if you understand.

2              THE WITNESS:  Could you repeat the question?

3              THE COURT:  Did you yourself substitute Fisher &

4   Taubenfeld for Mr. Mango's's name on the photograph?

5              THE WITNESS:  In our CMS there is a field to enter

6   photo credits, and I believe I was the one that entered the

7   photo credit for Fisher & Taubenfeld, yes.

8              THE COURT:  All right.  But when you did that, was

9   Mr. Mango's name in on that line?

10             THE WITNESS:  No.

11             THE COURT:  What was on that line?

12             THE WITNESS:  Nothing.

13             THE COURT:  All right.  Ms. Lackman.

14             MS. LACKMAN:  Does plaintiff have anything?

15             MR. FREEMAN:  Yes.  I just have a couple questions.

16             THE COURT:  Yes.

17  REDIRECT EXAMINATION

18  BY MR. FREEMAN:

19  Q.  Mr. Hayes, if you look at Plaintiff's Exhibit 13, on the

20  second page at the top, very top, you might see that there's a

21  quotation attributed to Mr. Parker.  It says:  "They can't

22  disqualify me because of my disability."

23             Do you see that?

24  A.  Yes.

25  Q.  Now, can you turn to Exhibit 20, on the second page.

18DAAMAN2                      Hayes - Redirect

1          If you go down I'd say maybe five paragraphs, right in

2     the middle of page, do you see that there's a quotation that

3     says:  "They can't disqualify me because of my disability,

4     Parker told The New York Post in an interview after the lawsuit

5     was filed."

6     A.  Yes.

7     Q.  So is it correct to say that you used Exhibit 13 as a

8     source not only for the photograph but also for Mr. Parker's

9     interview with The New York Post?

10          MS. LACKMAN:  Objection to the term "the source."  He

11     didn't testify --

12          THE COURT:  Overruled.

13     A.  It's plain to see that I incorporated a quote from

14     Mr. Parker that was given to The New York Post and clearly

15     attributed that quote to an interview that Mr. Parker gave The

16     New York Post both in context of the article as well as in what

17     I believed to be a hyperlink based on the fact that The New

18     York Post is shaded blue here.

19     Q.  And did you attempt to contact Mr. Parker in connection

20     with your own article to get your own quotation or interview

21     with Mr. Parker?

22     A.  I contacted his lawyer Liane Fisher.

23          MR. FREEMAN:  Thank you.

24          No further questions.

25          THE COURT:  Ms. Lackman.

18DAAMAN2                    Hayes – Recross

1    RECROSS EXAMINATION

2    BY MS. LACKMAN:

3    Q.  Including the credits from Fisher & Taubenfeld, you

4    concluded the photo in The New York Post came from Ms. Fisher

5    at some point, is that correct?

6    A.  Yes.

7    Q.  And when you attributed the quote to The New York Post, you

8    as a matter of logic, or tell me if I'm wrong, you weren't

9    trying to conceal from the public that the quote came from The

10   New York Post, right?

11   A.  Actually not.

12           MR. FREEMAN:  Objection.  That is a leading question.

13           THE COURT:  Sustained.

14           MS. LACKMAN:  He's been called as a hostile witness.

15   Accordingly, I am attempting to cross or redirect in that

16   regard.

17           Maybe I can ask it another way.

18   Q.  If you had intended to conceal from the public that you got

19   the quote from The New York Post, would you have mentioned The

20   New York Post?

21   A.  No.

22           THE COURT:  All right.  Ms. Lackman, I think that this

23   is all irrelevant.  It has nothing to do with the photograph.

24           MS. LACKMAN:  Well, to clarify:

25   Q.  The hyperlink that you referenced is to the article you

18DAAMAN2                    Hayes - Recross

1    were shown in Exhibit 13?

2    A.  I would be willing to bet, yes.

3    Q.  So basically as a matter of a layperson's terminology, you

4    click on the link and it takes to you The New York Post

5    article?

6    A.  Yes.

7    Q.  When did you first see Mr. Mango's name under the

8    photograph in Exhibit 13?

9    A.  I probably saw it around the time that I learned about this

10   lawsuit.

11   Q.  Do you have any understanding as to -- it's there.  Do you

12   have any understanding as why you didn't see it?

13   A.  Again, it's very faint.  I don't recall seeing it before

14   that time.

15   Q.  And is the gutter credit inside the photograph?

16   A.  No.  The gutter credit -- it's hard for me to -- I am

17   speculating on The New York Post's CMS.  This is how our CMS

18   works.

19            The gutter credit I imagine was a added as a text line

20   in a field under the photo.

21   Q.  So it's a separate element from the image?

22   A.  I believe so.  Yes.  Again, the only metadata that I've

23   looked at for this photo was in Exhibit 77, I believe it is.

24   Q.  So the boundaries, let's just say the boundaries of the

25   photograph, those end at the boundaries of the image, correct?

1  A.  Correct.  For this particular photograph all you have to do

2  is look at Exhibit 77, the image contained in 77, and that will

3  tell you the boundaries of the metadata for this image.

4  Q.  OK.  So if you right click on the image, it won't take the

5  gutter credit with it?

6  A.  No.

7  Q.  Earlier I believe you said that you needed a photo of

8  Mr. Parker.  Someone said you need a photo.  Maybe the Court

9  did.  Did you need a photo of Mr. Parker?

10  A.  I could have published the article without it.  We

11  typically try to obtain photos, utilize photos of the subject

12  of a story that we're publishing.

13  Q.  And why is that?

14  A.  We believe that gives the reader your best context of the

15  story.

16  Q.  What if you can't get a photo of a subject?

17  A.  We'll typically still include a photo in an article and

18  we'll use something else.

19  Q.  OK.  So just one last question to clean up on the concept

20  of image versus the gutter credit.  When you downloaded the

21  photograph, it's correct at that time the gutter credit did not

22  come with it?

23  A.  Correct.

24  Q.  So there was no -- in your view, was there any

25  substitution?

18DAAMAN2                    Hayes – Recross

1   A.  Substitution?

2   Q.  Sorry.  The substitution of one credit for another.

3   A.  In my mind, no.

4   Q.  So on BuzzFeed's system in order to include a credit, you

5   have to affirmatively type in what you want under the photo,

6   right?

7   A.  Correct.

8              MS. LACKMAN:  I hope that helps the Court.

9              I have no further questions.

10             THE COURT:  Thank you.

11             What I am going to ask the parties to do is to find on

12  the computer that's before you, and agree upon it, the exact

13  photograph or the article from The New York Post that's in

14  Exhibit 13.

15             MS. LACKMAN:  Can we show the Court, with consent of

16  plaintiff's counsel and perhaps with Mr. Hayes advising us, the

17  process of going to the article and getting the photo and

18  downloading.

19             THE COURT:  Just go through the process and get the

20  photograph, the article.

21             MS. LACKMAN:  Sure.  We could do that now.

22             THE COURT:  Get on the screen the article that

23  Mr. Hayes said he found.

24             (Pause)

25             MS. LACKMAN:  Can we take a five-minute break and call

18DAAMAN2                    Hayes - Recross

1    the IT person?

2           THE COURT:  We have it here on the screen.  You can

3    come around and see if this conforms to what your understanding

4    is of the site.

5           (Pause)

6           MS. LACKMAN:  That's right.

7           MR. FREEMAN:  That's it.

8           THE COURT:  Mr. Hayes, can you look at that photograph

9    yourself.

10          THE WITNESS:  I can see it from here, yes.

11          THE COURT:  Mr. Hayes, can you just step up forward

12   and take a look at the picture.

13          (Pause)

14          THE DEPUTY CLERK:  Save the picture?

15          THE COURT:  Yes.

16          (Pause)

17          THE COURT:  Mr. Hayes, do you see the photograph

18   clearly enough?

19          THE WITNESS:  Yes.

20          THE COURT:  Do you see Mr. Parker's name?

21          THE WITNESS:  Yes.

22          THE COURT:  Do you see Mr. Mango's name?

23          THE WITNESS:  Yes.

24          THE COURT:  Is Mr. Mango's name blurred, obscured, in

25   any way difficult to read?

18DAAMAN2                    Hayes - Recross

1                  THE WITNESS:  It's difficult to read.

2                  THE COURT:  Difficult?

3                  THE WITNESS:  Yes.

4                  THE COURT:  It's in a lighter font maybe, but you say

5        you cannot make that out?

6                  THE WITNESS:  I can make it out.

7                  THE COURT:  But you see that there is a name there.

8                  THE WITNESS:  Yes.

9                  THE COURT:  And the name is Gregory Mango's.

10                 THE WITNESS:  Yes.

11                 THE COURT:  All right.  Thank you.

12                 Ms. Lackman, any questions?

13                 MS. LACKMAN:  Are we going to do anything with the

14       photo?  If I can take a look at it.

15                 THE COURT:  Can you look at it.

16                 MS. LACKMAN:  Can we open it up?  Can we see the files

17       on the computer, see what was downloaded?

18                 THE COURT:  Sure.

19                 (Pause)

20       BY MS. LACKMAN:

21       Q.  Mr. Hayes, is that what you would have seen if you

22       downloaded the photo?

23       A.  Something similar to that, yes.

24       Q.  Does it contain any credit?

25       A.  No.

18DAAMAN2                    Hayes - Recross

1              THE COURT:  Again, Mr. Hayes, before you downloaded in

2    that version, you had seen the entire photograph with

3    Mr. Mango's name on it; is that it?

4              THE WITNESS:  I saw it --

5              THE COURT:  The article.

6              THE WITNESS:  -- the article, yes.

7              THE COURT:  Yes.

8              Anything else?

9              MS. LACKMAN:  Can we right click so that the Court can

10   see the metadata that's downloaded, so we can see the metadata.

11             (Pause)

12   BY MS. LACKMAN:

13   Q.  Mr. Hayes, is that consistent with the process that you

14   went through to get Exhibit 77, to right click and then --

15   A.  I believe the commands are slightly different on the MAC,

16   but I imagine what you just did, the process, is probably

17   synonymous with.

18             THE COURT:  All right.  Thank you.

19             MS. LACKMAN:  And it has a created date of today.

20             THE COURT:  All right.

21   BY MS. LACKMAN:

22   Q.  One last question.  I believe it was your testimony that

23   you didn't see Mr. Mango's name when you downloaded the photo.

24   A.  Yes.

25   Q.  Do you know whether what we're looking at today is exactly

18DAAMAN2                    Hayes - Recross

1   what was up on The New York Post website in April of last year?

2   A.   It's possible it's different.

3   Q.   Is it possible that the gutter credit could have been added

4   later?

5   A.   Yes, it's possible.

6           MS. LACKMAN:   I have no further questions.

7           MR. FREEMAN:   No further questions, your Honor.

8           THE COURT:   Mr. Hayes, in your experience, how

9   frequent would it be for a newspaper article to contain a

10  photograph and not have the photographer's name?

11          THE WITNESS:   I would say infrequent.  It's possible

12  that in a breaking news setting that articles would be

13  published without photo credit and they might be added at some

14  point in the not-so-distant future after that.

15          THE COURT:   All right.  Mr. Freeman, Ms. Lackman, is

16  it possible to go back to April 11, 2017 and find the original

17  of The New York Post article showing whether or not Mr. Mango's

18  name was part of the gutter credits?

19          MR. FREEMAN:   Is your Honor asking whether online or

20  in print?

21          THE COURT:   Well, either one.

22          MR. FREEMAN:   I believe that we can determine that.

23  There's a web archive that may indicate exactly the way that it

24  appeared as of April 11th of 2017.  But we don't know if

25  there's a guarantee.

 1          THE COURT:  Well, let's make an attempt.  New York

 2   Post archives on that day containing the photograph as a

 3   appears on Exhibit No. 13 or whether that photograph may have

 4   been subsequently altered.

 5          Mr. Hayes has testified that it is unlikely, but it

 6   still leaves the possibility.  He is still saying it is

 7   possible that it may have been alter later on.  Right?

 8          MR. FREEMAN:  Right.  I understand we also have

 9   deposition testimony from Mr. Mango which states that when they

10   asked him, they said did you check the gutter credit soon after

11   the article was published, because that is his customary

12   practice to do, to make sure that is there.  It is very

13   important to Mr. Mango that his work is credited.

14          THE COURT:  All right.  Let's not --

15          MR. FREEMAN:  We are getting ahead of ourselves.  But

16   we will certainly look for web archive, yes.

17          THE COURT:  Thank you, Mr. Hayes.  You may step down.

18          (Witness excused)

19          THE COURT:  Mr. Freeman.

20          MR. FREEMAN:  Yes, your Honor.  We have one more

21   witness, Mr. Mango.

22          Would you like to proceed now?

23          THE COURT:  How long would Mr. Mango be on the stand?

24          MR. FREEMAN:  Our side, I think it will be roughly 15

25   to 20 minutes.  But I don't know how long Ms. Lackman will take

18DAAMAN2                    Hayes – Recross

1    with Mr. Mango.

2              MS. LACKMAN:  I just will observe that Mr. Brehm was

3    supposed to have been on the stand for 10 to 15 minutes.  That

4    went a little longer.

5              THE COURT:  Why don't we then break for lunch for one

6    hour and return at roughly at 1:20.

7              All right.

8              MR. FREEMAN:  Thank you, your Honor.

9              (Luncheon Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18DAAMAN2                         Hayes - Recross

1          A F T E R N O O N   S E S S I O N

2                         1:20 p.m.

3              THE COURT:  Thank you.  Be seated.

4              All right.  Mr. Freeman, your next witness.

5              MR. FREEMAN:  Yes, your Honor.  Before calling the

6     next witness we'd like to inform the Court that we were able to

7     check on our cellphones for archives on Plaintiff's Exhibit 13,

8     The New York Post article.  We did locate the article.

9              I'm not sure how your Honor would like plaintiff to

10    submit that evidence to the Court since we now have it on our

11    cellphone.  We could certainly go back to the office, take some

12    screenshots of it, and submit it via fax.  But I guess that

13    depends on --

14             THE COURT:  Can you summarize and stipulate to what

15    you believe it depicts on the relevant issue of what the

16    photograph contains with respect to the gutter credits as of

17    the date that Mr. Hayes first saw it.

18             MS. LACKMAN:  We're trying to pull it up now.  Nothing

19    is coming up.  So I'm not sure I can stipulate to it.

20             My computer -- you said you had it on your cellphone.

21             MR. FREEMAN:  Over lunch we pulled it up on his

22    cellphone.  So I suppose he could pull it up now.

23             Do you have your cellphone?  We could pull it up right

24    now and show the Court.

25             (Pause)

1              THE COURT:  Let's get back on the record.

2              The status of that photograph as of the date that

3      Mr. Hayes first saw it.

4              MS. LACKMAN:  I am prepared to stipulate that the

5      Wayback Machine shows that this is what was there.  I'm not

6      prepared to stipulate the Wayback Machine's image or record is

7      correct.  I can't verify that.

8              MR. FREEMAN:  Just to clarify for the record that

9      Plaintiff's Exhibit 13, which shows The New York Post article

10     dated January 18th of 2017, that the internet shows that the

11     Wayback archive as of January 20, 2017, Gregory P. Mango's

12     gutter credit was included on the face of the article.

13             THE COURT:  All right.  So now we'll get into a

14     dispute about the accuracy of Wayback technology.

15             MS. LACKMAN:  I hope we won't, but, your Honor, as a

16     matter of just professional obligation, I can't put my full

17     faith and credit on the Wayback machine.

18             THE COURT:  You may then submit expert testimony about

19     the degree of accuracy of the Wayback technology, how

20     frequently it is inaccurate.

21             MS. LACKMAN:  I hope not to have to do that, but I

22     would certainly hope to be able to reserve my right to do so.

23     I would certainly hate to agree and then come out and find out

24     that the front page of The New York Post says Wayback Machine a

25     fraud and then I've waived my rights.

18DAAMAN2                    Hayes - Recross

1             Sorry to be technical, Judge, but I am taking too much

2    faith.  It is just like relying on anything in Wikipedia.  They

3    change every day, just because somebody decides to ambush the

4    page.  So I don't know for certain.  I haven't had a chance to

5    test it.  I don't know if the Wayback Machine ever overlays, if

6    the findings are mostly similar, if they make caches later on.

7    I just don't know how it works in that detail.

8             So certainly if we believe that this is something

9    worth spending our energies on and that the case turns on this

10   point, we don't want to waive that opportunity.  I would

11   probably be in trouble with my client if I did.

12            THE COURT:  The case may not necessarily rest on this

13   point, Ms. Lackman, but Mr. Hayes' credibility certainly is

14   influenced by something like that.  He has made some very

15   categorical statements about what was there and was not.

16            MS. LACKMAN:  He said he did not see.  I don't believe

17   he has said I can say for sure it was not there.  He hasn't

18   said that.  So we would not purport to say that he said it

19   wasn't there.  It may have been there.  We just don't know.

20            THE COURT:  There is evidence on the record now based

21   on your stipulation that it was there on that date subject to

22   the accuracy of the technology.

23            MS. LACKMAN:  My stipulation is that the Wayback

24   Machine says it was there on this day.  The Wayback Machine is

25   an out-of-court speaker and to some extent hearsay not

18DAAMAN2                    Mango – Direct

1  verified.

2                  THE COURT:  Mr. Freeman, anything else?

3                  MR. FREEMAN:  No your Honor.

4                  THE COURT:  Let's proceed then.

5                  MR. FREEMAN:  I'd like to call plaintiff's witness

6  Mr. Gregory P. Mango.

7    GREGORY P. MANGO,

8         called as a witness,

9         having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. FREEMAN:

12  Q.  Hello, Mr. Mango.  Thanks for appearing today.

13                  What is your occupation?

14  A.  I'm a photo journalist.

15  Q.  How long have you been a photo journalist?

16  A.  I started my professional business in May of 1992.

17  Q.  And did you go to school for photography?

18  A.  I did.

19  Q.  Where was that?

20  A.  Ithaca College.

21  Q.  What year?

22  A.  I graduated in May of 1987 with a bachelor of science in

23  cinema and photography.

24  Q.  Where do you currently work?

25  A.  I run my own business.  Its called P3200 Photo Journalism.

1  I have a variety of clients, and my main one of course is The

2  New York Post.

3  Q.  Have you done freelance work with the New York Post?

4  A.  I have.

5  Q.  And how long have you been freelancing with The New York

6  Post?

7  A.  I had one assignment sometime in probably June of 1998 for

8  the Mermaid Day Parade, which I did well with, but then I got

9  sidetracked with other clients and I didn't really go back to

10 get work from them until November of 2003.  So basically we are

11 coming up on my 15-year anniversary.

12 Q.  How many days week do you freelance with the New York Post?

13 A.  I have been blessed to get roughly five days a week most

14 weeks.  There are some weeks where I only get four days.  On

15 occasion, maybe once or twice a year I'll only have three days.

16 Q.  And how are you compensated by The New York Post?

17 A.  Well, I am given a day rate, which consists of an

18 eight-hour shift, if you will.  And of course that day rate is

19 very much different than any sort of licensing agreements that

20 I would ever negotiate with other media companies for two

21 reasons.

22        One, of course, is that when they hire me for a job

23 they don't know if I'm actually going to produce a photograph.

24 So there's an investment on their part money-wise that

25 hopefully I'll come up with something good that they can use,

1   and there is an investment on my part that I'll find that image

2   and get it.

3          The second reason, of course, is that you don't know

4   the value of something that hasn't yet been created.  So when

5   they give me a day rate, it's a relatively low fee mostly

6   because they're my main client and they get a discount for

7   employing me for like the last 15 years, but also there's no

8   way to determine what a photograph is going to be worth before

9   it's been created.

10  Q.  And does the day rate that you earn for The New York Post

11  reflect the amount that you would charge another media

12  organization to use your photographs?

13  A.  It does not.

14  Q.  And why is that?

15  A.  Other organizations that call me for photos would be asking

16  for a licensing agreement and there's whole bunch of factors

17  that are involved in those negotiations.  I had mentioned four

18  during the deposition.  Actually, the gentlemen from the law

19  firm mentioned a fifth.  So those factors are -- which I agree

20  with him -- the factors are the size of company, how long they

21  want to use it, could be a single-day use, could be six months,

22  a year, could be in perpetuity.

23         The third factor would be which means that they wanted

24  to use it, and that could be television, internet or print, and

25  actually even radio now has a presence on the internet.  So

1    even a radio station might want to buy a photo to use on their

2    website.  So that would be the third factor.

3            The fourth is the newsworthiness of the image, and of

4    course in this case there were multiple news outlets that did

5    do stories about Mr. Parker.  There's a very interesting case

6    about discrimination because of his health issues.  Preet

7    Bharara had to get involved on that case.

8            Then of course probably in some ways the most

9    important factor is the rarity, the fact that this image was

10   not available anywhere else.

11           MR. FREEMAN:  Plaintiff respectfully refers the Court

12   to Plaintiff's Exhibit 13, which has been admitted.

13           Your Honor, may I have permission to approach the

14   witness?

15           THE COURT:  Yes.

16           (Pause)

17   Q.  Mr. Mango, do you recognize this document?

18   A.  I do.

19   Q.  What is the subject matter of this news article?

20   A.  The subject matter is the lawsuit that was filed on behalf

21   of Raymond Parker for his, for the fact that the New York

22   Police Department rescinded a job offer after they had offered

23   it to him upon finding out that he is HIV positive.

24   Q.  Who took this photograph?

25   A.  I did.

1    Q.  When did you take it?

2    A.  This was taken on January 18th of 2017.

3    Q.  And underneath the photograph of Mr. Parker, is that your

4    name listed?

5    A.  It is.

6    Q.  Is it customary for The New York Post to list your name

7    under a photograph you take?

8    A.  Yes, it is.

9    Q.  Why is that?

10   A.  Well, you know, I guess just from a personal point of view

11   you want to see your name in print.  Writers have the same

12   thing.  But more importantly, you know, when other news

13   organizations are interested in stories and they do scour other

14   websites for stories, if they want a purchase the photo they

15   know who to call and they know who to ask for.  Many times I'll

16   get a call from someone and they'll tell me they got my phone

17   number from an editor at The New York Post.

18   Q.  When this news article was published back a January of

19   2017, did you verify whether or not your name was included

20   below the photograph?

21   A.  I did.

22   Q.  And why did you make a inquiry?

23   A.  I wanted to be able to make sure that I have credit so that

24   in case anybody wants to purchase the photo from me, they're

25   able to contact me, they'll know who to ask for.

1    Q.  Thank you.

2            MR. FREEMAN:  Plaintiff respectfully refers the Court

3    to Plaintiff's Exhibit 20, which has been previously admitted.

4            Your Honor, may I approach the witness?

5            THE COURT:  Yes.

6            (Pause)

7    Q.  Mr. Mango, do you recognize this document?

8    A.  I do.

9    Q.  Is that your photograph of Mr. Parker?

10   A.  Yes, it is.

11   Q.  Did you authorize BuzzFeed to publish your photograph of

12   Mr. Parker?

13   A.  I did not.

14   Q.  Who is listed in the gutter credit?

15   A.  It's Fisher & Taubenfeld.

16   Q.  Who is Fisher & Taubenfeld?

17   A.  I believe they're the law firm that represented Mr. Parker

18   in his federal lawsuit.

19   Q.  How do you know that?

20   A.  Based on the story that I read here, on this BuzzFeed

21   story.

22   Q.  And did you authorize Fisher & Taubenfeld to publish this

23   photo?

24   A.  I did not.

25   Q.  Have you ever had communication with Fisher & Taubenfeld

18DAAMAN2                       Mango - Direct

1   either before or after the date of this article?

2   A.  No, I've never spoken with anybody from the firm.

3   Q.  Who is Mike Hayes?

4   A.  Mike Hayes is a reporter at BuzzFeed.

5   Q.  Did Mike Hayes ever communicate with you prior to

6   BuzzFeed's publication of this photo?

7   A.  He did not.

8   Q.  What does exclusivity mean?

9   A.  Well, it basically means that you have positioned yourself

10  in a situation where only you were able to obtain the photos

11  and there were no other journalists around to get the same

12  picture.  So you have exclusive content that nobody else has.

13  Q.  Is the photograph of Raymond Parker an exculsive

14  photograph?

15  A.  It is.

16          MR. FREEMAN:  Plaintiff would like to mark -- identify

17  Plaintiff's Exhibit 15.

18          Your Honor, we're anticipating an objection to the

19  production of this.

20          THE COURT:  What number?

21          MR. FREEMAN:  Plaintiff would request the Court leave

22  to respond to the objection.

23          THE COURT:  Which document?

24          MR. FREEMAN:  This is Plaintiff's Exhibit 15.  If I

25  may have the Court's permission.

1              THE COURT:  Yes.

2              (Pause)

3   Q.  Mr. Mango, do you recognize this document?

4   A.  I do.

5   Q.  How do you recognize it?

6   A.  Well, I recognize it as a similar story to the one that The

7   New York Post published on Raymond Parker.

8              MS. LACKMAN:  Objection.  Hearsay.

9              MR. FREEMAN:  Plaintiff respectfully posits to the

10  Court to admit Plaintiff's Exhibit and also requests the

11  opportunity to respond to Ms. Lackman's objection.

12             THE COURT:  What's your response to the objection?

13             MR. FREEMAN:  My response to the objection is that

14  Ms. Lackman maintains that this is hearsay.  However, the case

15  law makes perfectly clear, although quotations from a news

16  article may be deemed hearsay, news article are admissible for

17  the fact that the statements did occur and were published.

18  That is Second Circuit authority.  Shaft v. PLC British

19  Airways, 22 F.3d 59, at 64.

20             There's other citations as well indicating that news

21  articles may be proffered as background information of events

22  at issue.  That would be Krause v. Buffalo and Eri County, 425

23  F. Supp. 2d 352 at 378 (W.D. 2006).

24             THE COURT:  What is your theory of relevance?

25             MR. FREEMAN:  The relevance of this is that what other

1    news organizations published demonstrate the exclusivity of

2    Mr. Mango's photo and we believe that the exclusivity of

3    Mr. Mango's photo will impact the fair market value of how it's

4    measured.

5              THE COURT:  Ms. Lackman.

6              MS. LACKMAN:  First of all, we didn't receive a copy

7    of the bench memo so I don't know what authorities are being

8    cited.  But I can tell you that on its face Mr. Mango has no

9    knowledge as to why or why not someone used a photograph in an

10   article.  We don't have a witness from this publication to

11   testify as to why the photo was used or not used.

12             I think the evidence will show that nobody contacted

13   Mr. Mango to use the photograph.  So I don't think this is

14   going to take us anywhere apart from down a line of

15   speculation.

16             MR. FREEMAN:  Our response is that it's relevant and

17   not speculative.  We're simply introducing this as evidence to

18   show the fact that there were other news articles and other

19   news organizations out there that were reporting on this story

20   and they used stock photos rather than photos of Mr. Parker.

21             It demonstrates -- and we will ask Mr. Mango did these

22   organizations contact him, but it certainly demonstrates,

23   number one, that it was a newsworthy story.  This wasn't an

24   isolated incident of The New York Post reporting on it.

25             Number two, again, it impacts the exclusivity of the

18DAAMAN2                    Mango - Direct

1  photo, demonstrating that other news organizations had the

2  option to license and didn't do so.

3          We believe that it's relevant.  It certainly overcomes

4  the hearsay objection.  I haven't heard Ms. Lackman respond to

5  that argument.

6          MS. LACKMAN:  Well, I did respond to the hearsay

7  argument, your Honor.  What I said was the fact that they are

8  trying to offer it for the truth that this was so exclusive,

9  that somehow the authors of these articles couldn't get it from

10  Mr. Mango or something like that.  There's going to be some

11  conclusion that they want you to draw based on the fact that

12  the photo was used.

13          I think Mr. Hayes testified that you don't have to use

14  a photo of the subject and in fact, if one isn't available, you

15  won't.  But no one contacted him.  So I don't know where this

16  goes.  The fact that this is a newsworthy story was already

17  testified to.  Again, Mr. Mango has no foundational knowledge

18  to talk about these articles, what they say, why they were

19  published, why certain photos were used or not used.  He has

20  absolutely no knowledge of that.  So for him to testify to it

21  is classic hearsay.

22          THE COURT:  Thank you.

23          Sustained.

24  BY MR. FREEMAN:

25  Q.  Mr. Mango, I'd like to talk about your past licensed

18DAAMAN2                    Mango - Direct

1    transactions.

2    A.   Sure.

3    Q.   How do you go about licensing your photographs to media

4    organizations?

5    A.   Well, there are two primary ways that I do it.  One is when

6    I am contacted directly, I will engage in negotiations, usually

7    over the telephone, sometimes e-mail, on what their needs are,

8    their budget, and what I'm looking for.

9           The other ways I would syndicate the photos is through

10   two different photo agencies.  One is called Splash News and

11   the other one is Polaris.

12   Q.   It is Polaris and Splash News, stock photo agencies.  Are

13   those the only stock photo agencies that you've used in the

14   past?

15   A.   Yes.

16   Q.   If another media organization besides The New York Post

17   wanted to license a Raymond Parker photo from you, how would

18   you go about doing that?

19   A.   I would -- well, usually they'd contact me.  You know, they

20   usually get the phone number from one of the editors at The New

21   York Post and then they'll usually contact me.  As I said, I

22   will find out how long they want to use it for.  Is it just a

23   one-day, one-story use, one-time use, or do they want it in

24   perpetuity.

25           I remember I had licensed some photos on Andrew Madoff

1    in the beginning of that investigation.  They decided that they

2    might not need the photo of Andrew right away, that he may come

3    into play as the case moves forward.  So that was one where I

4    believe that they got in perpetuity.

5              So yeah, the length of time.  And if it is a print

6    publication, I'll ask if it's going to be a quarter page, half

7    page, full page, double page.  That will be a second concern.

8    Of course I'll know pretty much right away how big the company

9    is just by the name of the company.  If it is ABC or something

10   versus The Sky Valley news in Spokane, Washington, or

11   something, you can sort of tailor our fees to what the budget

12   is.  Then of course the two factors I also mentioned,

13   newsworthiness and the rarity.

14   Q.  In this case would a media organization be able to license

15   the Raymond Parker photograph through a stock photo agency?

16   A.  No.  The Raymond Parker photos were not syndicated.  They

17   never left my computer.  Only to be sent to The New York Post,

18   but I never sent them to Splash or Polaris.

19   Q.  So a media organization could not license this photograph

20   to Splash or Polaris?

21   A.  No.

22   Q.  How about through Getty?

23   A.  I've never given Getty any of my work.

24   Q.  Did any media organization license the photograph of

25   Raymond Parker -- I'm sorry.  Strike that.

1          Did any other media organization contact you to

2     license the Raymond Parker photograph?

3     A.  They did not.

4          MR. FREEMAN:  Now, we'd like to mark, identify

5     Plaintiff's Exhibit 88.

6          Your Honor, may I have permission to approach the

7     witness?

8          THE COURT:  Yes.

9          (Pause)

10    Q.  Mr. Mango, do you recognize this document?

11    A.  Yes, I do.

12    Q.  And what does this chart show?

13    A.  This shows various licensing fees for different media

14    organizations that I personally negotiated for the license fee

15    agreement.

16         MR. FREEMAN:  Your Honor, plaintiff respectfully moves

17    the Court to admit Plaintiff's Exhibit 88.

18         MS. LACKMAN:  We have no objection to this as a

19    summary to the extent it is complete true and accurate.  He

20    hasn't testified to that at this point in time, but we do agree

21    that it potentially qualifies under Rule 106.

22         THE COURT:  Admitted.

23         (Plaintiff's Exhibit 88 received in evidence)

24    Q.  What's the date range here of the license transactions

25    indicated?

A.   Looks like the oldest one goes back to October 29th of 2005 and the most recent one listed here is from October of 2016.  I think they asked me to give them the 2006 to the present, but I went one year further back and gave them from 2005 to the present.

Q.   And what's the highest fee you have received for a single image through your own personal negotiations?

A.   Looks like I've got two for the same dollar amount of $750.  One from February 2nd of 2006 and one from February 18th of 2009.

Q.   Now, was there any back-and-forth negotiations between you and the media organization before you actually settled on these dollar amounts?

A.   Oh, there always is.  They never want to give you what you ask for in the beginning.  The other thing is I also tell a lot of photographers, they ask me, some of younger guys, ask me, well, how do I go about doing this.  A lot of times we'll shoot five or ten different images for a story.  We call it a package.  I often tell them that if you can mention these other photos, cause maybe they will only see one photo published, but there may be other relevant images.  I often tell them, tell the client that you've got other photos and that you will put together a package with a discount price.  So, for example, it would be better to receive -- sell three photos at $500 each rather than one photo at $750.

18DAAMAN2                        Mango - Direct

1    Q.  So when a media organization contacts you after seeing your

2    work published in The New York Post, what do you customarily

3    charge?  In other words, what's your opening offer?

4    A.  Well, it depends on who's contacting me.  I would say that

5    in the case of the Raymond Parker photo, based on the fact that

6    it was a newsworthy event, large company, and extremely rare

7    photo, I would have made my opening bid at $1,000.

8    Q.  What's the lowest amount you've ever received for licensed

9    image where you personally negotiated the fee?

10   A.  $250.

11   Q.  And what's the median for single images that you've

12   personally negotiated?

13   A.  Looks to be close to $500.

14        MR. FREEMAN:  Plaintiff would like to mark for

15   identification Plaintiff's Exhibit 89.

16        Your Honor, may I have permission to approach the

17   witness?

18        THE COURT:  Yes.

19        (Pause)

20   Q.  Mr. Mango, do you recognize these documents?

21   A.  Yes, I do.

22   Q.  What are they?

23   A.  These are invoices for various media companies that are

24   licensing agreements for them to use various photos that

25   they've seen in The New York Post.

18DAAMAN2                         Mango - Direct

1   Q.  And you've testified that P3200 Photo Journalism is your

2   company?

3   A.  Yes it is.

4   Q.  So did you personally prepare these invoices?

5   A.  Every one of them.

6            MR. FREEMAN:  Plaintiff respectful moves the court to

7   admit Plaintiff's Exhibit 88.

8            MS. LACKMAN:  89?

9            MR. FREEMAN:  I'm sorry.  89.

10            MS. LACKMAN:  No objection.

11  Q.  Did each of the photographs described in these invoices

12  originally appear in The New York Post?

13  A.  Yes, that's true.

14  Q.  In each case did the media organization contact you

15  directly to obtain a license?

16  A.  Well, as I said, I think in probably most of these cases

17  they probably called The New York Post first to get my phone

18  number, but then, yes, usually it was a phone call.  Maybe in a

19  couple of cases it might have been an e-mail.

20            MR. FREEMAN:  Plaintiff identifies Plaintiff's Exhibit

21  90.

22            Your Honor, may I have permission to approach the

23  witness?

24            THE COURT:  Yes.

25            (Pause)

1    Q.  Mr. Mango, do you recognize this document?

2    A.  Yes, I do.

3    Q.  And what does this chart show?

4    A.  Well, these are licensing fees that were obtained for me by

5    the two agencies I mentioned earlier, Splash and Polaris.

6    Q.  These are the top 12 licensing fees that you received from

7    Polaris and Splash?

8    A.  Yes, that's correct.

9            MR. FREEMAN:  Plaintiff respectful moves to Court

10   admit Plaintiff's Exhibit 90.

11           MS. LACKMAN:  We have an objection with respect to the

12   fact of whether it is a genuine summary.  It is clearly a

13   cherrypicked group of the top 12 licenses.  To the extent it

14   summarizes those, we have no objection.  But to the extent it

15   attempts to summarize his whole license history, we of course

16   object.

17           THE COURT:  Overruled.

18           (Plaintiff's Exhibit 90 received in evidence)

19   BY MR. FREEMAN:

20   Q.  Mr. Mango, what's the date range of your transactions that

21   are listed on this chart?

22   A.  Looks like the oldest one would be from October of 2007 to

23   November of 2012.

24   Q.  And what's the highest licensing fee you've received for a

25   single image through a stock photo agency?

18DAAMAN2                        Mango - Direct

1   A.   That would be the number one entry, which is the $2500,

2   which was a story I remember very well about a home invasion in

3   New Britain, Connecticut, where a doctor was held hostage in

4   the basement while his family was killed by two thieves and

5   then the house was set on fire.

6           THE COURT:  Mr. Mango, going back to the exhibit.  I

7   am looking at number five.

8           THE WITNESS:  On Exhibit 90?

9           THE COURT:  Yes.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  What's the date there?

12          THE WITNESS:  Oh, I'm sorry.  I was missed that one.

13  Yeah.  It's mistake.  I'm sorry.  The newest one is from March

14  of 2015.

15          MR. FREEMAN:  Thank you, your Honor.

16          THE WITNESS:  Sorry about that.

17  Q.   And did you personally negotiate the licensing transactions

18  that are listed on the chart?  Did you personally negotiate

19  these yourself?

20  A.   I did not.

21  Q.   They were negotiated on your behalf, right?

22  A.   Yes.

23          MR. FREEMAN:  Plaintiff marks for identification

24  Exhibit No. 91.

25          Your Honor, may I have the Court's permission to

1    approach the witness?

2              THE COURT:  Yes.

3              (Pause)

4    Q.  Mr. Mango, do you recognize these documents?

5    A.  Yes, I do.

6    Q.  And how would you describe them?

7    A.  These are, Polaris is calling them sales statements and

8    Splash is calling them sales reports.  They're basically

9    summaries of images that I had syndicated to them to sell on my

10   behalf.  They represent the amount that they charged and then

11   the amount, I think in the case of Polaris I am getting

12   50 percent, and Splash I guess I am getting 50 percent.  It

13   shows what they sold it for plus my part of the payment.

14             MR. FREEMAN:  Plaintiff respectfully moves the Court

15   to admit Plaintiff's Exhibit 91.

16             MS. LACKMAN:  I have no objection.

17   BY MR. FREEMAN:

18   Q.  Mr. Mango, did you personally prepare these invoices?

19   A.  I did not.

20   Q.  Do you know what factors determine the price negotiated by

21   a third-party stock photo agency on your behalf?

22   A.  I don't know how they do it.  They have a giant sales force

23   and probably some of them have a lot more experience than me.

24   I'm sure they do a better job than I do.  But no, I don't have

25   firsthand knowledge about how they go about doing the sales.

18DAAMAN2                      Mango - Cross

1    Q.  In April of 2017 had BuzzFeed contacted you and asked you

2    to license the Raymond Parker photograph, how much would you

3    have charged?

4           MS. LACKMAN:  Objection.  This is not about evidence.

5    It is about speculation.

6           THE COURT:  Overruled.

7    A.  As I had mentioned earlier, based on the size of the

8    company, the newsworthiness of the photo and the rarity of the

9    photo, my opening ask would have been $1,000.

10   Q.  How much would you have accepted?

11   A.  Well, it's something I can't answer and that we'll never

12   know because Mr. Hayes made the decision not to pick up the

13   phone and call me and work out some kind of negotiations.

14          MR. FREEMAN:  No further questions, your Honor.

15          THE COURT:  Ms. Lackman.

16   CROSS-EXAMINATION

17   BY MS. LACKMAN:

18   Q.  Mr. Mango, did you make a decision not to pick up the phone

19   and call BuzzFeed to obtain a retroactive license?

20   A.  No, I did not make a decision.

21   Q.  You chose to sue instead?

22   A.  You know, I work for The Post about 50 hours a week and it

23   had been brought to my attention that the Liebowitz law firm

24   would be a very good help for me to track images that were

25   being stolen on the internet.

18DAAMAN2                      Mango - Cross

 1              So in August of 2016, I signed a retainer with the

 2    Leibowitz law firm to have them do all of that work.  Not only

 3    finding the images that may have been infringed upon, but also

 4    doing all the registration work.  This is stuff that I do not

 5    have the time to do.  So it was really just a question of sort

 6    of delegating some of work of keeping track of my intellectual

 7    property to someone who has expertise in the area.

 8    Q.  So are you saying that because you have an agreement with

 9    the Liebowitz firm you could not have approached BuzzFeed to

10    get a --

11    A.  I'm not saying that.  I'm saying that in terms of

12    infringements -- let's remember now this is after the fact.

13    This is not during the time of the publication of BuzzFeed.

14              After the fact I was notified about this and I left it

15    to my legal representation to, you know, take care of it one

16    way or another, whether it be a settlement or a lawsuit.

17    Q.  Are you responsible for -- did your firm -- but nobody ever

18    reached out to discuss settlement, correct?  No one ever

19    reached out to BuzzFeed to talk about settling the case before

20    it was filed?

21    A.  Of course, we went to settlement conference together.  You

22    and I were there.

23    Q.  After the lawsuit was filed.  I am talking about prior to

24    the filing of lawsuit.

25    A.  I didn't call BuzzFeed, no, I did not.

Q.   Are you responsible for the filing fees for this case?

A.   I am.

Q.   You say you are a photo journalist.  Do you ever write
articles?

A.   I have.

Q.   Have you done it for pay?

A.   Yes.

Q.   How many publications?

A.   I have had less than half a dozen articles published in The
New York Post, probably three or four, and before that I did a
lot of work for a chain of newspapers in Brooklyn called The
Brooklyn Papers.  Probably, again, maybe less than half a dozen
stories that I wrote as well.

         In those cases I generally do the photography as well.
I can remember one I did The Brooklyn Papers on a holocaust
designer who became a painter at the age of 77 and these went
wonderful images of his time in Buchenwald.

Q.   Were you paid a day rate from The New York Post when you
wrote articles?

A.   Yes.

Q.   OK.  And you said that you worked an eight-hour shift when
you worked for The Post?

A.   Well, the day rate that I negotiated with the director of
photography would include eight hours.  Of course most of these
stories, especially if you start to gather information late in

 1    the day, you usually go beyond the eight hours, in which case I

 2    have an hourly add on.

 3    Q.   On this day that you took the photos of Mr. Parker, how

 4    many photos did you provide The Post?

 5    A.   I can't give you an exact amount, but I usually try and

 6    give them somewhere between 7, 15.  So I'm going to guess,

 7    somewhere maybe between eight and ten.

 8    Q.   How many did they use?

 9    A.   I know they used one on January 18 and then a slightly

10    different one on April 11th.  So at least two.  There may have

11    been more.  The two I am sure of.  There are two that I am sure

12    of I should say.

13    Q.   Those were taken on the same day?

14    A.   They were.

15    Q.   At the same day rate?

16    A.   Yes.

17    Q.   How much were you paid?

18    A.   That was a normal day.  It was 11 a.m. to 7 p.m., and I was

19    paid $300.

20    Q.   Did The Post pay you a separate license fee for using the

21    photos, publishing the photos in their articles?

22    A.   Can you repeat that question?

23    Q.   Sure.

24           In addition to the day rate of the $300, did they then

25    pay you a separate license fee for using the photographs of

1   Mr. Parker in those articles?

2   A.  You are referring to subsequent articles?

3   Q.  The article in January and then the one in April, did they

4   pay you a license fee?

5   A.  In other words, you are asking, they paid me once in

6   January, did they pay me again a April for the same photo.  Is

7   that what you're asking?

8   Q.  Well, they paid you on the day -- for your work on the

9   photos?

10  A.  Yeah.

11  Q.  Did they pay you a separate license fee to use either or

12  both of those photos in actual articles subsequently?

13  A.  I was paid once, January 17.

14  Q.  OK.  So when you work at the day rate and provide photos,

15  The Post -- tell me if this is incorrect -- the price that's

16  paid on a day rate gives them a license to use the photographs?

17  A.  It's in the contract.

18  Q.  Let's look at the contract really quickly.  I have the

19  binder.  Exhibit B is a contract between you and The New York

20  Post and I'd like to see if you recognize it.  Can you take a

21  look.

22  A.  I do.

23  Q.  What is it?

24  A.  It's my freelance photographer independent contractor

25  agreement.

18DAAMAN2                          Mango - Cross

 1              MR. FREEMAN:  I would like to move that Exhibit B be

 2      admitted into evidence.

 3              THE COURT:  Didn't you say this morning that all of

 4      the defendant's exhibits in the binder were not objected to?

 5              MR. FREEMAN:  Yes.  So I would say it's not a question

 6      of that I'm objecting to the admissibility.  I just wanted to

 7      state that this was produced by The New York Post pursuant to a

 8      protective order.  So to the extent that it could be filed

 9      under seal to honor that protective order, we would move to do

10      so.

11              MS. LACKMAN:  We have no objection with that.

12              THE COURT:  Proceed.

13      Q.  If you could please turn to the section on the third page,

14      it's section six that says "credit."

15              Do you see that?

16      A.  Yes.

17      Q.  And do you see the first line that says, "Publisher will

18      usually reasonable efforts to five freelancers credit for each

19      published work?"

20              Do you see that?

21      A.  Yes.

22      Q.  Is a reasonable effort acceptable to you?

23      A.  I signed the contract.

24      Q.  OK.  Why didn't you negotiate for a one hundred percent

25      compliance standard?

18DAAMAN2                          Mango - Cross

A.   This was the contract that was presented to me.  I did get

some complaints from other photographers about some of terms of

the contract.  I advised them to sign the contract and to go on

with it because we -- unfortunately, it's not 1950.  There's

not 25 newspapers.  So at the time there was three main

newspapers in the city -- The Times, The New York Post and New

York Daily News.  Of course, now we found out two weeks, three

weeks ago that the entire photography staff was fired.  So

there was even less opportunity to, if you're unhappy with the

contract, you go somewhere else.  So there's no union to

negotiate contracts.  So it was basically a take-it-or-leave-it

situation.  So I took it.

Q.   So if they make a mistake or they forget, it is your

understanding that you have a breach of contract?

A.   I haven't run across that situation.

Q.   Is that because you check every photo that they publish?

A.   It would -- I can't check every single one, but I haven't

had any problem.

Q.   I think you mentioned earlier that you did in this

circumstance, you did check.  How do you know when a photo of

yours is used by The Post?

A.   I go onto the website and look for the story.

Q.   They don't alert you of that?

A.   No.

Q.   Do you check The Post everyday?

18DAAMAN2                    Mango - Cross

1   A.  Absolutely.  Probably check it seven, eight, maybe ten

2   times a day.

3   Q.  When you see a situation where they haven't used a credit,

4   do you notify them?

5   A.  Absolutely.

6          MS. LACKMAN:  I'd like to mark -- not mark.  I'd like

7   to show the witness what was previously marked Plaintiff's

8   Exhibit 17.

9          I am assuming that plaintiff has no objection, but if

10  I can please present it to the witness.

11         THE COURT:  Yes.

12         (Pause)

13  Q.  Mr. Mango, I am showing you what's been previously marked

14  as Exhibit 17.  It is double-sided in case you haven't seen

15  that.

16         Have you seen this before, this article?

17  A.  Yes.

18  Q.  OK.  And can you briefly tell me what it is.

19  A.  This is a followup article to the first story that was done

20  in January, and I guess it's a news story that talks about the

21  fact that Mr. Parker was successful with his lawsuit and that

22  he was given, I believe, retroactive pay of $85,000 and he got

23  his job back.

24  Q.  If you could please turn to --

25         MS. LACKMAN:  Actually, first, let me move to have

1     this admitted into evidence.

2               I assume the plaintiff has no objection.

3               MR. FREEMAN:  No objection, your Honor.

4     Q.  If you could please turn over to the back of the --

5     backside of the page, which is continues at the top "I

6     represent to you."

7               Do you see the image on the upper left side of the

8     page?

9     A.  Yes.

10    Q.  Where is your photo credit here?

11    A.  I don't see one.

12    Q.  Did you contact The Post about it?

13    A.  No.

14    Q.  Why not?

15    A.  Because when you click on -- this is a hyperlink.  And when

16    you click on this image or the text that's underneath it, it

17    brings you to the original story that has my photo credit.

18    Q.  So it's not a problem if the photo credit is missing if you

19    can click somewhere and find the photo with the credit?

20    A.  Well, don't forget that the top of the story has my name

21    right on it, same guy with the same clothes.

22    Q.  But is it possible that someone else could have come in

23    after you and taken this picture of him?

24    A.  I guess it's possible, but I knew it was my photo.

25    Q.  Would the outside observer know that that was your photo?

18DAAMAN2                           Mango - Cross

1    A.  Well, I mean, if they see the picture of a guy sitting on a

2    couch with a red jacket on and flip it over and see the exact

3    same outfit and same couch, they could probably put two and two

4    together and figure out that's my photo.

5    Q.  Can you tell from the big image that he is sitting on a

6    couch?

7    A.  Say that again.

8    Q.  Does he appear to be -- how do you know that he is sitting

9    on a couch?

10   A.  Cause I took the picture.

11   Q.  How would anyone else know?

12   A.  I don't know.

13   Q.  Could it be a selfie?

14   A.  Yeah.  I guess so.  You usually see the person's arm, but

15   I'm not an expert of selfies.  I am terrible at selfies.  I

16   always let my girlfriend do them.  I always mess them up.

17   Q.  OK.  We talked earlier about the metadata in this case.  I

18   am sure you recall.

19   A.  Yes.

20   Q.  Why do you allow The New York Post to not include your name

21   in the metadata to the photos that they use?

22   A.  Well, first of all, I very rarely look at metadata.  What

23   I'm concerned with is when I work on these photos, before I

24   send them in to The New York Post, I have to write a caption

25   and that caption is extremely important.  I try to fill it up

18DAAMAN2                    Mango - Cross

1    with a lot of proper nouns.  So that it could be months, years

2    later, people could type in a certain phrases and find these

3    photos.

4          In that caption my name is in three different spots.

5    It is in the actual description where I write caption, it is in

6    the origin above, and then it's in the third spot, in a

7    different field.  I can't remember the name of it.  But that's

8    where I'm concerned with having my name next to the photo

9    captioning.

10   Q.  So this is information that is provided to The Post?

11   A.  It is attached to the photoshop file.  So when they go into

12   their meetings to discuss layout and stuff, it will print out

13   black and whites of the images and at the bottom will be the

14   box with my caption and my name.

15   Q.  But that's not provided to the public?

16   A.  The caption is sometimes transcribed by the people doing

17   the layouts.  They will actually take a sentence or two out of

18   my caption and write it.  So I guess you could say part of it's

19   put under the photo, but maybe not every little detail.

20   Q.  Sometimes not at all.

21   A.  Sometimes they just put the name of the person, like what

22   we have here.

23   Q.  Have you ever signed a contract that assigns all rights to

24   someone else, giving up the copyright rights?

25   A.  I have not.

18DAAMAN2                        Mango - Cross

1    Q.  Are you aware that this is possible?

2    A.  Sure.  My friends at the Daily News signed away their

3    rights.

4    Q.  OK.  Have your friends at the Daily News signed away their

5    rights to get credit?

6    A.  I don't know.

7    Q.  Are you aware of any circumstances where a creator of a

8    copyrighted work might sign away their rights to get credit?

9    A.  Probably someone just starting out in the field.  I could

10   see a young kid just coming out of school who has never been

11   published before getting very excited about trying to build a

12   portfolio, and in that case they might sign away their rights

13   to get the photo credit so they could go to, you know, a

14   portfolio of tear sheets with their name on it to sort of build

15   their career that way.  That could be possible.

16   Q.  Just so it's clear on the record, did anyone else contact

17   you to use the photographs at issue in this case?

18   A.  No.  I wish they had.  I could have used the money.

19   Q.  Do you know whether anyone contacted The New York Post to

20   use the photo at issue in the case?

21   A.  I do not know.

22   Q.  If someone had contacted The Post, would they tell you?

23   A.  Absolutely.

24   Q.  But you are aware that -- strike that.

25                Are you aware of any third party using the photograph

18DAAMAN2                          Mango - Cross

1    without permission in any kind of news article?

2    A.  You mean other than BuzzFeed?

3    Q.  Right.

4    A.  I'm not aware of anybody else using it.

5    Q.  I want to talk briefly about some factors that you were

6    discussing and get some clarity there.

7    A.  OK.

8    Q.  So one thing you talked about was the media type.

9    A.  Yeah.

10   Q.  And do television licenses tend to be the highest rate?

11   A.  I'd have to take a look.

12          You want me to talk about the Splash and Polaris.  I

13   probably shouldn't because I don't know how they work, but I

14   can talk about my own.

15   Q.  Just in your experience.  You said that the type of media

16   makes a difference.  So I'm assuming you have some

17   understanding as to how that makes a difference.

18          So I'm trying to find out, do you know what types of

19   media tends to carry higher rates?

20   A.  It takes a lot of money to run a television station, so

21   generally they are going to be bigger companies.  It's not so

22   much the media as it is the size of company.

23          But if you want to make the parallel that television

24   because they are big they tend to command more money, I would

25   agree with that.  Sure.

18DAAMAN2                      Mango - Cross

1    Q.  Do books carry a higher rate than internet use?

2    A.  I wouldn't say -- based on my own limited experience, I

3    only sold to a book publisher a couple of times.  They are in

4    the range.  They're in an average range.  They are not super

5    high, they are not super low.

6    Q.  We will go into this in a little more detail perhaps.

7              You have considered the frequency of use, right?  I

8    think you said something like one-time length of user or

9    one-time user or something like that.

10   A.  Yeah.  If you look at my agreements, almost all of them say

11   one-time use.

12   Q.  What does one-time use mean to you?  I just want to

13   understand, do you mean use for one article or one type of use

14   or do you mean use for one day?  What does that mean?

15   A.  It would be one article, yeah.

16   Q.  OK.  So that means, for example, with the Post, they are

17   engaging in -- let's talk about a hypothetical article.  I

18   think your photo was used twice.

19             If I read an article and there is your photo as a

20   one-time use, it can stay on the internet forever, right?

21   A.  That one article, yes.

22   Q.  Another thing you talked about was rarity of image.

23   A.  Yes.

24   Q.  Just to clarify your testimony, when you say rarity, I

25   think you said that it's rare if it's an image that isn't

18DAAMAN2                          Mango - Cross

1   available elsewhere; is that what you meant?

2   A.   Generally it means that you are the only photographer at a

3   particular place and time to capture a particular image that

4   once that event passes, they cannot be recreated.

5   Q.   In your experience, has more than one photographer taken

6   the same photograph?

7   A.   Imagine Stormy Daniels walking into federal court with

8   Michael Avenetti.  You've got maybe 10 to 12 print media out

9   standing by the U.S. Marshals by 500 Pearl, you've probably got

10  another five or ten television stations, also making sure that

11  there isn't chaos and pandemonian because it does get kind of

12  rough out there.  I've been knocked to the ground a number of

13  times.  So sure, you've got people who are elbow to elbow and

14  they are going to press that button at the exact same time and

15  basically they are going to create the same photo.

16  Q.   If I wanted to take a picture myself of Mr. Parker sitting

17  on his couch this afternoon, theoretically could I do that?

18  A.   Of course.

19  Q.   So Mr. Parker, then, it's fair to say, it wasn't a

20  circumstance where there was a large crowd of people inside a

21  room and they are all taking pictures at the same time?

22  A.   No.  I was the only one there.

23  Q.   Because him sitting on his couch is not a particularly

24  newsworthy event.

25  A.   The story was newsworthy and we were hot on the story and

1   we wound up scouring East New York -- I know we went to at

2   least two addresses; we may have gone to a third one -- to find

3   this man and do this storey.

4   Q.  But in terms of rarity, is a rare photo that nobody wants

5   to license worth as much as a semi-rare photo that everybody

6   wants to license?

7   A.  A rare photo is something that only one photographer has

8   and, if you're lucky, a lot of people want to license it.

9   Q.  But in this circumstance not a lot of people wanted to

10  license this photo, did they?

11  A.  I wasn't contacted by anybody else.  But in terms of the

12  rarity of the photo, yes, no one else has -- by the way, no one

13  even knew where the guy lived to even send their own

14  photographers.

15          For example, CBS, rather than using cop cars, which is

16  a generic picture of the cop cars in Times Square, if they

17  wanted to go ahead and actually get this particular subject

18  matter, they would have had to put some time and money, they

19  would have had to hire a photographer and spend the money to do

20  that, as well as a writer.

21          We looked for this guy for a couple of hours before we

22  even found him.  Just finding the guy is part of the equation.

23  Q.  Right.  You were with a reporter from the New York Post,

24  correct?

25  A.  Yes.

18DAAMAN2                           Mango - Cross

1    Q.  And her assignment was to do a story about Mr. Parker,

2    correct?

3    A.  Yes.

4    Q.  And this was The New York Post's idea, right?

5    A.  Well, it actually came from this building.  We have a

6    federal court reporter who covers cases all the time.  She had

7    found the filing of the lawsuit.  I believe it was that day.

8    So I believe it was January 18.  And we jumped right on it.

9         I was on the police scanner in the morning and I think

10   around two o'clock they found the first address, which turned

11   out to be a bad address.  But you go to one address, they're

12   not there, but then you speak to somebody who knows an aunt who

13   lives in the next building over.  Then you go see her and, oh,

14   he is over now at another address on Park Avenue or wherever.

15   That is how that unfolded.

16   Q.  Right.  It wasn't you deciding to write a story about

17   Mr. Parker?

18   A.  It was not me, no.

19   Q.  So if you didn't find Mr. Parker, The Post wouldn't have

20   written a story about him?

21   A.  I can't answer that.  I'm pretty sure they would write a

22   story either way.

23        THE COURT:  Excuse me.  I think that this questioning

24   is becoming, one, cumulative; two, thinly relevant; and three,

25   largely speculative.

1           MS. LACKMAN:  I wanted to talk about some of the

2    factors that went into it, but I think we have covered some of

3    them at least.

4    Q.  Let's talk about your licensing provisions a little bit.

5    A.  OK.

6    Q.  And some of exhibits that you were shown.

7    A.  OK.

8    Q.  Is the subject of a photograph relevant to the licensing

9    fee that you charge?

10   A.  Is the subject relevant?

11   Q.  Yeah.  Does it affect the price?

12   A.  Again, if it is a rare subject that is not often

13   photographed and it is newsworthy, it will affect the price.

14   Of course.

15   Q.  If a photograph depicts a well-known celebrity, the

16   licensee would be on it, right?

17   A.  Well-known celebrities are photographed all the time.  You

18   can take one case I remember -- I wish it was me -- the

19   photographer found Paul McCartney with his new girlfriend, I

20   think was out in the Hamptons somewhere, and nobody else had

21   the picture.  So he got a lot of money for that.

22           How many pictures of Stormy Daniels, whatever it is,

23   lots of pictures of her.  So I can't tell you what each photo

24   would be worth, and I don't know if it is wise to sort of make

25   the generalization that because they're a celebrity you are

1  going to get more money.

2  Q.  I wanted to go back to your testimony in your deposition

3  regarding Jeffrey Epstein.

4  A.  Yes.

5  Q.  Is it correct that the photograph you took of him and that

6  you were talking about at the deposition was worth a lot

7  because he is hard to find in public?

8  A.  As far as I can remember, and we are going back to I think

9  it was 2011, I think he had just gotten out of prison.  So he

10  hadn't been seen for quite some time.  He may have been

11  photographed a lot before he was in prison.  I don't know what

12  the prison term was.  If my memory is correct, he had more

13  recently just got out of prison and come up from Florida.  So

14  yeah.

15         The other thing, of course, is he was very, very good

16  friends with the Duke of York, Andrew Ferguson I believe is his

17  real name.  So in Europe, for example, especially in England,

18  the picture was well sought after.  I think I sold to the

19  Telegraph, perhaps to the Guardian.

20  Q.  And you described Jeffrey Epstein as notorious, right?

21  A.  Did I use that word?

22  Q.  I think you agreed to that term.

23  A.  Notorious?

24  Q.  Notorious.

25  A.  If I used the word, then I used the word.  I don't know a

18DAAMAN2                     Mango - Cross

1   lot about him.  I probably shouldn't have used that word.

2              THE COURT:  Ms. Lackman, please, I'm asking you to

3   move this testimony along.  I think this is getting to be

4   tiresome.

5              MS. LACKMAN:  Yes.  I am going to go through the

6   exhibits that he spoke about.

7   Q.  Is there anything else that we haven't discussed today that

8   you take into account in licensing a photo?

9   A.  Well, it all sounds very neat and organized and systematic

10  when I lay out the five factors, but at the end of the day you

11  can make these arguments to the clients and, you know,

12  sometimes they say, well, look, we have a budget of $500, take

13  it or leave it.  So that kind of throws everything out the

14  window.

15             So from that point of view, yes, the factors are

16  relevant, but, you know, it is not guaranteed that you are

17  going to get it.  Just because you say, well, it's a rare photo

18  and it is newsworthy you are a giant company doesn't mean you

19  are going to necessarily get what you'd like.

20  Q.  Let's go to Plaintiff's Exhibit 88.

21  A.  Got it.

22  Q.  Is it fair to say that most of these are -- in fact, none

23  of these are internet-only licenses?

24  A.  Well, I didn't actually create this document, but I trust

25  that Mr. Freeman did a fine job at putting this together.

1      So whatever it says it says.  So you've got TV, you've

2  got all media, print, internet.  I don't see anything here

3  that's just internet.

4  Q.  Well, isn't it the case that the $500 print and internet

5  license which was due to the Globe Magazine was not for the

6  internet at all?

7  A.  I have to look at that agreement.  Give me one second.

8      Globe?

9  Q.  Yes.  In 406.

10      THE COURT:  OK.  What's the question?

11  Q.  That that's a print use.

12  A.  It says here, sales for one-time use only in Globe

13  Magazine.  Future usage to be negotiated at that time.  Photo

14  credit to be given.  Whatever possible is copyrighted, has not

15  been transferred, November 26, 2005.  Right.  So maybe that

16  might be a mistake on the summary.

17  Q.  OK.  Let's look at, there's another on the summary chart

18  that referenced, license from March 24, 2013 where you

19  negotiated a print/internet license for $250, is that right?

20  A.  Which number that?

21  Q.  The one ending in 638.

22  A.  638.

23  Q.  Sorry.  629.

24  A.  OK.  Got it.

25      Yes.  Build digital, German outfit.

Q.  So $250, would it be fair to say that if we take Exhibit 88

to be all personally negotiated licenses since 2005 that the

highest internet licenses you've received is $250?

A.  Well, the paragraph about usage says -- it is a one-year

license starting on March 24, 2013 and ending on March 24th of

2014.  I granted them permission to publish and print or on the

web -- I am not sure if they have a print edition of their

website -- one image.

Q.  So you are not sure?

A.  Well, I mean it actually says print and internet.

Q.  OK.  And print licenses tend to be higher other than online

licenses, correct?

A.  Well, a lot of -- almost every news organization that has a

print edition also has a web presence.  So you kind of can't,

you kind of -- they're usually looking to get both when you

make the negotiations.

Q.  Right.  But my question was do print licenses tend to be

higher than online licenses.

A.  I don't have any experience to answer that question.

Q.  Have you only negotiated 15 licenses on your behalf since

2005?

A.  Yes.

Q.  And this is reflective of -- so we're talking on this

document, Exhibit 88, we're talking about a total of 20 images,

right?

18DAAMAN2                          Mango - Cross

1    A.  20, yes.

2    Q.  So if I've done the math right, that's an average of

3    $417.50 per image for images you've negotiated yourself?

4    A.  OK.

5    Q.  You don't dispute that?

6    A.  It's pure math.  I can't dispute it.

7    Q.  Good.  Some might try.

8           And it's true, is it not, that you've never personally

9    negotiated an internet-only license with any party?

10   A.  Not from this chart, no.

11   Q.  From your recollection.

12   A.  Again, most of these have internet presence, especially --

13   even going back to 2005, the internet was pretty much up and

14   running by then.  So there's always an internet component.

15   Q.  Right.  That's why I said an internet-only license.

16   A.  I don't see that here, no.

17   Q.  So you can't be sure, but you could have negotiated a

18   license with BuzzFeed yourself, correct?

19   A.  I could have definitely have negotiated a license with

20   BuzzFeed.  Of course I could.

21   Q.  It would have been your first time.

22   A.  It wouldn't have been my first negotiation.

23   Q.  No.  It would have been your first time negotiating an

24   internet-only license.

25   A.  OK.

1    Q.   Yes?

2    A.   Yes, yeah.

3    Q.   You talked about exclusivity and non-exclusivity, and I

4    believe you said that exclusivity means that only one

5    photographer has the image.

6    A.   Yeah.

7    Q.   Doesn't exclusivity mean -- well, do any of these

8    agreements that you identified in tab 89 refer to exclusive or

9    non-exclusive?

10   A.   89?

11   Q.   Yes.  Do any of these tell the licensee that they are

12   exclusive?

13   A.   Well, let's see.

14   Q.   Isn't it the case that you cannot give someone an -- that

15   the term exclusive refers to how many outlets have that image

16   as opposed to how many photographers have taken that image?

17   A.    Well, I think it could be both.  I generally think of it is

18   as the intellectual property of one person.  But I can tell you

19   that, like in years past when I had given the work to both

20   Splash and Polaris, a lot of times they would ask me not to

21   give it to the other agencies so they could sell it as

22   exclusive.

23        So in that case, yes, it would be the outlet or the

24   photo agency that could say to their magazines or whatever, we

25   have these exclusively from Greg Mango, but they're acting on

18DAAMAN2                    Mango - Cross

1   my behalf.  So they are kind of the same.

2   Q.  So if you were licensing photographs that previously

3   appeared in the New York Post, you could not give an exclusive

4   license to another party, correct?

5   A.  It's good question.  Well, I could tell them that, well,

6   obviously you saw it in the New York Post so you know it is in

7   there, but it isn't with any photo agencies so it's not going

8   to go to any other publications.  So from that point of view

9   excusive -- excluding, I should say, excluding The New York

10  Post I can make that statement, sure.

11  Q.  Let's look in Exhibit 89, first license.

12  A.  Yes.

13  Q.  Does it say that this one was in The New York Post

14  previously?

15  A.  It does not say that, but the producer who called me got my

16  phone number from the New York Post.

17  Q.  So Exhibit 89, I understood your testimony to reflect

18  licenses of photographs that had already been in The New York

19  Post, right?

20  A.  Yes.

21  Q.  OK.  Let's then turn to the three or four pages in.  At the

22  bottom it says MANG0423?

23  A.  Yes.  Got it.

24  Q.  Do you see the Re line at the top?

25  A.  Yes, I see that.

18DAAMAN2                          Mango - Cross

1   Q.  What publication is referenced there?

2   A.  New York Magazine.

3   Q.  Is that a mistake?

4   A.  I don't believe.  I think that they told me that they saw

5   it in New York Magazine, but it was originally published in The

6   New York Post.

7   Q.  How do you know that?

8   A.  How do I know it was originally published in the New York

9   Post?

10  Q.  Um-hmm.

11  A.  Because I saw it published in The New York Post.  It is a

12  great story, an amazing story.  I worked on this story for

13  about a year.  Big trial.

14          We had gotten exclusive access.  This was a new

15  funeral director who had taken over a place in Bensonhurst and

16  set up a secret autopsy room in the funeral home.  During the

17  transition from the old funeral director to the new one, we had

18  gotten access to this room where he was taking --

19          THE COURT:  Mr. Mango, I'm going to again ask you to

20  move along.  This has no bearing whatsoever on this.

21  A.  Yes.  It was originally published in The New York Post.

22  Q.  Let's move on to Exhibit 90, which we were talking about

23  earlier.

24  A.  OK.

25  Q.  Before we move on from agency licensing, you mentioned

1    something that you had engaged in discussions over the

2    telephone.  Do you remember that?

3    A.  I'm sorry.  I had engaged in telephone discussions?

4    Q.  Yeah, with the licensee when you directed the negotiations.

5    A.  Yeah, usually they call me.

6    Q.  Have you ever given permission to someone over the phone to

7    use the photo and say you are going to follow up with an

8    invoice?

9    A.  Once we have an agreement, it's usually in writing because

10   what has to happen is I have to send them the images after we

11   talk on the phone.  So I'll create an e-mail and I'll attach

12   the images.  In that e-mail it'll have the general agreement,

13   the dollar amount, stuff like that.  And then usually at the

14   bottom I'll say I'm sending an invoice to you tonight or

15   something like that.

16   Q.  When you say agreement, are you referring to types of

17   documents we saw in Exhibit 89 or something else?

18   A.  What's the question?

19   Q.  When you said you'll send them an agreement when you send

20   them a photograph --

21   A.  An invoice.

22   Q.  So this is essentially an example of what you sent?

23   A.  Yeah, these invoices.

24   Q.  I didn't know if there were other documents.

25   A.  No, just the invoice.

1    Q.  Has anyone ever -- have you ever sent the invoice

2    subsequently to sending the photos?

3    A.  Have I sent the invoice when?

4    Q.  After you sent the photos.

5    A.  Depending on how much free time I have, I could attach the

6    invoice at the same time as the photo.  But usually the invoice

7    is sent after I send the photo because they are usually on a

8    deadline to get this stuff printed right away and I don't want

9    to waste their time with me having to create an invoice.  So I

10   would say that definitely a number of times the invoice is sent

11   after the photos are sent.

12   Q.  OK.  And so you're paid after the party uses the photo?

13   A.  I mean, I try and get paid within 30 days.

14   Q.  Exhibit 90.

15   A.  Yes.

16   Q.  This is summary of the 12 highest license fees negotiated

17   by third-party stock photo agencies on your behalf.

18   A.  Yes, it is.

19   Q.  Why is it just 12?  Why not ten or 15?

20   A.  I didn't create that document.  This was created by

21   Mr. Freeman.

22   Q.  Is it fair to say that if a license you've earned through a

23   third party is not on this list, the fee was lower?

24   A.  I don't know.

25   Q.  What does top 12 mean in your understanding?

18DAAMAN2                          Mango - Cross

1    A.  I guess it's just sort of to show what I have been able to

2    command for photos over these years.

3    Q.  I'll note that there appears to me to be only one internet

4    license referenced on this cart.  Is that correct?

5    A.  That's what it says.

6    Q.  And in 2015 there is a license fee in the amount of $750.

7    Do you see that?

8    A.  Yes.

9    Q.  Do you recall the underlying photograph this corresponds

10   to?

11   A.  I would take a wild guess that it is Jeffrey Epstein, but I

12   couldn't be sure.

13   Q.  If you wanted to take a look at Exhibit 91 at page 438,

14   which is five or six pages in, does that refresh your

15   recollection?

16   A.  Yes, and I was correct, it's Jeffrey Epstein.

17   Q.  Was this a popular photograph?

18   A.  Yes.

19   Q.  Do you know how many times this was licensed?

20   A.  No.

21   Q.  Do you have a rough estimate?

22   A.  15 times.

23   Q.  OK.  Did you receive $750 each time it was licensed?

24   A.  I don't believe so.

25   Q.  Did you receive $750 when it was licensed that one time?

1   A.  Yes.

2   Q.  The photo agency didn't take a cut?

3   A.  I am sorry.  It was sold for seven.  Let's be clear that

4   these numbers here are what the photos were sold before, not

5   what I received on the chart of 12.

6   Q.  What did you receive in that instance?

7   A.  I get 60 percent.  So I got $450 for that one.

8   Q.  And if you look at page -- basically this royalty

9   statement, which includes the Jeffrey Epstein images, there's

10  reference to 438 and 439 on it.

11          Do you see a variety of licenses?

12  A.  Yes, I do.

13  Q.  And did you receive $450 for each of these uses?

14  A.  No, no.  All different amounts.  There was only one sale on

15  March 2nd of 2015.  The Jeffrey Epstein photo was sold for $750

16  and I received 450.  The other photos were sold for different

17  amounts.

18          MS. LACKMAN:  I am going to move on to another exhibit

19  in just a moment.

20          (Pause)

21  Q.  In your experience when a photo agency acts on your behalf

22  to license the photo, has any licensees ever questioned the

23  authority of the agency to act on your behalf?

24  A.  I have no idea.

25  Q.  Has anyone ever contacted, any licensee contacted you and

18DAAMAN2                    Mango - Cross

1   said, hey, is Splash or Polaris your agent?

2   A.   I have had e-mails from news organizations asking me does

3   your agency, do they have these photos or do I have to get them

4   directly from you.

5   Q.   OK.  But nobody has ever called you up and said, hey, I was

6   talking to Splash and I'm not sure, are they legit?  Have you

7   had any conversations like that?

8   A.   No, I haven't.

9   Q.   OK.  Let's look in the binder at Exhibit L.

10  A.   OK.

11  Q.   Do you have any understanding of how many documented

12  licenses you provided to us as part of this litigation?

13  A.   Well, I know that I gave Mr. Freeman the paper documents

14  that I found from Splash and Polaris in my office, plus my own

15  personal licensing agreements, plus anything I could find from

16  older years of financial records in my motor cycle garage.

17  Then I think I found about, I don't know, 60 or 70 PDFs from

18  Splash that were on my computer, which I also forwarded to

19  Mr. Freeman.  Each one of those probably had five or ten images

20  on it.  So I really -- hundreds of licenses.

21  Q.   OK.  About 330?  Would that sound about right?

22  A.   Sounds like you did the math.  I have no idea.  But if you

23  counted them, then I'll go with it.

24  Q.   OK.

25          MS. LACKMAN:  Looking at Exhibit L, I would like to

18DAAMAN2                          Mango - Cross

1  move for the admission of this into evidence under Rule 1006

2  rather than providing 330 licenses to the Court.

3         THE COURT:  This exhibit was in your binder?

4         MS. LACKMAN:  Yes.

5         THE COURT:  The agreement was anything in the binder

6  was admitted.

7         MS. LACKMAN:  OK.  Just making sure.

8         THE COURT:  Yes.  Let's take a ten-minute break.

9         (Recess)

10        THE COURT:  You may be seated.

11        Ms. Lackman, let's get a bearing on time and on

12  relevance.

13        MS. LACKMAN:  Yes.  I'm going to go through Exhibit L

14  and wrap this up.

15        THE COURT:  How long?

16        MS. LACKMAN:  20 minutes, 15 minutes, being realistic.

17 This is not a Mr. Freeman 20 minutes.  This is a real 20

18 minutes.

19        THE COURT:  Let's take the 20 minutes and that will be

20 it.

21 BY MS. LACKMAN:

22 Q.  Let's look at this document marked as Exhibit L.  We

23 discussed this is a summary provided under a rule that allows

24 us to summarize voluminous documents.

25        Do you have any reason to believe just sitting here

1   now that the summary is not accurate?

2   A.  Well, it's thirteen pages of licensing agreements.  I would

3   need hours to go over this to tell you if it's accurate.  But I

4   would just assume that barring any mistakes that whoever input

5   this, I'll accept it as accurate.

6   Q.  Thank you.  The judge has only begin me 20 minutes, so

7   thank you for saying that.

8           So if we have over 300 licenses here and you are

9   showing us 15 licenses for 20 photographs you negotiated plus

10  the top 12 you negotiated that was in Exhibit 90, is it fair to

11  say that this exhibit is somewhat more comprehensive of your

12  licensing history?

13  A.  I would say that it's really not relevant because I didn't

14  negotiate these licenses and I don't know the inner workings

15  and mechanics of how Splash and Polaris works.  So it's

16  something that I don't have a lot knowledge to comment on.

17  Q.  So you're saying the only licenses that are relevant are

18  the 15 that you negotiated?

19  A.  I am saying those are the only ones I can talk about.

20  Q.  Are you aware what you've received from your licensing?

21  A.  Yes, of course.

22  Q.  OK.  Let's look at the Epstein image briefly.  Would you be

23  surprised if I told you the Epstein image has been licensed

24  approximately 65 times?

25  A.  It's more than I would have guessed.

18DAAMAN2                    Mango – Cross

1   Q.  That's more than you would have guessed?

2   A.  I think I said 15 earlier.

3   Q.  Let's look at the first page.  In the second category of

4   the second box, you'll see sort of midway through there are

5   four entries to Jeffrey Epstein.

6           Do you see that?

7   A.  Yes.

8   Q.  And do you see the last one you received $450 for that use.

9   Is that correct?

10  A.  Yes.

11  Q.  And then previous to that, if you look up to the first

12  reference, four lines up, there's reference to popsugar.com.

13  Same licensee.  $24.

14          Do you see that?

15  A.  I do.

16  Q.  How about with respect to the Daily Beast, you received $30

17  for use of that same photo, correct?

18  A.  Yes.

19  Q.  These are all internet-only photos?

20  A.  That's what it says.

21  Q.  OK.  And so aren't these numbers in the 20 to 30 dollar

22  range, isn't this a little bit more typical of what you receive

23  for a non-subscription internet use?

24  A.  Again, I don't know how they make their sales and I don't

25  know what their parameters are.  Basically for me it's whatever

18DAAMAN2                         Mango - Cross

1    they send me, that's what I accept.  So I can't tell you what's

2    typical and what's not.

3    Q.  If you look at the second column of the second box category

4    at the bottom, you see there's a total average there.

5    A.  Yes, I do.

6    Q.  Do you have any reason to dispute that the average license

7    fee that you've received for non-subscription use, for internet

8    use, is $51.14?

9    A.  That's what they negotiated.

10   Q.  And did you ever go back to them and refuse your royalty

11   statement?

12   A.  Of course not.

13   Q.  Did you ever go back to them and say I want $450, not $30?

14   A.  No.

15   Q.  Let's look at the top box.  In the first part there's a

16   reference to Petit Gravesite Flowers.

17          Do you see that?

18   A.  I do.

19   Q.  This was for a book use, correct?

20   A.  That's what it says.

21   Q.  And you earned $475 in connection with that?

22   A.  For, it looks like an eighth of a page.  I guess the cover

23   of a book.

24   Q.  Who is William Petit at the time?

25   A.  He is the gentleman I described earlier.  He was a doctor

1    in New Britain, Connecticut.  Him and his family were subject

2    to a home invasion.  The wife and daughters were killed and

3    then they burned the house down.

4    Q.  I actually remember that.

5    A.  It was a big one.

6    Q.  And is this the same photograph you licensed to People

7    Magazine for $2500?

8    A.  No, it's not.  This was the photograph of the grave.  I was

9    there for two days in New Britain.  I took some time to drive

10   around the town and find the cemetery where the two girls and

11   the mom were buried.  So that was a photograph of the

12   gravesite, freshly dug gravesite.  I believe there was some

13   flowers near the graves.

14   Q.  So you licensed a photo of Mr. Petit, Dr. Petit himself at

15   the memorial service for his family.  Is that true?

16   A.  The picture of him?

17   Q.  He was probably deceased.

18   A.  No, no.  He survived.  The only one who survived.

19          There was a number -- like I say, sometimes these

20   stories have multiple pictures to illustrate the story.  So

21   there was a picture of him that was used on the cover of the

22   New York Post.  I think that was the picture that was used in

23   People Magazine where they sold it for $2500.  I am pretty

24   sure.

25   Q.  Picture used on the cover, you mean in print?

18DAAMAN2                    Mango - Cross

1    A.  When I first did it for The New York Post, yes, they used

2    it in print and I'm sure they put it on the web as well.

3           Then afterwards it was given to Splash and Polaris and

4    they went out and sold it.  And if I'm not mistaken, the

5    picture of Dr. Petit himself was used it in People Magazine.

6           THE COURT:  I am going to stop again, Ms. Lackman.

7    Beyond the point that you made that the average of all of these

8    is something like $52, what more is relevant?

9           MS. LACKMAN:  Not much if I've made the point.

10          THE COURT:  He has now spent ten minutes telling us

11   about pictures in Connecticut which is neither here nor there.

12          MS. LACKMAN:  Well, I'm trying to focus on what the

13   direct covered and trying to work through that.  If that's been

14   covered, then we're good.

15   Q.  Just to clarify, did the picture of Mr. Parker at issue in

16   this case ever appear in The New York Post in print, Mr. Parker

17   in print?

18   A.  I don't know.  I think so, but I couldn't be sure.

19          THE COURT:  Ms. Lackman, what relevance does that have

20   to the issue in this case?

21          MS. LACKMAN:  It has relevance to the calculation of

22   damages and what is reasonable.

23          THE COURT:  You have already put on the record that

24   the average is $52 and it ranges from 2500 to 3000 to 50,000.

25          MS. LACKMAN:  Your Honor has a fair point.

1          And just to ask my last question.

2     Q.  Given this rate, even given your opening offer, did you

3     receive BuzzFeed's offer of judgment for $2500?

4               MR. FREEMAN:  Objection, your Honor.

5               THE COURT:  Sustained.

6               MR. FREEMAN:  You don't have to answer.

7               THE WITNESS:  OK.

8               MS. LACKMAN:  No more questions.

9               MR. FREEMAN:  Your Honor, I have one question.

10              THE COURT:  Yes.

11    REDIRECT EXAMINATION

12    BY MR. FREEMAN:

13    Q.  Mr. Mango, can you look at Plaintiff's Exhibit 89, Bates

14    stamp number MANG416.  It's the fourth page.  It's the one that

15    says ABC News?

16    A.  Yes, I have it.

17    Q.  Do you see that?

18    A.  Yes.

19    Q.  This was for $750?

20    A.  That's right.  That's right.  That's correct.

21    Q.  This included internet?

22    A.  Yes.

23              MR. FREEMAN:  Thank you.

24              No further questions, your Honor.

25              THE WITNESS:  OK.

18DAAMAN2                          Mango - Recross

1   RECROSS EXAMINATION

2   BY MS. LACKMAN:

3   Q.  This is a document stamped Mango 416, correct?  Is that

4   what Mr. Freeman asked you about?

5   A.  Yes, ABC News.

6   Q.  And can you please read the territory of the scope that's

7   provided or the permission scope?

8   A.  Yes.  It says, worldwide and all media now known or

9   hereafter devised.

10  Q.  You can stop there.

11          In your understanding, does all media now known or

12  hereafter devised, does that include more than just the

13  Internet?

14  A.  Well, the media is listed in that sentence.

15  Q.  Okay.

16          MS. LACKMAN:  So I have no further questions.

17          THE COURT:  Let me ask Mr. Mango a couple of

18  questions.

19          THE WITNESS:  Sure.

20          THE COURT:  You testified about the instances, which

21  appear to be about a dozen or so, over the years in which you

22  directly negotiated a license for one of your photographs with

23  one of the sources.

24          Tell us generally how those negotiations went.  You

25  said that usually they are media calls and you get on the

18DAAMAN2                         Mango - Recross

1    phone, right?

2              THE WITNESS:  Yes.

3              THE COURT:  So then what happens.

4              THE WITNESS:  Well, you know, they usually compliment

5    me and say we really like the work you're doing on a piece on

6    this and we would really like to have them in the story or TV

7    show or in print, and then I start to ask them some questions

8    about it.

9              THE COURT:  You go through your five factors.

10             THE WITNESS:  Five factors.  I ask them do they have a

11   budget, stuff like that.  You know, I throw out some numbers.

12   I also try to sell more than one photo cause, as I said

13   earlier, it is better to get three at 500 than one at 750.  So

14   I try to push them as sort of the bulk discount.  And they are

15   not easy negotiations.  When I went to photography school, I

16   wasn't trained to how to be a salesman.  So they are tough

17   because they want to chisel you down.

18             THE COURT:  Generally, how long would it take for you

19   to conclude a deal, if you do conclude it?

20             THE WITNESS:  You know, usually I don't talk -- the

21   first phone call is usually not a person who can sign off on

22   it.  So usually they'll say, OK, I've got to talk to my

23   producer and get back to you.  So usually it's two phone calls.

24             THE COURT:  OK.  How long does it take you to go to a

25   producer and get approval?

18DAAMAN2                           Mango - Recross

1          THE WITNESS:  Usually it's done the same day.

2          THE COURT:  Same day.

3          THE WITNESS:  Oh, yeah, cause everything's on a time

4     schedule.

5          THE COURT:  You also indicated that you generally work

6     50 hours a week for The Post.

7          THE WITNESS:  Maybe between 45 and 50, you know, on

8     the days when I work five days.  Four days would be less.

9          THE COURT:  You being a photographer I assume you

10    don't sit at a desk all day long.

11         THE WITNESS:  No.  I'm in my car all day usually.

12         THE COURT:  Except if somebody calls you, when might

13    you be able to talk to them?

14         THE WITNESS:  Well, it depends on if I'm in between

15    assignments, I could talk to them right then and there

16    sometimes.  I'll have to -- you know, the problem is they want

17    the stuff right away.  So I kind of have to make time for them.

18    Even if I am in the middle of an assignment, I have to make a

19    five-minute phone call.  But it really depends on what

20    assignment I'm on.

21         THE COURT:  So if somebody is on a tight deadline and

22    you are out in the field, they may or may not be able to get to

23    you or if they get you, it might take time before you can get

24    back to them and get approval.  Is that a fair statement?

25         THE WITNESS:  Yeah.

18DAAMAN2                        Mango - Recross

1              THE COURT:  And if they have half an hour, is that

2      enough time generally or is it possible it could take longer?

3              THE WITNESS:  For them to get back to me?

4              THE COURT:  No.  For the whole transaction to be

5      completed.

6              THE WITNESS:  Is a half-hour accurate?

7              THE COURT:  No.  I am just saying in your experience,

8      would that be enough time or does it generally take longer?

9              THE WITNESS:  I would say half the time -- I would say

10     that probably 70 percent of the time we concluded it in a half

11     hour.  Maybe 30 to 40 percent of the time we have to wait to

12     see to hear back from somebody up above to approve it.  And

13     there are times when I don't get a return phone call and they

14     just drop the whole thing.  They don't want to pay.  That

15     happened to me last weekend.  I gave the guy some numbers and

16     they --

17             THE COURT:  How often have you had a situation like

18     this one where one of four photographs gets used without your

19     permission?

20             THE WITNESS:  Oh, gosh.  I mean, throughout my career?

21             THE COURT:  Yes.

22             THE WITNESS:  Hundreds of times.

23             THE COURT:  It happens.

24             THE WITNESS:  It's rampant.  I mean, when -- I've

25     known Anthony Weiner and Chuck Schumer for decades.  When

1  Anthony Weiner had his problems, I had taken some pictures of

2  him.  I just did a search -- this is before I was working with

3  the Leibowitz firm.  I had no representation and I had Anthony

4  Weiner, 57,000 websites had the photo and I wasn't paid from

5  57,000 websites for them.  I was maybe paid from 50 of them.

6          THE COURT:  Generally to what would you attribute the

7  fact that it's so rampant?  Is it possible that it's rampant

8  because the reporters want to get the story out and they don't

9  want to bother with having to track you down and spend the time

10  negotiating?

11          THE WITNESS:  I think that's definitely part of it.  I

12  also think ever since the advent of the internet we have a

13  situation where they're doing publishing, but they don't

14  necessarily set aside a budget for it.  So that puts

15  constraints on them as well.  You see this all the time where

16  other websites will use content and are not paying the

17  reporters to go out.  They'll take the story from The New York

18  Post, put the hyperlink, and say it's fair use.  Then maybe not

19  use a photo or steal one.  And, you know, certain publications

20  that are paying photographers are losing that ad revenue.  At

21  the end of the day what happens is the entire staff gets fired.

22  That is what happened to the Daily News a couple of weeks ago.

23          THE COURT:  All right.  Thank you.  That's the end of

24  my questions unless counsel have followups.

25          MR. FREEMAN:  No, your Honor.

1          MS. LACKMAN:  I have just a couple of questions, just

2     to clarify a couple of things.

3     BY MS. LACKMAN:

4     Q.  In 15 years, is it fair to say that in 15 years you've

5     negotiated photo licenses directly 15 times?

6     A.  Yes.

7     Q.  OK.  So the vast majority of your licensing is done by

8     photo agencies?

9     A.  Used to be.  Not any more, but used to be, yeah.  I don't

10    use them anymore.

11    Q.  Are there other -- when you were talking about other uses

12    of photographs, we're not talking about this photograph, are

13    we?  No?

14    A.  Can you repeat question?

15    Q.  Sure.  When you were talking with the judge about the uses

16    of the photograph, of your photographs, you weren't talking

17    about this photograph, right, being widespread and all that?

18    A.  I'm not sure what part of the conversation you are

19    referring to.

20    Q.  Sure.

21          Right at the end you were talking about web sites that

22    have your photos on them for which you were not paid.

23    A.  Oh, right.  Yes.

24    Q.  Did this happen in the context of this particular

25    photograph, the one at issue in this case?

18DAAMAN2                        Mango - Recross

1    A.  I was not paid for that photograph, no.

2    Q.  Did they appear all over the Internet?

3    A.  This photo, not that I know of.

4    Q.  Are the uses you were talking about primarily done by U.S.

5    companies that have a couple -- have more than a few employees?

6    I am trying to understand what you're getting at with the

7    widespread usage.

8    A.  I mean, a lot of these websites, crazy names, small

9    operations, you read the title of the website, you don't -- I

10   mean, I remember one example where the title of a website had a

11   curse word in the title and it was, I believe it was just a

12   single person sort of blogging from their house.  That would be

13   one extent.  And then of course the other extreme would be big

14   companies that want it on their website.  It could vary.

15            MS. LACKMAN:  Just one moment.

16            (Pause)

17            MS. LACKMAN:  No further questions.

18            THE COURT:  Thank you.  You are excused.  You may step

19   down.

20            THE WITNESS:  Thank you.

21            (Witness excused)

22            THE COURT:  Mr. Freeman.

23            MR. FREEMAN:  Yes, your Honor.  Well, we've concluded

24   our presentation.  We thank the Court for investing substantial

25   resources and court staff or entertaining this case on trial.

1          The last thing we want to do is impose further paper

2    on the Court.  That being said, there was a venerable goldmine

3    of testimony today that we would like to process and, if it

4    pleases the Court, to submit at the appropriate time and under

5    whatever parameters the Court selects, to submit a proposed

6    posttrial brief.  It could be something like a single-spaced

7    letter brief or it could be a 10- to 15-page brief if it

8    pleases the Court.

9          THE COURT:  What about a mini-closing argument?

10          MR. FREEMAN:  You'd like a closing argument?

11          THE COURT:  Yes.  Let's do that, unless Ms. Lackman

12    has anything else.

13          Do you rest as well?

14          MS. LACKMAN:  Yes.  We're don't have any more on our

15    case.  We believe we put in our case in chief in conjunction

16    with this.

17          THE COURT:  All right.  Then let's hear closing

18    arguments.

19          MR. FREEMAN:  Your Honor, I believe in a typical trial

20    the defendant goes first and the plaintiff goes last.

21          MS. LACKMAN:  From what the Court has heard today, we

22    have a couple claims in the case.  The first claim in the case

23    is infringement under Section 501 of the Copyright Act.  It's a

24    strict liability tort.  As your Honor is aware, without a

25    license or other type of defense, my client is technically

1    liable for copyright infringement.

2            We heard Ms. Fisher today deny that she had the

3    authority to give permission to use the photograph in The Post.

4    We did not uncover any evidence to believe otherwise.

5    Accordingly, BuzzFeed is liable.

6            That said, the amount of damages in this case for this

7    claim is extremely low.  Mr. Mango conceded and did not dispute

8    that even in cases of non-subscription uses, which would be the

9    case here and is typically higher, the average license fee

10   would be $51.14.  In this district courts have looked at, in

11   determining statutory damages, even in cases of non-innocent

12   infringement or willful infringement some sort of small

13   multiplier of a reasonable license fee.

14           In this case a reasonable license fee may have been

15   lower than $51, but let's say it was.  The courts in this

16   district apply three to five times of a reasonable license fee,

17   and this is particularly in some instances generous under the

18   circumstance, as I will explain.

19           There is also a minimum if statutory damages are

20   claimed, and we are not disputing that they're claimed.

21   There's a minimum of $750.  So even if the five times

22   multiplier were applied, we are talking about $250.  The uplift

23   is $750.  That is actually what the parties were advised as an

24   initial inclination at a conference before this court back in

25   December.  We believe that there shouldn't be an award higher

than $750 given these circumstances.

Relatedly, there's this Section 1202 claim of the Copyright Act, which relates to the removal of copyright management information.  This one involves a high burden to show -- the plaintiff is required to establish, they have the burden of proof to establish that copyright management information was removed intentionally, and not only that, that the reason for the removal was in order to conceal infringement or to facilitate other infringement.

The law was enacted essentially to prevent people from damaging encryption systems and other types of things that were being used to protect works over the Internet.

Mr. Hayes was not -- first of all, he didn't remove anything.  He downloaded a photo and the gutter credit didn't come with the photo.  Whether he saw it or not or overlooked it or was confused, he reached out.  He sought permission.  We believe that Ms. Fisher did give permission and is now walking it back.  Unfortunately, we don't have that in an email.  But even so, he wasn't trying to conceal anything.  He thought he had permission to use the photograph.  He said if he didn't have permission, he would have used something else.  His testimony on that point is very credible.

So the fact that he went ahead and did this and used this shows his good faith.  In addition, he linked to the original article that included the photograph just like The New

18DAAMAN2                        Mango - Recross

York Post did when they linked to the original article that had

featured that photograph without the use of gutter credits.

Mr. Mango testified that if you click on the link, you'll see

the original photo.  If you click on The New York Post article,

you'll see the original photo.

          If Mr. Hayes was trying to hide the use, he did a

really bad job by leaving a link to the original source.  And

he did give a credit.  He gave a credit to what he thought was

the source.

          This falls very far short of establishing liability

for a copyright management information claim under Section 1202

of the Copyright Act and, therefore, the concept of damages,

the door shouldn't even be opened.

          It's clear what happened here.  Whether it was a

mistake or whether there was misunderstanding or whether

Ms. Fisher really did say OK.  Mr. Hayes clearly did what he

thought was the right thing.  He credited the source, the

source that he was able -- that he got the photo from.  He

believed that Ms. Fisher had given the photo to The Post

originally.  Mr. Mango could have been an employee of The Post.

Nobody really knows.  But that level of diligence is also not

common, not standard, not expected and, most importantly, it

doesn't rise to the level of a willful calculating attempt to

violate someone's rights.

          Mr. Hayes is a writer himself.  He has seen those

18DAAMAN2                    Mango - Recross

1    violations to himself.  He has never been in trouble, never had

2    a claim over the thousands of photos he's written.  He is not

3    the type of bad guy that should be implicated by Section 1202.

4    Therefore, that second claim should be dismissed.

5              Accordingly, the value of the case, the total damages

6    that should be awarded is $750 and liability should not be

7    entered on any additional claim other than that's been

8    stipulated.

9              THE COURT:  Thank you.

10             Mr. Freeman.

11             MR. FREEMAN:  Thank you, your Honor.  Well, the first

12   issue on Count One is willfulness.  In evaluating willfulness

13   the courts will look at several factors, including whether the

14   infringer was on notice that the copyrighted work was

15   protected, whether the infringer had received warnings of the

16   infringement, whether the infringer had experience with

17   previous copyright ownership, prior lawsuits regarding similar

18   practices or worked in an industry where copyright a prevalent.

19   That is the Morel case, 934 F. Supp. 2d 547.

20             Here, there is no dispute that BuzzFeed works in an

21   industry where copyright is prevalent.  There is no dispute

22   that BuzzFeed has had extensive experience with copyright

23   ownership and licensing photographs.  There is no dispute that

24   BuzzFeed has guidelines for handling copyright ownership and

25   properly attributing photographs.

18DAAMAN2                    Mango - Recross

1          Mr. Hayes testified that he has written over a

2     thousand articles.  He's been an employee of BuzzFeed for seven

3     years.  He's been a senior reporter for five and a half years.

4          Mr. Brehm testified that there are written internal

5     memorandum, which, by the way, we asked for in discovery and

6     didn't get, which instruct the employees of BuzzFeed how to

7     properly license photographs and how to properly attribute

8     photographs.

9          The BuzzFeed employee implicated in infringing Mango's

10    copyright here, Mr. Hayes, was aware of those guidelines.  He

11    testified that he had been trained.  He testified that he had

12    received internal memorandum.  He clearly did not follow those

13    guidelines.

14          Furthermore, there could be really no question that at

15    the very least he acted in reckless disregard of Mr. Mango's

16    rights.  That is all we have to show for willfulness.  Granted,

17    the degree of willfulness is important here in terms of

18    calculating damages, but I think there's no question that we

19    we've met the threshold of showing that Mr. Hayes wanted a

20    photograph of Raymond Parker, he wanted it fast -- if you may

21    recall, the sooner the better -- and he wanted it for free

22    cause.  He asked Ms. Fisher, who had no prior experience in

23    licensing photographs or distributing press kits or

24    distributing press releases to, quote/unquote, share a

25    photograph with him.  He didn't say do you have a photograph to

1    license, he said would you share it.

2            He never got a response.  So what does he do?  He goes

3    to The New York Post website.  He downloads the picture from

4    the website.  He cannot possible, it's not credible that he

5    didn't see the gutter credit.  This is what he does everyday

6    for a living.  This is how he makes his living.  He writes

7    articles, sources photos, and he credits the photographer.

8            We had walked through at least two photographs from

9    other articles he had published in which he did input the

10   credit of the name of the photographer.  So he understood what

11   he was doing.  But here is the kicker.  If the Court were to

12   look back at the pretrial submissions of defendant in this

13   case, they argue in their pretrial submission that Mr. Hayes

14   was justified in believing that he had authority from Fisher &

15   Taubenfeld because he had a past practice of receiving press

16   kits from lawyers and attorneys.  But when he took the stand

17   today, he didn't even know what a press kit was.  He testified

18   that he had never received a press kit from any attorney or

19   lawyer.  That in and of itself undermines his credibility on

20   the issue.

21           Furthermore, with respect -- so in the sense of

22   establishing willfulness, we've certainly met our evidentiary

23   burden, and there could be no question that Mr. Hayes working

24   on behalf of BuzzFeed acted in reckless disregard.  In fact, it

25   was above reckless disregard; it was willful.

1          Now in terms of damages on Count One, you've seen the

2     defendant submit their chart which summarizes averages.  They

3     have been talking all about averages.  They asked Mr. Mango

4     what is the average.  No where since the Copyright Act has been

5     enacted in 1976 have I found a single case where a court of law

6     determined the fair market value based on an average.  In fact,

7     it's quite the opposite.

8          The Second Circuit ruled that an award of actual

9     damages in a copyright infringement case "should be broadly

10     construed in favor of victims of infringement."  That's Davis

11     v. Gap, 246 F.3d 152.

12          William Packard, copyright law -- in fact, it is a

13     treatise -- says:  "Within reason, any ambiguity should be

14     resolved in favor of the copyright owner.  Thus, when a court

15     is confronted with imprecision in the calculation of

16     damages" -- and to be sure here there is a degree of

17     speculation because Mr. Mango never actually licensed the photo

18     to a third-party organization -- that "it should err on the

19     side of guaranteeing the plaintiff a full recovery."  That is a

20     Second Circuit case, Sigma Photo News, 778 F.2d 89.

21          Furthermore, Fitzgerald Public Company v. Bailer

22     Publishing Company, 807 F.2d 1110.  Quote:  Actual damages are

23     not narrowly focused.

24          So we're looking -- and one more point on Davis v.

25     Gap, which is the Second Circuit's sort of benchmark case on

1    how to calculate licensing fees.

2              Very revealing language where they say that the fee --

3    that the fair market value licensing is the licensing fee the

4    owner was entitled to charge for the infringer's use of the

5    copyrighted work.  I think that's the best language I've found

6    so far to say entitled to charge.  It's not necessarily what he

7    would have settle for; it's what would he have been quoted

8    reasonably.  What was he entitled to charge if BuzzFeed had

9    picked up the phone and called him and said we'd like to get a

10   license.

11             Mr. Mango testified it's thousand dollars.  We see

12   evidence on the record that it's plausible.  He could have

13   gotten more.  He could is gotten up to 2500.  It's likely

14   implausible he would have settled for anything less than 750

15   given that he has a past of licensing internet on that basis.

16             So in terms of calculating the lost licensing fee,

17   number one, we don't that is dispositive.  But if we're going

18   to include that as one of the factors, we don't know what it

19   would have been.  But we know that something between 750 on the

20   low end, of the 2500 on the high end, something in between is a

21   reasonable licensing fee.  So that's in terms of a metric for

22   calculating the fair market value.

23             Now, in terms of the multiple, there's no dispute that

24   there has been a traditional custom and practice in the last

25   three to four years, going back five years of using this

1   multiple of three times five.  Your Honor asked Mr. Mango on

2   the stand, what's going on here, why are these copyright

3   infringement cases so prevalent, why has the Liebowitz law firm

4   alone filed over 850 of these types of suits, and will probably

5   hit a thousand lawsuits by the end of this year.  Of course,

6   it's certainly that you have digital publishers who are not

7   following the law.  But there is an argument to make here that

8   perhaps the three times five licensing fee is not sufficient

9   deterrence.

10          I recognize that your Honor noted in the order on the

11  motion in limine that the courts that have used three times

12  five licensing multiple, that the courts have concluded that

13  that's a sufficient deterrent.  But it seems to me that the

14  floodgates of litigation have opened.  So perhaps it is not the

15  sufficient deterrence that is needed.

16          Just to give a simple metaphor, you know, the price

17  for riding the New York City subway is 2.75.  But if you jump

18  the turnstile, it's a hundred dollar fine.  That is a 36 times

19  multiple.

20          What would happen if the multiple was only three

21  times.  What if it was six bucks or eight bucks if you get

22  fined.  Would there be a lot more fare jumpers?  I think that

23  we can answer that in the affirmative.

24          So we're suggesting, and it's not the first time it

25  has been suggested, that an ideal multiple, particularly when

18DAAMAN2                    Mango - Recross

you are talking about breaking news photography or,

quote/unquote, lower value copyright cases is to apply a bit

more after hefty multiple, somewhere in the range of 10 to 12,

which we believe is adequate.  After all, the number 12 is the

number of one full cycle.  It is the number that represents

what goes around comes around.

I understand that your Honor might be reluctant to

break with the existing judicial custom and practice, but part

of this case -- I think I expressed this to your Honor since

the beginning -- is to perhaps redefine the parameters here and

to impose a more substantial penalty on infringers,

particularly those who are large-scale media companies,

large-scale corporations.  Because after all, this case is not

just about BuzzFeed.  It's in a sense a broken window case,

which mean if you left one broken window unrepaired in the

neighborhood, pretty soon you are going to have all the windows

in the neighborhood broken.

The same metaphor was applied in the '80s to the New

York City subway where you had graffiti on one car.  If you

don't clean up one car, pretty soon all the cars are full of

graffiti.

So we are here in a sense as a private attorney

general to enforce the Copyright Act, to make sure that there

is an existing, fully functioning licensing market that will

not only compensate the creators of the copyrighted work but

18DAAMAN2                        Mango - Recross

1    also aid in the progress of the useful arts by making sure

2    photographs are properly attributed and so that the copyright

3    owners are compensated for their contributions to society.

4            So we have said in the past and I've said it in my

5    papers, there is a jurisprudential disconnect between the

6    amount that's awarded on a default judgment.  We have cited

7    cases in our brief which stand for the proposition that in a

8    single-image case you can get $30,000.  Our law firm alone has

9    obtained nine default judgments in the amount of $30,000 that

10   is a single-image case without any proof of actual damages.

11           Where does that $30,000 come from?  Well, it's the

12   maximum amount provided for by the statute.  It's not a number

13   that is arbitrary.  So we've often said, $30,000, that is an

14   ideal civil penalty to impose upon a large-scale corporation

15   for an infringement under the Copyright Act.  So it is

16   justified by the statutory language, it is justified by the

17   custom and practice.

18           Default.  How could a defaulting party be treated that

19   much worse than a defendant like BuzzFeed who happens to defend

20   itself but is found liable pursuant to the allegations of our

21   complaint.  After all, fault is what?  It just means that the

22   factual allegations of the complaint are deemed true.  But if

23   we come into court after a year of hard-fought battle and we

24   establish the allegations of our complaint, why should BuzzFeed

25   treat it more favorably than the defaulting party.

18DAAMAN2                           Mango - Recross

1          So for that reason your Honor would be certainly

2     justified in departing from this multiplier theory and imposing

3     a $30,000 substantial penalty.  As your Honor noted in the

4     motion in limine, it couldn't be appealed because if the

5     defendant were to file an appeal and say, well, there is no

6     connection between the actual lost licensing fee and the

7     $30,000, we all know that in that case of Sohoyos, the Second

8     Circuit has already held it doesn't need to.

9          So your Honor does have the discretion to depart from

10    using the actual fair market value, which has a degree of

11    speculation, in imposing the $30,000.  But even if your Honor

12    were to use the $2,500 highest licensing fee on grounds that

13    all ambiguities are resolved against the infringer and times

14    that by 12, we still arrive at 30.

15         Let's move on to Count Two.  CMI.  According to the

16    case law, CMI exists to inform the public that a work is

17    copyrighted and by whom.  So Ms. Lackman said it had something

18    to do with integrated systems or with metadata.  It has nothing

19    to do with metadata.  It's all about notice.  It is all about

20    putting the world on notice as to who the copyright owner is.

21    You don't want an infringer to come along and take the work and

22    then pass it off as something else.  That's the idea with CMI.

23         So the point of CMI is to inform the public that

24    something is copyrighted and to prevent infringement.  That's

25    the point.  It is not just to give credit to Mr. Mango.  It is

18DAAMAN2                      Mango - Recross

1    also to let the world know, as Mr. Mango testified, that he is

2    the owner of the copyright and if a media organization wants to

3    license it from him, they can contact him directly.

4            Now, here is their big argument on Count Two, which is

5    is that the statute does not require -- I'm sorry.  Their big

6    argument is the CMI must be embedded in the metadata.  As we

7    saw today, the metadata is invisible.  So how does that conform

8    with the statue's purpose of informing the world.

9            The whole idea of CMI is that it needs to be visible.

10   That's where the gutter credit comes in.  So there's no

11   shortage of cases where the courts have recognized, and

12   particularly Judge Nathan's decision in Morel, which I cited

13   earlier, that a gutter credit is a CMI.  I believe Judge Nathan

14   also said in that case that it's just not credible that the

15   defendant wouldn't see the CMI, the gutter credit.  It's just

16   almost as a matter law it is presumed that the defendant who

17   uses the photograph saw the gutter credit.

18           So Mr. Haye's testimony that he didn't see it, even

19   putting aside credibility, we believe practically as a matter

20   of law he should be charged with such knowledge.

21           Now there are a couple cases which do say metadata and

22   CMI are not interchangeable.  First is Judge Engelmayer's

23   decision in Fisher v. Forest, 2017 WL 299-2663, which says

24   literally, the terms metadata and CMI are not interchangable.

25           Furthermore, although there is scarcely authority in

18DAAMAN2                        Mango - Recross

1    this area, there is a case out of the district in Kansas where

2    the district court rejected the exact argument they are making

3    here.  The court said:  The defendant's argument that 1202(b)

4    is limited to CMI located within metadata, and recognizing that

5    CMI may include information regarding the author of the work

6    and the copyright notice displayed in connection with the

7    book's illustrations, and that's <u>Tomelleri v. Zazzle</u>, 2015 WL

8    8375083.  So there that court rejected the idea that the CMI

9    must be embedded in the metadata.

10            Now, let's talk about the facts.  Mr. Hayes knew that

11   the image was not obtained from Ms. Fisher.  We have to really

12   carefully consider the chronology of events here.

13            So he contacts Ms. Fisher.  I'd like you to comment on

14   the story.  He says I need the comment quickly because he wants

15   to get the story up, and then he says also can you share a

16   photograph of Mr. Parker.  She doesn't respond.  He goes to The

17   New York Post website.  He downloads it.  He then says he

18   speaks to Ms. Fisher on the telephone.

19            I think your Honor may agree that Ms. Fisher's

20   testimony was -- she is an officer of the court in good

21   standing and her testimony was credible.  Although she said she

22   didn't recall, she also said I can't imagine that I would

23   authorize Mr. Hayes to use a photograph in The New York Post.

24   I can't imagine any other lawyer who could imagine the same.

25            It would be one thing if Ms. Fisher provided him with

1    the actual photograph.  That would be a whole different fact

2    pattern.  We wouldn't be here now if that was.  But it's not

3    what happened here.  He didn't get what he was looking for for

4    free, so he shoplifted it from The New York Post.  Then based

5    on this theory of, oh, well I've gotten authority before from

6    lawyers, he then placed that Fisher & Taubenfeld gutter credit

7    there.  And what was that?  It was a false alibi.  That's what

8    that was.  It was a concealment.  He was concealing the fact or

9    he was conveying the false impression that he was authorized to

10   use the photograph when he knew quite well that he wasn't, that

11   he hadn't received authorization, that he hadn't received the

12   photograph from Ms. Fisher, and that factual chronology alone

13   establishes the requisite intent that we need to prove the 1202

14   claim.

15         He acted with the required intent by distributing the

16   false CMI to BuzzFeed's audience knowing that Mango's CMI had

17   been removed.  By the way, back to the Fisher v. Forest case,

18   which is Judge Engelmayer's decision, Judge Engelmayer did

19   recognize -- I'm sorry.  Murphy v. Millennium Radio, which is a

20   Third Circuit case, 650 F.3d 295.  It says:  The mere fact that

21   Murphy's name appeared in a printed gutter credit near the

22   image rather than as data in an automated copyright protection

23   or management system does not prevent it from qualifying as CMI

24   or remove it from the protection of 1202.

25         The key point that I was making about the Fisher case

1    is that it's not necessary that the plaintiff show that

2    Mr. Hayes removed the CMI.  It's only that he distributed the

3    BuzzFeed article knowing that Mr. Mango's attribution had been

4    removed.

5            So in sum, on the 1202 claim we have certainly

6    shown -- we have met each of the requisite elements -- we have

7    shown the gutter credit is CMI, does not have to be metadata.

8    We have shown that Mr. Hayes distributed the article knowing

9    that there was a CMI that had been removed.  Mr. Hayes did

10   testify that he was aware that Mango was the photographer of

11   the photograph.  And, three, that BuzzFeed had reasonable

12   grounds to know that removal would facilitate infringement.  In

13   other words, reasonable grounds to know, which comes right from

14   the statutory language, implies that there is a constructive

15   knowledge standard to be met.   Did Mr. Hayes have reasonable

16   grounds to know that this would facilitate infringement?

17           I'd like to reiterate the point that, in the

18   defendant's brief they say, oh, well, his belief was based on

19   this idea that he had received press kits from lawyers in the

20   past.  But when he appeared in court today, he didn't even know

21   what a press kit was and testified that he had never received a

22   press kit.

23           Now in terms of statutory damages on the 1202 claim,

24   we're seeking $5,000.  The statutory range is between 2,500 and

25   25,000.  We are a seeking five.  Our law firm has actually

18DAAMAN2                    Mango - Recross

1    obtained ten before on default, but because I represented to

2    Court back in December that we'd be seeking five, I felt like

3    out of consistency we would seek five.  Ultimately we're

4    seeking an award of $30,000 for Count One, $5,000 on Count Two

5    and, as the prevailing party in this litigation, at least on

6    Count One and hopefully on Count Two and given that we believe

7    we have met our evidentiary burden of showing willfulness, we

8    believe that we qualify, of course within the Court's

9    discretion, for our attorney fees and costs which will serve

10   the deterrent effect.  It's necessary to deter large-scale

11   corporations like BuzzFeed from infringing in the future.

12            Thank you, your Honor.

13            THE COURT:  All right.  Thank you.

14            All right.

15            MS. LACKMAN:  Judge, do I have the possibility of

16   addressing --

17            THE COURT:  No.  There is no rebuttal in this district

18   after trials.

19            I am going to give the parties a last chance of two

20   weeks to see if you could arrange a resolution on your own and

21   after that I will issue a ruling as soon as possible

22   thereafter.

23            Thank you.

24            (Adjourned)

25

18DAAMAN2                    Mango - Recross

1                         INDEX OF EXAMINATION

2     Examination of:                            Page

3     MICHAEL HAYES

4     Direct The Court . . . 4 STYLE1 DIRECT EXAMINATION

5     Cross By Ms. Lackman . . . . . . . . . . . . . .41

6     Redirect By Mr. Freeman . . . . . . . . . . .48

7     LIANE FISHER

8     Direct By Mr. Freeman . . . . . . . . . . . .54

9     Cross By Ms. Lackman . . . . . . . . . . . . .61

10    GREGORY BREHM

11    Direct By Mr. Freeman . . . . . . . . . . . .69

12    Cross By Ms. Lackman . . . . . . . . . . . . .81

13    Redirect Q. . . . . . . . . . . . . . . . . .83

14    Recross By Ms. Lackman . . . . . . . . . . . .92

15    MICHAEL HAYES

16    Redirect By Mr. Freeman . . . . . . . . . . . 107

17    Recross By Ms. Lackman . . . . . . . . . . . 109

18    GREGORY P. MANGO

19    Direct By Mr. Freeman . . . . . . . . . . . 122

20    Cross By Ms. Lackman . . . . . . . . . . . . 141

21    Redirect By Mr. Freeman . . . . . . . . . . . 178

22    Recross By Ms. Lackman . . . . . . . . . . . 179

23                    PLAINTIFF EXHIBITS

24    Exhibit No.                            Received

25     37   . . . . . . . . . . . . . . . . . . . .12

18DAAMAN2                          Mango – Recross

1    38    . . . . . . . . . . . . . . . . . . . .18

2    13    . . . . . . . . . . . . . . . . . . . .22

3    73    . . . . . . . . . . . . . . . . . . . .24

4    74    . . . . . . . . . . . . . . . . . . . .26

5    75    . . . . . . . . . . . . . . . . . . . .26

6    76    . . . . . . . . . . . . . . . . . . . .28

7    77    . . . . . . . . . . . . . . . . . . . .29

8    77    . . . . . . . . . . . . . . . . . . . .31

9    20    . . . . . . . . . . . . . . . . . . . .32

10   78    . . . . . . . . . . . . . . . . . . . .37

11   79    . . . . . . . . . . . . . . . . . . . .37

12   96    . . . . . . . . . . . . . . . . . . . .84

13   88    . . . . . . . . . . . . . . . . . . . 134

14   90    . . . . . . . . . . . . . . . . . . 138

15

16

17

18

19

20

21

22

23

24

25